FILED FOR RECORD
**Cause No.: D-16-05-0545-CV**
Ector County - 358th District Court
Ector County, Texas
5/27/2016 3:25:16 PM
**Clarissa Webster**
**District Clerk**
By: DiAnn Espinoza, Deputy

NO. _____

| | | |
|---|---|---|
| WILLIAM NEWBROUGH | § | IN THE COUNTY COURT |
| | § | |
| VS. | § | AT LAW NO ____ |
| | § | |
| ANCHOR RISK MANAGEMENT AND | § | |
| CENTRAL FREIGHT LINES, INC. | § | ECTOR COUNTY, TEXAS |

### PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES. PLAINTIFF, WILLIAM NEWBROUGH, complaining of ANCHOR

CLAIMS MANAGEMENT AND CENTRAL FREIGHT LINES, INC., DEFENDANTS, and for

cause of action would show:

I.

### *Claims for Relief*

Pursuant to Rule 47, Tex. R. Civ. P., this suit is within the jurisdictional limits of this

court, and Plaintiff seeks monetary relief between $100,000 and $200,000.

II.

### *Parties*

Plaintiff is a resident of Ector County, Texas.

Defendant, ANCHOR CLAIMS MANAGEMENT, is a domestic company doing

business in the State of Texas, and may be served with citation through its registered agent CT

CORPORATION SYSTEM at 1999 Bryan St., Suite 900, Dallas, Texas 75201.

Defendant CENTRAL FREIGHT LINES, INC. Is a Texas corporation and may be served

with citation through its registered agent NATIONAL CORPORATE RESEARCH, LTD at

1

EXHIBIT
D

1601 Elm St., Suite 4360, Dallas, Texas 75201.

III.

Plaintiffs intends to conduct discovery under level II of Rule 190 of the Texas Rules of Civil Procedure.

IV.

Venue is proper in Ector County, Texas as the majority of the events surrounding and giving rise to the incident made the basis of this suit occurred in Ector County.

V.

***Claims Against Central Freight Lines***

Plaintiff brings this suit to recover damages for personal injuries sustained by Plaintiff in an accident which occurred in Ector County, Texas, on or about June 18, 2015, which was proximately caused by the negligence of the Defendant CENTRAL FREIGHT LINES, INC.

Plaintiff, WILLIAM NEWBROUGH, while exercising due care for his own safety was in the course and scope of his employment with Defendant CENTRAL FREIGHT LINES, INC. when he was injured as a result of the negligence of Defendant CENTRAL FREIGHT LINES, INC.

Defendant CENTRAL FREIGHT LINES, INC. failed to provide a safe working environment and failed to provide safe equipment for Plaintiff's use, which proximately caused his injuries. At the time and on the occasion in question, Defendant CENTRAL FREIGHT LINES, INC.  was negligent of various acts and omissions, which negligence was the proximate cause of the occurrence in question. Defendant CENTRAL FREIGHT LINES, INC. failed to provide a working environment that was safe and free from hazard and failed to provide safe

2

equipment for the use of their employees.

As a result of the accident above described, Plaintiff suffered severe personal injuries, causing Plaintiff to incur reasonable and necessary medical expenses, physical pain and mental anguish, disfigurement, impairment, all in the past, and in reasonable probability, will continue to suffer same in the future by reason of the nature and severity of the Plaintiff's injuries, as a result of Defendant's negligence for which Plaintiff sues.

VI.

### *Claims against Anchor Risk Management*

Prior to this suit, Plaintiff made claims against SMOKER'S OUTLET, INC. for his injuries arising from the above described incident.

On May 13, 2016 the Plaintiff and Defendant, by and through their respective representatives, settled claims that NEWBROUGH had against Defendant SMOKER'S OUTLET, INC. arising from the incident described above wherein he was injured on June 18, 2015.

NEWBROUGH, who had never been apprised of any subrogation interest by any party, settled the claims against SMOKER'S OUTLET, INC. and at SMOKER'S OUTLET INC.'s request, NEWBROUGH indemnified SMOKER'S OUTLET INC. for any subrogation interests which may exist. This agreement was reached on May 13, 2016.

On May 20, 2016 NEWBROUGH executed and returned to SMOKER'S OUTLET INC. a written release of claims in exchange for $35,000.

On May 24, 2016 NEWBROUGH was made aware for the first time that ANCHOR RISK MANAGEMENT was asserting a subrogation interest. This date was after both the

3

agreement was made and the release was returned.

Defendant ANCHOR RISK MANAGEMENT interfered with the settlement agreement by, after the agreement had been made, improperly asserting a subrogation interest in the settlement agreement which it has waived by its course of conduct.

NEWBROUGH further sues ANCHOR RISK MANAGEMENT pursuant to the Texas Declaratory Judgments Act for a declaration that it has no subrogation interest in the settlement agreement between NEWBROUGH and SMOKER'S OUTLET, INC. Defendant ANCHOR RISK MANAGEMENT failed or refused to assert its interest, if any, prior to any settlement. As such any interest, if any, has been waived and for laches.

NEWBROUGH further sues for reasonable and customary attorney's fees pursuant to Chapter 37, Tex. Civ. Prac. & Rem. Code.

VII.

By reason of the above and foregoing, Plaintiff has been damaged in a sum within the minimum jurisdictional limits of this court in excess of $100,000 but less than $200,000.

VIII.

Pursuant to Rule 194, Plaintiff requests Defendants to disclose, within fifty (50) days of service of this request, the information or material described in Rule 194.2 (a)-(l).

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests that Defendants be cited to appear and answer herein and that upon a final trial of this cause, Plaintiff recover: judgment against Defendants for Plaintiff's damages as set forth above in an amount within the minimum jurisdictional limits of this court; prejudgment interests on Plaintiff's damages as allowed by law; interest on the judgment at the legal rate; costs of court; and such other and further relief to

which Plaintiff may be entitled.

Respectfully submitted,

LAW OFFICES OF MILLER & BICKLEIN
4555 E. University Ave., Suite D–5
Odessa, Texas 79762
(432) 362-4878
(432) 362-4624 (FAX)


By: _____ /s/ KEVIN B. MILLER _____
          KEVIN B. MILLER
          Kevin@mblaw.org
          STATE BAR NO. 14094500

          MARK A. CEVALLOS
          Mark@mblaw.org
          STATE BAR NO. 24038810

          ATTORNEYS FOR PLAINTIFF


PLAINTIFFS DEMANDS TRIAL BY JURY.

5

**FILED FOR RECORD**
**Cause No.: D-16-05-0545-CV**
Ector County - 358th District Court
Ector County, Texas
5/31/2016 3:33:08 PM
**Clarissa Webster**
**District Clerk**
By: Natalie Guthrie, Deputy

NO. D-16-05-0545-CV

| | | |
|---|---|---|
| WILLIAM NEWBROUGH | § | IN THE DISTRICT COURT |
| | § | |
| VS. | § | 358TH JUDICIAL DISTRICT |
| | § | |
| ANCHOR RISK MANAGEMENT AND | § | |
| CENTRAL FREIGHT LINES, INC. | § | ECTOR COUNTY, TEXAS |

## PLAINTIFF'S FIRST AMENDED PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES. PLAINTIFF, WILLIAM NEWBROUGH, complaining of ANCHOR

RISK MANAGEMENT AND CENTRAL FREIGHT LINES, INC., DEFENDANTS, and for

cause of action would show:

### I.

### *Claims for Relief*

Pursuant to Rule 47, Tex. R. Civ. P., this suit is within the jurisdictional limits of this

court, and Plaintiff seeks monetary relief between $100,000 and $200,000.

### II.

### *Parties*

Plaintiff is a resident of Ector County, Texas.

Defendant, ANCHOR RISK MANAGEMENT, is a domestic company doing business in

the State of Texas, and may be served with citation through its registered agent CT

CORPORATION SYSTEM at 1999 Bryan St., Suite 900, Dallas, Texas 75201.

Defendant CENTRAL FREIGHT LINES, INC. Is a Texas corporation and may be served

with citation through its registered agent NATIONAL CORPORATE RESEARCH, LTD at

1

1601 Elm St., Suite 4360, Dallas, Texas 75201.

III.

Plaintiffs intends to conduct discovery under level II of Rule 190 of the Texas Rules of Civil Procedure.

IV.

Venue is proper in Ector County, Texas as the majority of the events surrounding and giving rise to the incident made the basis of this suit occurred in Ector County.

V.

***Claims Against Central Freight Lines***

Plaintiff brings this suit to recover damages for personal injuries sustained by Plaintiff in an accident which occurred in Ector County, Texas, on or about June 18, 2015, which was proximately caused by the negligence of the Defendant CENTRAL FREIGHT LINES, INC.

Plaintiff, WILLIAM NEWBROUGH, while exercising due care for his own safety was in the course and scope of his employment with Defendant CENTRAL FREIGHT LINES, INC. when he was injured as a result of the negligence of Defendant CENTRAL FREIGHT LINES, INC.

Defendant CENTRAL FREIGHT LINES, INC. failed to provide a safe working environment and failed to provide safe equipment for Plaintiff's use, which proximately caused his injuries. At the time and on the occasion in question, Defendant CENTRAL FREIGHT LINES, INC. was negligent of various acts and omissions, which negligence was the proximate cause of the occurrence in question. Defendant CENTRAL FREIGHT LINES, INC. failed to provide a working environment that was safe and free from hazard and failed to provide safe

2

equipment for the use of their employees.

As a result of the accident above described, Plaintiff suffered severe personal injuries, causing Plaintiff to incur reasonable and necessary medical expenses, physical pain and mental anguish, disfigurement, impairment, all in the past, and in reasonable probability, will continue to suffer same in the future by reason of the nature and severity of the Plaintiff's injuries, as a result of Defendant's negligence for which Plaintiff sues.

VI.

*Claims against Anchor Risk Management*

Prior to this suit, Plaintiff made claims against SMOKER'S OUTLET, INC. for his injuries arising from the above described incident.

On May 13, 2016 the Plaintiff and Defendant, by and through their respective representatives, settled claims that NEWBROUGH had against Defendant SMOKER'S OUTLET, INC. arising from the incident described above wherein he was injured on June 18, 2015.

NEWBROUGH, who had never been apprised of any subrogation interest by any party, settled the claims against SMOKER'S OUTLET, INC. and at SMOKER'S OUTLET INC.'s request, NEWBROUGH indemnified SMOKER'S OUTLET INC. for any subrogation interests which may exist. This agreement was reached on May 13, 2016.

On May 20, 2016 NEWBROUGH executed and returned to SMOKER'S OUTLET INC. a written release of claims in exchange for $35,000.

On May 24, 2016 NEWBROUGH was made aware for the first time that ANCHOR RISK MANAGEMENT was asserting a subrogation interest. This date was after both the

3

agreement was made and the release was returned.

Defendant ANCHOR RISK MANAGEMENT interfered with the settlement agreement by, after the agreement had been made, improperly asserting a subrogation interest in the settlement agreement which it has waived by its course of conduct.

NEWBROUGH further sues ANCHOR RISK MANAGEMENT pursuant to the Texas Declaratory Judgments Act for a declaration that it has no subrogation interest in the settlement agreement between NEWBROUGH and SMOKER'S OUTLET, INC. Defendant ANCHOR RISK MANAGEMENT failed or refused to assert its interest, if any, prior to any settlement. As such any interest, if any, has been waived and for laches.

NEWBROUGH further sues for reasonable and customary attorney's fees pursuant to Chapter 37, Tex. Civ. Prac. & Rem. Code.

VII.

By reason of the above and foregoing, Plaintiff has been damaged in a sum within the minimum jurisdictional limits of this court in excess of $100,000 but less than $200,000.

VIII.

Pursuant to Rule 194, Plaintiff requests Defendants to disclose, within fifty (50) days of service of this request, the information or material described in Rule 194.2 (a)-(l).

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests that Defendants be cited to appear and answer herein and that upon a final trial of this cause, Plaintiff recover: judgment against Defendants for Plaintiff's damages as set forth above in an amount within the minimum jurisdictional limits of this court; prejudgment interests on Plaintiff's damages as allowed by law; interest on the judgment at the legal rate; costs of court; and such other and further relief to

4

which Plaintiff may be entitled.

Respectfully submitted,

LAW OFFICES OF MILLER & BICKLEIN
4555 E. University Ave., Suite D–5
Odessa, Texas 79762
(432) 362-4878
(432) 362-4624 (FAX)


By: _____ /s/ KEVIN B. MILLER _____
          KEVIN B. MILLER
          Kevin@mblaw.org
          STATE BAR NO. 14094500

          MARK A. CEVALLOS
          Mark@mblaw.org
          STATE BAR NO. 24038810

          ATTORNEYS FOR PLAINTIFF


PLAINTIFFS DEMANDS TRIAL BY JURY.

5

3

## THE STATE OF TEXAS

### CITATION BY CERTIFIED MAIL

WILLIAM NEWBROUGH VS. ANCHOR RISK
MANAGEMENT, CENTRAL FREIGHT LINES, INC.

CAUSE NO. D-16-05-0545-CV
IN THE 358TH DISTRICT COURT
OF
ECTOR COUNTY, TEXAS

TO:  ANCHOR RISK MANAGEMENT, BY SERVING ITS
     REGISTERD AGENT, CT CORPORATION SYSTEM,
     DEFENDANT - GREETINGS

NOTICE TO DEFENDANT: "You have been sued. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 am on the Monday next following the expiration of 20 days after the date you were served this citation and petition, a default judgment may be taken against you."

You are hereby commanded to appear by filing a written answer to the Plaintiff's First Amended Petition at or before 10:00 o'clock a.m. on the Monday next after the expiration of 20 days after the date of service of this citation before the Honorable W. Stacy Trotter of Ector County, Texas at the Courthouse in said County in Odessa, Texas.

Said Plaintiff's First Amended Petition was filed in said court on 05/31/2016 in the above entitled cause.

The nature of Plaintiff's demand is fully shown by a true and correct copy of Plaintiff's First Amended Petition accompanying this citation and made a part hereof.

Issued and given under my hand and seal of said Court at Odessa Texas on this the 1st day of June, 2016.

Attorney for Plaintiff:
KEVIN B MILLER
4555 E UNIVERSITY STE D-5
Odessa TX  79762



CLARISSA WEBSTER, CLERK
358th District Court
ECTOR COUNTY, TEXAS

Signed: 6/1/2016 4:06:34 PM

BY: *Brandie Lara*
Brandie Lara, Deputy

NOTICE:   This constitutes service by certified mail, as allowed by RULE
          106(a)(2) of the TEXAS RULE OF CIVIL PROCEDURE.

[CLERK'S FILE COPY]

ATTACH RETURN RECEIPTS WITH

*ADDRESSEE'S SIGNATURE*

RULE 106(A)(2) THE CITATION SHALL
BE SERVED BY MAILING TO THE
DEFENDANT BY ____ CERTIFIED MAIL
____RETURN RECEIPT REQUESTED, A
TRUE COPY OF THE CITATION.
SEC.17.027 RULE OF CIVIL PRACTICE
AND REMEDIES CODE IF NOT PREPARED
BY CLERK OF COURT.

Sent to:
ANCHOR RISK MANAGEMENT
REGISTERED AGENT, CT CORPORATION
SYSTEM
1999 BRYAN ST SUITE 900
DALLAS TX 75201

_____
_____, Deputy Clerk

300 North Grant Ave., Rm. 301

Odessa, TX 79761

*CERTIFICATE OF DELIVERY BY MAIL*

I hereby certify that on the _____day
of

_____, 20____

At _____ o'clock _____m., was
delivered to

_____.
Defendant(s) by registered mail or
certified mail, with delivery restricted to
addressee only, return receipt requested, a
true copy of this citation with a copy of
the petition attached thereto.

[CLERK'S FILE COPY]

USPS.com® - USPS Tracking®

English   Customer Service   USPS Mobile

Register / Sign In

◆USPS.COM®

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

Postage $ 1.15
Certified Fee 3.30
Return Receipt Fee (Endorsement Required) 2.70
Restricted Delivery Fee (Endorsement Required) 0
Total Postage & Fees $ 7.15

Sent To (D-16-05-0545-CV) Anchor Risk Management
Street, Apt. No; or PO Box No. Registered Agent, CT Corporation System
City, State, ZIP+4 1999 Bryan St Suite 900
Dallas TX 75201

7014 0150 0001 8444 0162

# USPS Tracking®

Tracking Number: 70140150000184440162

## Product & Tracking Information

Postal Product:    Features:
                   Certified Mail™

| DATE & TIME | STATUS OF ITEM | LOCATION |
|---|---|---|
| June 6, 2016 , 8:46 am | Delivered | DALLAS, TX 75201 |

Your item was delivered at 8:46 am on June 6, 2016 in DALLAS, TX 75201.

| June 4, 2016 , 9:44 am | Business Closed | DALLAS, TX 75201 |
| June 4, 2016 , 4:58 am | Departed USPS Facility | DALLAS, TX 75260 |
| June 3, 2016 , 2:08 pm | Arrived at USPS Facility | DALLAS, TX 75260 |
| June 3, 2016 , 12:42 am | Departed USPS Facility | MIDLAND, TX 79711 |
| June 2, 2016 , 9:54 pm | Arrived at USPS Facility | MIDLAND, TX 79711 |

## Track Another Package

Tracking (or receipt) number

Track It

## Manage Incoming Packages

Track all your packages from a dashboard.
No tracking numbers necessary.

Sign up for My USPS ›

LEGAL INFORMATION
Privacy Policy
Terms of Use
FOIA
No FEAR Act EEO Data

**SENDER: COMPLETE THIS SECTION**
- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:
DISTRICT CLERK
ECTOR COUNTY, TEXAS
(D-16-05-0545-CV)
Anchor Risk Management
Registered Agent, CT Corporation System
1999 Bryan St Suite 900
Dallas TX 75201

**COMPLETE THIS SECTION ON DELIVERY**
A. Signature
X _____ ☐ Agent ☐ Addressee
B. Received by (Printed Name) Chris Wells   C. Date of Delivery JUN 06
D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

3. Service Type
☑ Certified Mail  ☐ Priority Mail Express™
☐ Registered  ☑ Return Receipt for Merchandise
☐ Insured Mail  ☐ Collect on Delivery
4. Restricted Delivery? (Extra Fee)  ☐ Yes

2. Article Number
(Transfer from service label)   7014 0150 0001 8444 0162

000184440162   6/13/2016

Appendix 24

3

## THE STATE OF TEXAS

### CITATION BY CERTIFIED MAIL

CAUSE NO. D-16-05-0545-CV

WILLIAM NEWBROUGH VS. ANCHOR RISK
MANAGEMENT, CENTRAL FREIGHT LINES, INC.

IN THE 358TH DISTRICT COURT
OF
ECTOR COUNTY, TEXAS

TO:   CENTRAL FREIGHT LINES, INC., BY SERVING ITS
REGISTERED AGENT, NATIONAL CORPORATE
RESEARCH, LTD, DEFENDANT - GREETINGS

NOTICE TO DEFENDANT: "You have been sued. You may employ an attorney. If you or your attorney do not
file a written answer with the clerk who issued this citation by 10:00 am on the Monday next following the
expiration of 20 days after the date you were served this citation and petition, a default judgment may be taken
against you."

You are hereby commanded to appear by filing a written answer to the Plaintiff's First Amended Petition at or
before 10:00 o'clock a.m. on the Monday next after the expiration of 20 days after the date of service of this
citation before the Honorable W. Stacy Trotter of Ector County, Texas at the Courthouse in said County in
Odessa, Texas.

Said Plaintiff's First Amended Petition was filed in said court on 05/31/2016 in the above entitled cause.

The nature of Plaintiff's demand is fully shown by a true and correct copy of Plaintiff's First Amended Petition
accompanying this citation and made a part hereof.

Issued and given under my hand and seal of said Court at Odessa Texas on this the 1st day of June, 2016.

Attorney for Plaintiff:
KEVIN B MILLER
4555 E UNIVERSITY STE D-5
Odessa TX 79762



CLARISSA WEBSTER, CLERK
358th District Court
ECTOR COUNTY, TEXAS

Signed: 6/1/2016 4:10:44 PM

BY: *Brandie Lara*

Brandie Lara, Deputy

NOTICE:      This constitutes service by certified mail, as allowed by RULE
106(a)(2) of the TEXAS RULE OF CIVIL PROCEDURE.

[CLERK'S FILE COPY]

ATTACH RETURN RECEIPTS WITH

*ADDRESSEE'S SIGNATURE*

    RULE 106(A)(2) THE CITATION SHALL
    BE SERVED BY MAILING TO THE
    DEFENDANT BY ___ CERTIFIED MAIL
    ___RETURN RECEIPT REQUESTED, A
    TRUE COPY OF THE CITATION.
  SEC.17.027 RULE OF CIVIL PRACTICE
AND REMEDIES CODE IF NOT PREPARED
    BY CLERK OF COURT.

*CERTIFICATE OF DELIVERY BY MAIL*

I hereby certify that on the _____day
of

_____, 20___

At _____ o'clock _____m., was
delivered to

_____.

Defendant(s) by registered mail or
certified mail, with delivery restricted to
addressee only, return receipt requested, a
true copy of this citation with a copy of
the petition attached thereto.

Sent to:
CENTRAL FREIGHT LINES, INC.
REGISTERED AGENT, NATIONAL
CORPORATE RESEARCH LTD
1601 ELM ST SUITE 4360
DALLAS TX 75201

_____
_____, Deputy Clerk

300 North Grant Ave., Rm. 301
Odessa, TX 79761

[CLERK'S FILE COPY]

USPS.com® ~ USPS Tracking®

English    Customer Service    USPS Mobile                          Register / Sign In

**≣USPS.COM**

## USPS Tracking®

Tracking Number: 70140150000184440179

### Product & Tracking Information

| Postal Product: | Features: |
| --- | --- |
| | Certified Mail™ |

| DATE & TIME | STATUS OF ITEM | LOCATION |
| --- | --- | --- |
| June 6, 2016 , 11:50 am | Delivered, Left with Individual | DALLAS, TX 75201 |

Your item was delivered to an individual at the address at 11:50 am on June 6, 2016 in DALLAS, TX 75201.

| June 4, 2016 , 4:58 am | Departed USPS Facility | DALLAS, TX 75260 |
| --- | --- | --- |
| June 3, 2016 , 2:08 pm | Arrived at USPS Facility | DALLAS, TX 75260 |
| June 3, 2016 , 12:42 am | Departed USPS Facility | MIDLAND, TX 79711 |
| June 2, 2016 , 9:54 pm | Arrived at USPS Facility | MIDLAND, TX 79711 |

### Track Another Package

Tracking (or receipt) number

Track It

### Manage Incoming Packages

Track all your packages from a dashboard.
No tracking numbers necessary.

Sign up for My USPS ›

LEGAL INFORMATION
Privacy Policy
Terms of Use
FOIA
No FEAR Act EEO Data

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

**OFFICIAL USE**

| Postage | $ | 1.15 |
| --- | --- | --- |
| Certified Fee | | 3.30 |
| Return Receipt Fee (Endorsement Required) | | 2.70 |
| Restricted Delivery Fee (Endorsement Required) | | 0 |
| Total Postage & Fees | $ | 7.15 |

ODESSA TX 79761-99
Postmark Here
JUN - 2 2016

(D-16-05-0545-CV)
Sent To Central Freight Lines, Inc.
Street, Apt No.; or PO Box No. A Registered Agent, National Corporate Research LTD
1601 Elm St Suite 4360
City, State, ZIP+4 Dallas TX 75201

PS Form 3800, August 2006                See Reverse for Instructions

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

(D-16-05-0545-CV)
Central Freight Lines, Inc.
Registered Agent, National Corporate Research LTD
1601 Elm St Suite 4360
Dallas TX 75201

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X Rodney Walker                    ☐ Agent
                                    ☐ Addressee
B. Received by (Printed Name)    C. Date of Delivery
Rodney Walker                      6-6-16
D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Certified Mail    ☐ Priority Mail Express™
☐ Registered        ☐ Return Receipt for Merchandise
☐ Insured Mail      ☐ Collect on Delivery
4. Restricted Delivery? (Extra Fee)        ☐ Yes

2. Article Number
(Transfer from service label)
7014 0150 0001 8444 0179

000184440179               6/13/2016

Appendix 27

FILED FOR RECORD
Cause No.: D-16-05-0545-CV
Ector County - 358th District Court
Ector County, Texas
6/17/2016 8:40:56 AM
Clarissa Webster
District Clerk
By: Krystal Estrada, Deputy

## CAUSE NO. D-16-05-0545-CV

| | | |
|---|---|---|
| WILLIAM NEWBROUGH | § | IN THE DISTRICT COURT |
| | § | |
| | § | |
| | § | |
| VS. | § | 358TH JUDICIAL DISTRICT |
| | § | |
| ANCHOR RISK MANAGEMENT | § | |
| AND CENTRAL FREIGHT LINES, | § | |
| INC. | § | ECTOR COUNTY, TEXAS |

## DEFENDANT CENTRAL FREIGHT LINES, INC.'S ORIGINAL ANSWER TO PLAINTIFF'S FIRST AMENDED PETITION

### TO THE HONORABLE JUDGE OF SAID COURT:

**COMES NOW**, Central Freight Lines, Inc., a Defendant in the above-styled and numbered cause, and files this, its Original Answer to Plaintiff's First Amended Petition, and would respectfully show the Court the following:

### I.

### <u>GENERAL DENIAL</u>

Defendant generally denies each and every, all and singular, the material allegations contained in the Plaintiff's First Amended Petition and, being allegations of fact, demands that the Plaintiff be required to prove such allegations by a preponderance of the evidence if the Plaintiff can so do.

### II.

Defendant requests Level III Discovery Plan.

DEFENDANT CENTRAL FREIGHT LINES, INC.'S ORIGINAL ANSWER TO
PLAINTIFF'S FIRST AMENDED PETITION                                                  PAGE 1

**WHEREFORE, PREMISES CONSIDERED,** Defendant prays that Plaintiff take nothing by this suit; and that Defendant goes hence without delay and recover all costs expended in Defendant's behalf. Praying further, Defendant prays for such other and further relief, either at law or in equity, to which Defendant may be justly entitled.

Respectfully submitted,

**CHAMBLEE, RYAN, KERSHAW & ANDERSON, P.C.**

By:   */s/William H. Chamblee*
      William H. Chamblee
      State Bar No. 04086100
      wchamblee@crka.law
      Shawn C. Morgan
      State Bar No. 24002650
      smorgan@crka.law

2777 Stemmons Freeway, Suite 1157
Dallas, Texas 75207
(214) 905-2003
(214) 905-1213 (Facsimile)
**ATTORNEY FOR DEFENDANT**
**Central Freight Lines, Inc.**

## CERTIFICATE OF SERVICE

I do hereby certify that on June 17, 2016 a true and correct copy of the above and foregoing document has been forwarded by court's e-filing service to Plaintiff's counsel of record, Kevin B. Miller, Law Offices of Miller & Bicklein, 4555 E. University Ave., Suite D-5, Odessa, Texas 79762, and to all other counsel by regular, first-class mail.

*/s/William H. Chamblee*
William H. Chamblee

**DEFENDANT CENTRAL FREIGHT LINES, INC. 'S ORIGINAL ANSWER TO**
**PLAINTIFF'S FIRST AMENDED PETITION**                                    **PAGE 2**

**FILED FOR RECORD**
**Cause No.: D-16-05-0545-CV**
Ector County - 358th District Court
Ector County, Texas
6/17/2016 8:43:08 AM
**Clarissa Webster**
**District Clerk**
By: Krystal Estrada, Deputy

## CAUSE NO. D-16-05-0545-CV

| | | |
|---|---|---|
| **WILLIAM NEWBROUGH** | § | **IN THE DISTRICT COURT** |
| | § | |
| | § | |
| | § | |
| **VS.** | § | **358TH JUDICIAL DISTRICT** |
| | § | |
| **ANCHOR RISK MANAGEMENT** | § | |
| **AND CENTRAL FREIGHT** | § | |
| **LINES, INC.** | § | **ECTOR COUNTY, TEXAS** |

## DEFENDANT CENTRAL FREIGHT LINES, INC.'S
## DEMAND FOR JURY TRIAL

**TO THE HONORABLE JUDGE OF SAID COURT:**

**COME NOW**, Central Freight Lines, Inc., Defendant herein, and in accordance with Rule 216 of the Texas Rules of Civil Procedure, demands a trial by jury. Simultaneously with the filing of this demand, a jury fee is being paid on behalf of Defendant.

Respectfully submitted,

**CHAMBLEE, RYAN, KERSHAW & ANDERSON, P.C.**

By:   */s/William H. Chamblee*
      William H. Chamblee
      State Bar No. 04086100
      wchamblee@crka.law
      Shawn C. Morgan
      State Bar No. 24002650
      smorgan@crka.law

2777 Stemmons Freeway, Suite 1157
Dallas, Texas 75207

DEFENDANT CENTRAL FREIGHT LINES, INC. 'S DEMAND FOR
JURY TRIAL.                                                    PAGE 1

(214) 905-2003
(214) 905-1213 (Facsimile)
**ATTORNEY FOR DEFENDANT**
**Central Freight Lines, Inc.**

## CERTIFICATE OF SERVICE

I do hereby certify that on June 17, 2016 a true and correct copy of the above and foregoing document has been forwarded by court's e-filing service to Plaintiff's counsel of record, Kevin B. Miller, Law Offices of Miller & Bicklein, 4555 E. University Ave., Suite D-5, Odessa, texas 79762, and to all other counsel by regular, first-class mail.

/s/William H. Chamblee
William H. Chamblee

DEFENDANT CENTRAL FREIGHT LINES, INC. 'S DEMAND FOR JURY TRIAL.

PAGE 2

Appendix 31

**FILED FOR RECORD**
**Cause No.: D-16-05-0545-CV**
Ector County - 358th District Court
Ector County, Texas
9/26/2016 2:09:09 PM
**Clarissa Webster**
**District Clerk**
By: Natalie Guthrie, Deputy

## CAUSE NO. D-16-05-0545-CV

| | | |
|---|---|---|
| **WILLIAM NEWBROUGH** | § | **IN THE DISTRICT COURT** |
| | § | |
| **v.** | § | **358TH JUDICIAL DISTRICT** |
| | § | |
| **ANCHOR RISK MANAGEMENT AND** | § | |
| **CENTRAL FREIGHT LINES, INC.** | § | **ECTOR COUNTY, TEXAS** |

### DEFENDANT ANCHOR RISK MANAGEMENT'S ORIGINAL ANSWER

Defendant Anchor Risk Management answers as follows to the petition filed by Plaintiff in the above-referenced action:

### GENERAL DENIAL

Defendant generally denies each and every allegation and demands strict proof thereon pursuant to Rule 92 of the Texas Rules of Civil Procedure.

Respectfully submitted,


_____/s/ Blake A. Bailey_____
BLAKE A. BAILEY
Texas State Bar No. 01514700
PHELPS DUNBAR LLP
Southlake Town Square
115 Grand Avenue, Suite 222
Southlake, Texas  76092-7629
(817) 305-0332
(817) 488-3214 (Fax)
blake.bailey@phelps.com
ATTORNEY FOR DEFENDANT
ANCHOR RISK MANAGEMENT

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing document was served via electronic service, on Plaintiff, on this 26th day of September, 2016.

_/s/ Blake A. Bailey_
Blake A. Bailey

FILED FOR RECORD
Cause No.: D-16-05-0545-CV
Ector County - 358th District Court
Ector County, Texas
3/20/2017 5:26:20 PM
Clarissa Webster
District Clerk
By: Margarita Salazar, Deputy

## CAUSE NO. D-16-05-0545-CV

| | | |
|---|---|---|
| WILLIAM NEWBROUGH | § § § § | IN THE DISTRICT COURT |
| VS. | § § | 358TH JUDICIAL DISTRICT |
| ANCHOR RISK MANAGEMENT AND CENTRAL FREIGHT LINES, INC. | § § § § | ECTOR COUNTY, TEXAS |

## DEFENDANT CENTRAL FREIGHT LINES, INC.'S FIRST AMENDED ANSWER
## TO PLAINTIFF'S FIRST AMENDED PETITION

**TO THE HONORABLE JUDGE OF SAID COURT:**

**COMES NOW**, Central Freight Lines, Inc., a Defendant in the above-styled and numbered cause, and files this, its First Amended Answer to Plaintiff's First Amended Petition, and would respectfully show the Court the following:

### GENERAL DENIAL

**1.**

Defendant generally denies each and every, all and singular, the material allegations contained in Plaintiff's First Amended Petition and, being allegations of fact, demands that Plaintiff be required to prove such allegations by a preponderance of the evidence if Plaintiff can so do.

Defendant Central Freight Lines, Inc.'s First Amended Answer – Page 1

## AFFIRMATIVE DEFENSES

### 2.

Defendant pleads that, to the extent Plaintiff seeks recovery for medical bills, expenses and services that were allegedly incurred by Plaintiff, but were never paid by Plaintiff, his private insurance, Medicare and/or Medicaid, then, to the extent they exceed the amount authorized by Medicare and/or Medicaid, paid by private insurance, or otherwise reduced or written off, these Defendant says that Plaintiff is not entitled to recover these amounts, nor plead these amounts to the jury as reasonable and necessary medical expenses. TEX. CIV. PRAC. & REM. CODE § 41.0105.

### 3.

Pleading further, Defendant states that Plaintiff is barred from seeking economic losses which exceed the net loss requirements prescribed by the Tex. Civ. Prac. & Rem. Code, Sec. 18.091.

### 4.

Defendant further asserts the pre-judgment limitations contained in Chapter 304 of the Finance Code, including 304.003, 304.007, 304.103, 304.104, and 304.1045.

### 5.

Defendant asserts its right to contribution from co-defendant pursuant

Defendant Central Freight Lines, Inc.'s First Amended Answer – Page 2

to Chapters 32 and 33 of the Texas Civil Practice and Remedies Code.

### 6.

Defendant asserts all rights, elections, and remedies allowed it pursuant to Chapters 32 and 33 of the Texas Civil Practice & Remedies Code, including contribution, indemnity, proportionate responsibility, and/or comparative responsibility, to the extent they are available to Defendant. In the event of a settlement between Plaintiff and any other Defendant, Defendant reserves its right to make an election consistent with Texas Civil Practice & Remedies Code § 33.012, 33.013, 33.015, 33.016, and 33.017.

### 7.

Defendant would show Plaintiff's claimed injury or damage, if any, was caused by Plaintiff or by the conduct, acts, or omissions of a third party or third parties, over whom this Defendant had no control or right of control. Defendant further contends that such negligent acts or omissions on behalf of Plaintiff and/or a third party were the sole proximate cause or, in the alternative, a proximate cause, of the alleged injuries and damages.

### 8.

Defendant pleads the affirmative defense of offset for all amounts received or to be received by Plaintiff from any settlement with any party including, specifically, Smoker's Outlet, Inc. Defendant would show that

Plaintiff has entered into a settlement agreement which he signed May 20, 2016, which provides for the payment of $35,000 to Plaintiff. Because this settlement arises out of the same facts, Defendant is entitled to the benefit of said agreement under Chapters 32 and 33 of the Texas Civil Practice & Remedies Code.

## 9.

Defendant asserts that Plaintiff received significant wage loss payments from Defendant. Defendant also paid claimant's medical bills for months after the incident in question. These payments were made in accordance with an ERISA-approved health plan (Employee Injury Benefit Plan). Defendant would also show that said Plan provides Defendant, as Plan Administrator, with the right of first recovery from any judgment, settlement or other payment Plaintiff may receive from a third party, regardless of whether Plaintiff has been "made whole." Accordingly, Defendant is entitled to first recovery and reimbursement from Plaintiff for any such amount received by or on behalf of Plaintiff.

## 10.

Defendant would show that Plaintiff was obligated by reason of his Employee Injury Benefit Plan ("the Plan") to provide Defendant with prior written notice of his involvement in any lawsuit, settlement discussion or

other proceeding, one of the principal purposes of which is recovering damages or other compensation in any way related to any injury for which Plaintiff has received benefits under the Plan. Defendant would also show that Plaintiff failed to provide such notice, and he nonetheless entered into a settlement agreement with, or on behalf of, Smoker's Outlet, Inc. and its insurance carrier without proper notification to Defendant.

### 11.

Defendant would further show, as Plan Administrator of the Plan, Defendant is entitled to a first right of recovery and reimbursement for all damages or other compensation to which Plaintiff may become entitled, or directly or indirectly receives, whether by litigation, settlement or other proceeding. Such right on behalf of Defendant is automatically required as to Plaintiff, who must reimburse the Plan out of any damages or compensation to the extent of the Plan benefits paid to, or with respect to, Plaintiff.

### 12.

Defendant affirmatively pleads every right or benefit existing under the Plan and to which it is entitled as Plan Administrator including, but not limited to, Paragraphs 9.3, 9.4, and 9.5.

**13.**

Defendant requests a Level III Discovery Plan.

**14.**

Defendant hereby demands a trial by jury.   The jury fee has previously been tendered to the Court.

**WHEREFORE, PREMISES CONSIDERED,** Defendant prays that Plaintiff take nothing by this suit; and that Defendant go hence without delay and recover all costs expended in Defendant's behalf.   Defendant prays for such other and further relief, either at law or in equity, to which Defendant may be justly entitled.

Respectfully submitted,

CHAMBLEE, RYAN, KERSHAW & ANDERSON, P.C.

By: _____

William H. Chamblee
State Bar No.: 04086100
wchamblee@crka.law
Douglas R. Lewis
State Bar No. 12275800
dlewis@crka.law

2777 N. Stemmons Freeway
Suite 1157
Dallas, Texas  75207
(214) 905-2003
(214) 905-1213 (Facsimile)
ATTORNEYS FOR DEFENDANT
CENTRAL FREIGHT LINES, INC.

## CERTIFICATE OF SERVICE

I do hereby certify that on March ____, 2017, a true and correct copy of the above and foregoing document has been served via the court's efiling system and certified mail, return receipt requested to Plaintiff's counsel of record and efiling and first class mail to all other counsel of record.

Douglas R. Lewis

**FILED FOR RECORD**
**Cause No.: D-16-05-0545-CV**
Ector County - 358th District Court
Ector County, Texas
3/21/2017 5:10:06 PM
**Clarissa Webster**
**District Clerk**
By: Natalie Guthrie, Deputy

CAUSE NO. D-16-05-0545-CV

| | | |
|---|---|---|
| WILLIAM NEWBROUGH | §<br>§<br>§ | IN THE DISTRICT COURT |
| VS. | §<br>§<br>§ | 358TH JUDICIAL DISTRICT |
| ANCHOR RISK MANAGEMENT AND<br>CENTRAL FREIGHT LINES, INC. | §<br>§<br>§ | ECTOR COUNTY, TEXAS |

## DEFENDANTS' JOINT MOTION FOR
## ENTRY OF LEVEL III SCHEDULING ORDER

**TO THE HONORABLE COURT:**

**COMES NOW** Central Freight Lines, Inc. and Anchor Risk Management, Defendants herein, and file their Joint Motion for Entry of Level III Scheduling Order. In support of same, the parties would respectfully show the Court as follows:

## I.

## PROCEDURAL BACKGROUND

This case original stems from an accident which allegedly occurred on June 18, 2015 at a third party's premises; namely, Smoker's Outlet, Inc. Thereafter, Plaintiff made a claim against Smoker's Outlet, Inc. and/or its insurance carrier, and a settlement was subsequently entered into by Plaintiff on May 20, 2016 in the amount of $35,000.

Upon receiving notice of said settlement, demand was made upon Plaintiff by or on behalf of his employer, Central Freight Lines, Inc., pursuant to the ERISA-approved Employee Injury Benefit Plan, for its first right of recovery/reimbursement for lost wage and medical benefits paid to or on behalf of Plaintiff due to his injury. Thereafter, Plaintiff filed this lawsuit for personal injury as to Central Freight Lines, Inc. Plaintiff also asserted various claims against Anchor Risk Management, including alleged

interference with Plaintiff's settlement agreement, attorneys' fees, and relief under the Texas Declaratory Judgments Act. Plaintiff seeks monetary relief between $100,000 and $200,000.

This case has not been set for trial. Written discovery only has taken place, and no depositions have yet been taken. Central's counsel has requested dates for Plaintiff's deposition but has not yet received a response.

Given the early stage of discovery, Defendants have jointly agreed to a Level III Scheduling Order with a trial date in February 2018, so as to have adequate time to complete discovery, mediation, and motion practice prior to trial. Defendants, therefore, file this Joint Motion for Entry of Level III Scheduling Order and request that this Court approve and enter the proposed Level III Scheduling Order attached as Exhibit "A" and enter a trial date according to the deadlines set forth in the attached order.

## II.

WHEREFORE, Defendants request that the Court enter an order that this lawsuit proceed pursuant to Rule 190.4(3) of the Texas Rules of Civil Procedure and that the Court enter their proposed Level III Scheduling Order submitted therewith. Defendants also request such other and further relief, at law or in equity, to which they may be justly entitled.

Respectfully submitted,

CHAMBLEE, RYAN, KERSHAW &
ANDERSON, P.C.

By: _____
          William H. Chamblee
          State Bar No.: 04086100
          wchamblee@crka.law
          Douglas R. Lewis
          State Bar No. 12275800
          dlewis@crka.law

          2777 N. Stemmons Freeway
          Suite 1157
          Dallas, Texas 75207
          (214) 905-2003
          (214) 905-1213 (Facsimile)

          ATTORNEYS FOR CENTRAL FREIGHT
          LINES, INC.

AGREED:

PHELPS DUNBAR LLP

By: _____
          Blake Bailey
          State Bar No. 01514700
          blake.bailey@phelps.com

          115 Grand Avenue, Suite 222
          Southlake, TX 76092
          (817) 305-0332
          (817) 488-3214 (Facsimile)

          ATTORNEYS FOR ANCHOR RISK
          MANAGEMENT

Defendants' Joint Motion for Entry of Level III Scheduling Order – Page 3

### CERTIFICATE OF CONFERENCE

Defense counsel, Douglas R. Lewis, had a telephone conversation with Mr. Kevin B. Miller, attorney for Plaintiff, on March 10, 2017, and discussed entry of a Level III Scheduling Order with a February, 2018 trial date. On March 13, the attached Level III Scheduling Order was forwarded to all counsel with request for signatures. Despite several follow-up telephone calls and emails, Mr. Miller has not returned his signature page for the scheduling order, nor has he responded to defense counsel's follow-up efforts. Accordingly, on information and belief, he is listed as opposed to this motion.

Douglas R. Lewis

### CERTIFICATE OF SERVICE

I do hereby certify that on March 1, 2017, a true and correct copy of the above and foregoing document has been forwarded via the Court's efiling system and via email to all counsel of record.

Douglas R. Lewis

# EXHIBIT A

CAUSE NO. D-16-05-0545-CV

| | | |
|---|---|---|
| WILLIAM NEWBROUGH | § | IN THE DISTRICT COURT |
| | § | |
| | § | |
| VS. | § | 358TH JUDICIAL DISTRICT |
| | § | |
| | § | |
| ANCHOR RISK MANAGEMENT | § | |
| AND CENTRAL FREIGHT LINES, | § | |
| INC. | § | ECTOR COUNTY, TEXAS |

## LEVEL III SCHEDULING ORDER

**TO THE HONORABLE JUDGE OF SAID COURT:**

In accordance with the Texas Rules of Civil Procedure, Defendants request entry of this scheduling order establishing deadlines to facilitate preparation of this matter for trial. Discovery in this case is controlled by Rule 190.4 (Level III) of the Texas Rules of Civil Procedure. In accordance therewith, the Court **ORDERS** as follows:

1.    **June 23, 2017:**  Deadline for joinder of any additional parties.

2.    **August 30, 2017:** On or before this date, Plaintiff shall serve all attorneys of record with his written designation and opinions of expert witnesses expected to testify at the trial of this cause in accordance with Tex. R. Civ. P. 194 and 195.  Plaintiff is required to provide written reports from retained experts.

Level III Scheduling Order – Page 1

3.   **October 2, 2017:** On or before this date, Defendants shall serve all attorneys of record with their written designation and opinions of expert witnesses expected to testify at the trial of this cause in accordance with Tex. R. Civ. P. 194 and 195.   Defendants are required to provide written reports from retained experts.

4.   **December 12, 2017:** The parties shall mediate the case on or before this date.

5.   **January 12, 2018:** All written discovery and depositions, including expert depositions, shall be completed and supplemented on or before this date.

6.   **January 15, 2018:** On or before this date, Plaintiff shall file with the Court and serve all attorneys of record any other amended and/or supplemental pleadings.

7.   **January 22, 2018:** On or before this date, Defendants shall file with the Court and serve all attorneys of record any other amended and/or supplemental pleadings.

8.   **January 7, 2018:** Except for leave of court, motions for summary judgment and any objection or motion to exclude or limit expert testimony due to qualification of the expert or reliability of the opinions must be filed on or before this date.

9.   **February 2, 2018:** On or before this date each party shall file with the Court its witness list, exhibit list, motion in limine, proposed jury charge, and designation of deposition testimony to be offered in direct examination.

10.   **February _____, 2018:** The case is set for jury trial on this date.

Level III Scheduling Order – Page 2

Unless otherwise covered by this Order, all other matters shall be governed according to the Texas Rules of Civil Procedure.  The provisions of this Order shall not be varied except upon agreement of the parties or upon subsequent Order by this Court.

   **SIGNED** on this _____ day of _____, 2017.

        _____

          **JUDGE PRESIDING**

Level III Scheduling Order – Page 3

FILED FOR RECORD
Cause No.: D-16-05-0545-CV
Ector County - 358th District Court
Ector County, Texas
3/22/2017 10:26:17 AM
Clarissa Webster
District Clerk
By: Natalie Guthrie, Deputy

## CAUSE NO. D-16-05-0545-CV

| | | |
|---|---|---|
| **WILLIAM NEWBROUGH** | § | **IN THE DISTRICT COURT** |
| | § | |
| **v.** | § | **358TH JUDICIAL DISTRICT** |
| | § | |
| **ANCHOR RISK MANAGEMENT AND** | § | |
| **CENTRAL FREIGHT LINES, INC.** | § | **ECTOR COUNTY, TEXAS** |

## DEFENDANT ANCHOR RISK MANAGEMENT'S
## MOTION FOR SUMMARY JUDGMENT

Defendant Anchor Risk Management ("Anchor") moves for summary judgment on Plaintiff's claim for declaratory judgment because the evidence establishes there is no justiciable controversy involving Anchor. Plaintiff seeks declaratory relief regarding Anchor's rights as an insurance carrier, but Anchor is not Plaintiff's insurer and therefore does not have a subrogation interest subject to a declaratory judgment. Furthermore, the undisputed evidence and admissions of Plaintiff establish as a matter of law that Anchor did not intentionally waive Central Freight Lines, Inc.'s ("Central Freight") subrogation interest in Plaintiff's medical costs. Accordingly, summary judgment should be granted dismissing Plaintiff's declaratory judgment action against Anchor.

### Introduction

Plaintiff seeks a declaratory judgment that Anchor waived its subrogation interest related to the money paid for Plaintiff's medical treatment. First, the relief sought is improper as Anchor is not an insurance carrier and therefore has no subrogation interest. Anchor is the third-party administrator for Central Freight's self-insured plan. As a third-party administrator, Anchor assists with administrating and handling the claims of Central Freight's employees, and it has no independent subrogation interest. Second, to the extent Plaintiff asserts that Anchor waived

Central Freight's subrogation interest, that claim also fails because under Texas law, waiver is an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right. Here, the pleadings and evidence establish that that there was no intentional waiver because Plaintiff tried to conceal his settlement with the alleged tortfeasor, and Anchor provided notice of Central Freight's subrogation interest as soon as it learned of Plaintiff's settlement discussions with the alleged tortfeasor. Thus, there can be no finding that Anchor intentionally relinquished any subrogation interest or acted in a manner inconsistent with claiming that right. Therefore, under each of these grounds, Anchor is entitled to summary judgment dismissing Plaintiff's declaratory judgment action against it.

### Summary Judgement Evidence

1. Pleadings on file with the Court;

2. **Exhibit A**: Affidavit of Debora Harvey;

3. **Exhibit B**: Affidavits Concerning Cost and Necessity of Medical or Other Services (with medical information redacted);

4. **Exhibit C**: Republic Group Release Agreement; and

5. **Exhibit D**: Letter from Anchor Risk Claims Management to Republic Group (with medical information redacted);

6. **Exhibit E**: Affidavit of Blake A. Bailey.

### Background Facts

6. Plaintiff William Newbrough ("Newbrough") was a driver for Defendant Central Freight Lines. (Plaintiff's First Amended Petition at p. 2). On or about June 18, 2015, while working for Central Freight, Newbrough was making a delivery to Smoker's Outlet, Inc. (*Id.* at 3). While on Smoker's Outlet's premises, Newbrough fell and sustained personal injuries. (*Id.*)

7.      Central Freight is a self-insured nonsubscriber to the Texas Workers' Compensation program, and Anchor serves as the third-party administrator for Central Freight's self-insured plan. (Affidavit of Debora Harvey, attached hereto as Exhibit A). As the third-party administrator, Anchor assists with administrating and handling the claims of Central Freight's injured employees. (Harvey Aff., ¶ 2). Anchor is not an insurance company, and Anchor is not Newbrough's insurer. (Harvey Aff., ¶ 2). All money paid on behalf of Newbrough for his medical treatment was paid by Central Freight. (Harvey Aff., ¶ 2).

8.      After his alleged injury, Newbrough received medical treatment. Newbrough or his healthcare provider submitted his proposed treatment to Anchor in its capacity as the third-party administrator for Central Freight's plan. (Harvey Aff., ¶ 3). Anchor then submitted the requested treatment to the appropriate department at Central Freight for approval. (Harvey Aff., ¶ 3).

9.      Without notifying Central Freight or Anchor, Newbrough hired the Law Offices of Miller & Bicklein to represent him in connection with the alleged personal injuries he received while making the delivery to Smoker's Outlet. (*See* Affidavits Concerning Cost and Necessity of Medical or Other Services, attached hereto as Exhibit B and hereinafter referred to as "Provider Affidavits"). According to the dates on the Provider Affidavits produced by Plaintiff, the Provider Affidavits were provided to the Law Offices of Miller & Bicklein as early as January 6, 2016. (*See* Provider Aff.). The information submitted with the Provider Affidavits clearly shows that Anchor, on behalf of Central Freight, was making payments to Newbrough's healthcare providers for his treatment. (*See* Provider Aff.). Newbrough and his attorney therefore had knowledge that these payments were being made from Central Freight's plan.

10.     In his Petition, Newbrough admits that "Plaintiff made claims against Smoker's Outlet, Inc. for his injuries . . . ." (Plaintiff's First Amended Petition at p. 3). Newbrough further admits that he and Smoker's Outlet settled his claims against Smoker's Outlet on May 13, 2016. (Plaintiff's First Amended Petition at p. 3). It was not until May 20, 2016, however, that Newbrough actually executed and returned the release of claims against Smoker's Outlet in exchange for payment of $35,000.00. (A true and correct copy of the Release is attached as Exhibit C). In negotiating and executing the settlement with Smoker's Outlet, Newbrough and his attorney were communicating with Republic Group, which is Smoker's Outlet's liability insurer. Newbrough executed the Release with Republic Group, on behalf of Smoker's Outlet, settling all claims Newbrough has against Smoker's Outlet. In the Release, Newbrough agreed to indemnify Smokers' Outlet and its insurer against all further claims, demands, costs, or expenses incurred by them. (Release at 2, Exhibit C).

11.     Newbrough attempted to negotiate a settlement with Smoker's Outlet in secret. Newbrough never notified Anchor that he was attempting to assert a claim or negotiate a settlement with Smoker's Outlet. (Harvey Aff., ¶ 6). Anchor and Central Freight first heard rumors that Newbrough hired an attorney on May 12, 2016 when the an adjuster for Anchor received an anonymous phone call notifying her that Newbrough had retained an attorney, and that Newbourgh's attorney said he planned to not disclose his representation to Central Freight or Anchor at that time. (Harvey Aff., ¶ 4). The next day, Anchor received a telephone call from the adjuster for Republic Group, the insurer of Smoker's Outlet. (Harvey Aff., ¶ 5). The adjuster for Republic Group requested that Anchor send a subrogation letter with a detailed check register. (Harvey Aff., ¶ 5). Anchor sent Republic Group the subrogation letter that same day, May 13, 2016, stating that Central Freight had paid $52,881.79 for treatment related to the injuries that

Newbrough allegedly sustained. (Harvey Aff., ¶ 5; Ex. D).  The adjuster for Republic Group (Smoker's Outlet) did not disclose a settlement was about to be signed. Neither Newbrough nor his attorney ever contacted or notified Anchor regarding the settlement with Smoker's Outlet. (Harvey Aff., ¶ 6).

12.     Newbrough filed this lawsuit requesting declaratory judgment that Anchor waived its right to subrogation. (Plaintiff's First Amended Petition at 3-4).  Newbrough claims that he "was made aware for the first time that [Anchor] was asserting a subrogation interest" on May 24, 2016. (*Id.* at 3). Newbrough further claims that Anchor interfered with the settlement agreement between Smoker's Outlet and Newbrough. (*Id.* at. 4).  In the end, Newbrough alleges that Anchor waived any subrogation interest because it "failed or refused to assert its interest" in a settlement that it knew nothing about and which Newbrough tried to conceal from both Anchor and Central Freight, while at the same time admitting that Newbrough was aware of the subrogation claim by May 24, 2016.

### Standards for Traditional Summary Judgment

13.     The purpose of summary judgment is to eliminate patently unmeritorious claims and untenable defenses. *Gulbenkian v. Penn*, 252 S.W.2d 929, 931 (Tex. 1952). According to Texas Rule of Civil Procedure 166a(c), a traditional summary judgment motion must be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the issues expressly set out in the motion.

### Arguments & Authorities

#### A.  There is no justiciable controversy to support a declaratory judgment action.

14.     A declaratory judgment action is only appropriate when there is a justiciable controversy about the rights or status of the parties and the declaration would resolve the controversy. *Bohham State Bank v. Beadle*, 907 S.W.2d 465, 467 (Tex. 1995). Here, there is no

justiciable controversy as Anchor is not Plaintiff's insurer, has not asserted a subrogation right on its behalf, and there is no contract between Anchor and Newbrough subject to construction. Tex. Civ. P. & Rem. Code § 37.004.

      15.    Anchor is not an insurance company, and Anchor is not Newbrough's insurer. (Harvey Aff., ¶ 2). Anchor serves as the third-party administrator for Central Freight's self-insured plan. (Harvey Aff, ¶ 2).  As third-party administrator for Central Freight's self-insured plan, Anchor assists with administrating and handling the claims of Central Freight's employees. (Harvey Aff., ¶ 2). All money paid on behalf of Newbrough for his medical treatment was paid by Central Freight. (Harvey Aff., ¶ 2). The Central Freight Plan is between Central Freight and Newbrough.  To the extent there is a subrogation interest, it is Central Freight's interest to assert, not Anchor's. Therefore, Anchor does not hold the subrogation interest that Newbrough argues Anchor waived and has not asserted that it has such an interest. Because Anchor is not Newbrough's insurer and because it has no subrogation interest in Newbrough's settlement, Newbrough cannot properly assert or prevail on a declaratory judgment action against Anchor, and summary judgment should be entered denying Newbrough's declaratory judgment action.

**B. Anchor did not waive any subrogation rights.**

      16.    To the extent that Plaintiff asserts Anchor has the ability to waive Central Freight's subrogation interest, summary judgment is still required because Anchor is not a proper or necessary party to such an issue and the undisputed facts disprove such a claim.

      17.    As stated above, Anchor is not Plaintiff's insurer and no case or controversy exists involving it.  Even if Plaintiff asserts that an act or failure to act by Anchor waived rights of Central, Anchor would be a witness, but is not a proper party as no relief is sought against it.

      18.    Furthermore, the undisputed facts established that Anchor did not waive Central's subrogation rights.  Under Texas law, "[w]aiver is an intentional relinquishment of a known right

or intentional conduct inconsistent with claiming that right." *Moayedi v. Interstate 35/Chisam Road, L.P.*, 438 S.W.3d 1, 6 (Tex. 2014); *Sun Expl. & Prod. Co. v. Benton*, 728 S.W.2d 35, 37 (Tex.1987). Determining whether there has been a waiver depends on the circumstances of the case. *Moayedi*, 438 S.W.3d at 6. Waiver is a matter of intent as there can be no waiver unless so intended by one party and so understood by the other. *Id.* at 6-7.

19.     Evidence of waiver generally takes one of three forms: (1) express renunciation of a known right; (2) silence or inaction, coupled with knowledge of the known right, for such an unreasonable period of time as to indicate an intention to waive the right; or (3) other conduct of the party knowingly possessing the right of such a nature as to mislead the opposite party into an honest belief that the waiver was intended or assented to. *Brannan Paving GP, LLC v. Pavement Markings, Inc.*, 446 S.W.3d 14, 20 (Tex. App.—Corpus Christi 2013, pet. denied); *Alford, Meroney & Co. v. Rowe*, 619 S.W.2d 210, 213 (Tex. Civ. App.—Amarillo 1981, writ ref'd n.r.e.). Waiver is ordinarily a question of fact, but when the surrounding facts and circumstances are undisputed, the question becomes one of law. *Jernigan v. Langley*, 111 S.W.3d 153, 156-57 (Tex. 2003); *Tenneco Inc. v. Enter. Prod. Co.*, 925 S.W.2d 640, 643 (Tex. 1996).

i.      **Anchor did not expressly renounce any subrogation interest.**

20.     Here, Anchor never renounced Central Freight's subrogation interest with regard to Newbrough's medical costs. Newbrough communicated with both Central Freight and Anchor during his treatment, and he knew Central Freight was paying his medical bills related to his injury. Furthermore, Newbrough's attorney, the Law Offices of Miller & Bicklein, received billing records at least by January 6, 2016 showing that Anchor had issued payment for Newbrough's medical bills. It is undisputed that Anchor communicated it was paying

Newbrough's medical bills and that Anchor never made any representation to any party that it had renounced any subrogation interest.

21.    Despite knowing that Central Freight had a subrogation interest in any recovery Newbrough received, neither Newbrough nor his attorney ever notified Anchor of their intent to pursue or settle a claim directly against Smoker's Outlet. For Anchor to have waived Central Freight's subrogation right, Anchor must have intended to do so. Anchor's actions show **no** intent to waive any subrogation rights, and Anchor never told Newbrough that it was waiving any subrogation rights. To the contrary, as soon as Anchor learned that Newbrough hired an attorney to pursue a claim against Smoker's Outlet, not from the insured or his counsel, but through an anonymous phone call, Anchor sent a subrogation letter asserting Central Freight's subrogation interest. While Newbrough was proceeding with settlement negotiations with Smoker's Outlet, he, not Anchor, was in the best position to notify all interested parties, and indeed had a duty to do so. In violation of his duty, he chose instead to conceal his pursuit of the settlement.

22.    Newbrough makes a blanket allegation in his Petition that Anchor improperly asserted its subrogation interest, but does not point to a single action by Anchor that even suggests that Anchor renounced its subrogation interest. Newbrough's admission in his pleadings that Anchor asserted subrogation rights defeats any claim that Anchor intentionally waived such rights.

### ii.    None of Anchor's actions indicate an intention to waive subrogation rights.

23.    The pleading and affidavits also establish that Anchor acted promptly in preserving Central Freight's subrogation interest. There is no allegation Anchor intended or acted in any manner that would suggest it intended to waive Central Freight's subrogation rights.

- 8 -

To the contrary, the pleadings establish that Anchor acted promptly in preserving the subrogation interest. "Waiver is largely a matter of intent, and for implied waiver to be found through a party's actions, intent must be clearly demonstrated by the surrounding facts and circumstances." *Jernigan*, 111 S.W.3d at 156 (citing *Motor Vehicle Bd. v. El Paso Indep. Auto. Dealers Ass'n, Inc.*, 1 S.W.3d 108, 111 (Tex. 1999)).

24.     Newbrough alleges that Anchor "interfered with the settlement agreement by, after the agreement had been made, improperly asserting a subrogation interest in the settlement agreement which it has waived by its own course of conduct." (Plaintiff's Amended Petition at 4). However, Newbrough points to no facts or circumstances that even tend to show, much less "clearly demonstrate," that Anchor intended to waive its subrogation rights.  The undisputed facts establish just the opposite.

25.     On May 13, 2016, the very same day that the adjuster for Republic Group informed Anchor that Newbrough was pursuing a claim, Anchor sent its subrogation letter.  It was not until May 20, 2016 that Newbrough actually executed the release with Republic Group settling his claims against Smoker's Outlet. At any time between May 13 and May 20, 2016, Newbrough could have asked Republic Group, Anchor, or Central Freight about any subrogation interest, and Newbrough would have been provided confirmation of information that he already knew—Central Freight, being self-insured, had a subrogation interest in Newbrough's potential claim or settlement with Smoker's Outlet. Instead, Newbrough attempted to conceal his settlement negotiations with Smoker's Outlet and to avoid exercising any diligence in determining what subrogation interests existed.

26.     In his petition, Plaintiff admits he actually knew Anchor was asserting rights of subrogation by May 24, 2016.  Construing all allegations in favor of Plaintiff, Anchor asserted

the subrogation rights four days after the settlement was signed, eleven days after being told by a third party that Newbrough hired his own counsel, and before Newbrough disclosed he was secretly pursuing his own claim. It is undisputed that Anchor acted decisively to protect any subrogation interest once it learned that Newbrough was attempting to settle a claim with Smoker's Outlet. The facts asserted by Plaintiff cannot support a finding of silence or inaction, coupled with knowledge, for an unreasonable period of time to constitute a waiver.

        **iii.**    **Anchor did nothing to mislead Newbrough to believe that Anchor intended to waive any subrogation interest.**

27.    "There can be no waiver of a right if the person sought to be charged with waiver says or does nothing inconsistent with an intent to rely upon such right." *Jernigan,* 111 S.W.3d at 156 (citing *Maryland Cas. Co. v. Palestine Fashions, Inc.,* 402 S.W.2d 883, 888 (Tex. 1966)). Newbrough admits in his Petition that Anchor did assert subrogation rights and never asserts that Anchor or Central sat on their rights for an unreasonable time. The affidavit of Anchor's adjuster establishes that Anchor sent a subrogation letter within one day of when it was told anonymously that Newbrough had hired counsel. It is impossible as a matter of law to establish that asserting sending the subrogation letter within one day is conduct that would mislead the Plaintiff into a belief that a waiver was intended. *Brannan Paving,* 446 S.W.3d at 20.

28.    In his Petition, Newbrough alleges that Anchor interfered with the settlement agreement. Newbrough further alleges that Anchor improperly asserted its subrogation interest, which was waived by its "course of conduct." (Plaintiff's Amended Petition at 4). These allegations establish that Anchor did not mislead Plaintiff into thinking it intended to waive any subrogation rights. To the contrary, it establishes that Anchor affirmatively did assert these rights and Newbrough does not point to a single action by Anchor that would suggest it intended to waive the subrogation rights. The undisputed facts show that Newbrough attempted to settle

PD.20562514.1

the claim in secret and avoid any subrogation claim, but that such plan was foiled by Anchor's timely action asserting the subrogation.  Such action is not a waiver.

**Request for Attorneys' Fees**

29.    Anchor seeks equitable and just attorneys' fees pursuant to Texas Civil Practice & Remedies Code § 37.009.   An award of attorneys' fees under the Uniform Declaratory Judgments Act is not limited to the plaintiff or the party seeking declaratory relief. *Bollner v. Plastics Solutions of Tex., Inc.*, 270 S.W.3d 157, 172 (Tex. App.—El Paso 2008, no pet.). Where a claimant brings an unsuccessful declaratory judgment action, the court may award the prevailing party "costs and reasonable and necessary attorney's fees as are equitable and just." *See Id.* (citing Tex. Civ. Prac. & Rem. Code § 37.009).  Anchor seeks recovery of its reasonable and necessary fees established by the affidavit of its counsel attached hereto as Exhibit E, plus such additional fees and costs incurred for any additional briefing and hearing on this motion.

**Prayer**

Defendant Anchor Risk Management requests that the Court grant summary judgment denying Plaintiff's declaratory judgment action. Plaintiff concealed his settlement negotiations with the tortfeasor. Anchor acted with diligence and never waived any subrogation interest in Plaintiff's costs for medical treatment. Therefore, Plaintiff's declaratory judgment action against Anchor fails as a matter of law and should be dismissed with prejudice, and Anchor, as the prevailing party, should be awarded its costs, including attorneys' fees, in this action.

Respectfully submitted,


_/s/ Blake A. Bailey_____
BLAKE A. BAILEY
Texas State Bar No. 01514700
BRAD R. TIMMS
Texas State Bar No. 24088535
PHELPS DUNBAR LLP
Southlake Town Square
115 Grand Avenue, Suite 222
Southlake, Texas 76092-7629
(817) 305-0332
(817) 488-3214 (Fax)
blake.bailey@phelps.com
brad.timms@phelps

ATTORNEYS FOR DEFENDANT
ANCHOR RISK MANAGEMENT


## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing document was served via electronic service, on Plaintiff, on this 22nd day of March, 2017.


_/s/ Blake A. Bailey_____
Blake A. Bailey

# Exhibit A

CAUSE NO. D-16-05-0545-CV

| | | |
|---|---|---|
| WILLIAM NEWBROUGH | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | 358TH JUDICIAL DISTRICT |
| | § | |
| ANCHOR RISK MANAGEMENT AND | § | |
| CENTRAL FREIGHT LINES, INC. | § | ECTOR COUNTY, TEXAS |

### AFFIDAVIT

STATE OF TEXAS      §
                           §
COUNTY OF Dallas     §

BEFORE ME, the undersigned authority, personally appeared Debora Harvey, who after being sworn, did depose and state as follows:

"My name is Debora Harvey. I am fully competent to make this affidavit. The statements made herein are true and are based on my personal knowledge gained in my employment and personal involvement in this matter.

1.    I am a Senior Claims Adjuster for Anchor Risk and Claims Management ("Anchor") and am familiar William Newbrough's ("Newbrough") claim for benefits under Central Freight Lines, Inc.'s ("Central Freight") Occupational Injury Benefit Plan. I was assigned by Anchor to manage Newbrough's claim for personal injuries relating to an accident that occurred on or about June 23, 2015 while he was making a delivery for Central Freight Lines at Smoker's Outlet.

2.    Central Freight is a self-insured nonsubscriber to the Texas Workers' Compensation program, and Anchor serves as the third-party administrator for Central Freight's self-insured Occupational Injury Benefit Plan. Anchor is not an insurer. All money paid on behalf of Newbrough for his medical treatment was paid by Central Freight.

3.      After his injury, Newbrough began medical treatment in June 2015. He or his healthcare provider submitted his proposed treatment to Anchor. I then obtained approval for the treatment from Central Freight. Between June 2015 and April 2016, I had numerous conversations with Newbrough and his healthcare providers regarding his medical treatment. Newbrough never informed Anchor that he was pursuing damages from Smoker's Outlet

4.      On May 12, 2016, I received an anonymous phone call. The caller informed me that Mr. Newbrough was now represented by counsel in connection with the injury for which he had made a claim and that Newbourgh's attorney was not going to disclose his representation to Central Freight or Anchor at that time.

5.      On May 13, 2016, the adjuster for Republic Group, Smoker's Outlet's insurer, contacted me and requested that I send a subrogation letter with a detailed check register. I sent Republic Group the subrogation letter and check register that same day, May 13, 2016.

6.      Neither Newbrough nor his attorney ever contacted me regarding Newbrough's settlement with Smoker's Outlet and Republic Group, and I never made any representations to Newbrough or his attorney regarding any subrogation interest.

7.      At no time did Anchor indicate that it would waive Central Freight's subrogation interest. Anchor never renounced any subrogation interest on behalf of Central Freight or any one else, and at no time did Anchor indicate an intention to waive any such subrogation interest.

8.      Attached as Exhibit D to Anchor's Motion for Summary Judgement is a true and correct copy of the letter and check register that I sent to Republic Group on May 13, 2016, with the payee of medical claims redacted due to medical privacy requirements. The letter and check register are a part of the records kept by Anchor in the regular course of business, and it was in the regular course and business for me, as the Senior Claims Adjuster handling the claim, to draft

the letter and transmit the letter and check register. The letter and check register were made in the regular course of business at or near the time."

Further, Affiant Sayeth Not.

SIGNED on this the ___9___ day of ___March___, 2017.

Debora Harvey

SUBSCRIBED AND SWORN TO before me, the undersigned Notary Public, on this the ___ day of ___March___, 2017, to certify which witness my hand and seal of office.

Notary Public in and for the State of Texas

DORIS G VAN HORN
Notary ID # 2832643
My Commission Expires
August 13, 2020

PD.20703063.1

Appendix 64

# Exhibit B

01/05/2016   10:18                          (FAX)2103664791        P.004/004

STATE OF TEXAS          §
                        §
COUNTY OF Ector         §

### AFFIDAVIT CONCERNING COST AND NECESSITY OF MEDICAL OR OTHER SERVICES

BEFORE ME, the undersigned authority, on this day personally appeared
Claudia Jacquez , who by me being duly sworn deposed as follows:

"My name is Claudia Jacquez . I am over 18 years
of age, of sound mind, capable of making this affidavit, and personally acquainted
with the facts stated below.

I am the person in charge of the PATIENT ACCOUNT RECORDS for
PhyTEx Rehab and as such, I am familiar with reasonable and necessary
charges for those services. Attached to this Affidavit are records that provide an
itemized statement for the service and the charge for the service that
PhyTEx Rehab provided to The Law Offices of Miller & Bicklein on the
date of January 6, 2016 . The attached records are a part of this
Affidavit.

The attached records are kept by PhyTEx Rehab in the regular
course of business, and it was the regular course of business of
PhyTEx Rehab for an employee or representative of
PhyTEx Rehab , with knowledge of the service provided, to
make the record or to transmit information to be included in the record. The
records were made in the regular course of business at or near the time or
reasonably soon after the time the service was provided. The records are the
original or a duplicate of the original.

The services were provided were necessary and the amount charged for the
services were reasonable at the time and place that the services were provided.

The total amount paid for the services was $ 2509.36 and the amount
currently unpaid but which 545.02 has a right to be paid after any
adjustments or credits is $ 545.02

Claudia Jacquez
AFFIANT

SUBSCRIBED AND SWORN TO BEFORE ME on this, the 6 day of January

2016, by the said Claudia Jacquez , Affiant

KIMBERLY D. FREDERICK
My Commission Expires
August 31, 2017

Kimberly D. Frederick
NOTARY PUBLIC, STATE OF TEXAS

## Patient Statement Inquiry

### Patient : 24329 – Newbrough,William H

| Dates | Type | Description | Units | Amount |
|-------|------|-------------|-------|--------|
| 09-10-2015 | | | 1.00 | 160.00 |
| | | | 1.00 | 75.00 |
| | | | 1.00 | 0.01 |
| | | | 1.00 | 0.01 |
| 09-15-2015 | | | 2.00 | 136.00 |
| | | | 1.00 | 65.00 |
| | | | 1.00 | 34.00 |
| 09-17-2015 | | | 2.00 | 136.00 |
| | | | 1.00 | 65.00 |
| | | | 1.00 | 34.00 |
| 09-21-2015 | | | 2.00 | 136.00 |
| | | | 1.00 | 65.00 |
| | | | 1.00 | 34.00 |
| 09-24-2015 | | | 2.00 | 136.00 |
| | | | 1.00 | 65.00 |
| | | | 1.00 | 34.00 |
| 09-29-2015 | | | 2.00 | 136.00 |
| | | | 1.00 | 65.00 |
| | | | 1.00 | 34.00 |
| 10-01-2015 | | | 2.00 | 136.00 |
| | | | 1.00 | 65.00 |
| | | | 1.00 | 34.00 |
| 10-06-2015 | | | 1.00 | 75.00 |
| | | | 2.00 | 136.00 |
| | | | 1.00 | 0.01 |
| | | | 1.00 | 0.01 |
| 10-08-2015 | | | 2.00 | 136.00 |
| | | | 1.00 | 65.00 |
| | | | 1.00 | 34.00 |
| 10-13-2015 | | | 3.00 | 204.00 |
| | | | 1.00 | 65.00 |
| | | | 1.00 | 34.00 |
| 10-15-2015 | | | 3.00 | 204.00 |
| | | | 1.00 | 65.00 |
| | | | 1.00 | 34.00 |
| 10-20-2015 | | | 3.00 | 204.00 |
| | | | 1.00 | 34.00 |
| 10-22-2015 | | | 4.00 | 272.00 |
| | | | 1.00 | 65.00 |
| 11-06-2015 | Payment | Anchor Claims Management paid 147.77 for DOS 09/15/2015-09/15/2015 via check # 14017, Batch # 110615PTRDEP1SS. | | -147.77 |

Appendix 67

# Patient Statement Inquiry

Patient : 24329 - Newbrough,William H

| Date | Type | Description | Units | Amount |
|------|------|-------------|-------|--------|
| 11-06-2015 | Payment | Anchor Claims Management paid 147.77 for DOS 09/24/2015-09/24/2015 via check # 14017, Batch # 110615PTRDEP1SS. | | -147.77 |
| 11-06-2015 | Payment | Anchor Claims Management paid 147.77 for DOS 09/17/2015-09/17/2015 via check # 14017, Batch # 110615PTRDEP1SS. | | -147.77 |
| 11-06-2015 | Payment | Anchor Claims Management paid 150.20 for DOS 09/10/2015-09/10/2015 via check # 14017, Batch # 110615PTRDEP1SS. | | -150.20 |
| 11-06-2015 | Payment | Anchor Claims Management paid 147.77 for DOS 09/21/2015-09/21/2015 via check # 14017, Batch # 110615PTRDEP1SS. | | -147.77 |
| 11-06-2015 | Payment | Anchor Claims Management paid 147.77 for DOS 09/29/2015-09/29/2015 via check # 14017, Batch # 110615PTRDEP1SS. | | -147.77 |
| 11-06-2015 | Discount | Discount of $87.23 for DOS 09/15/2015-09/15/2015, Batch # 110615PTRDEP1SS. | | -87.23 |
| 11-06-2015 | Discount | Discount of $87.23 for DOS 09/24/2015-09/24/2015, Batch # 110615PTRDEP1SS. | | -87.23 |
| 11-06-2015 | Discount | Discount of $87.23 for DOS 09/17/2015-09/17/2015, Batch # 110615PTRDEP1SS. | | -87.23 |
| 11-06-2015 | Discount | Discount of $84.82 for DOS 09/10/2015-09/10/2015, Batch # 110615PTRDEP1SS. | | -84.82 |
| 11-06-2015 | Discount | Discount of $87.23 for DOS 09/21/2015-09/21/2015, Batch # 110615PTRDEP1SS. | | -87.23 |
| 11-06-2015 | Discount | Discount of $87.23 for DOS 09/29/2015-09/29/2015, Batch # 110615PTRDEP1SS. | | -87.23 |
| 11-09-2015 | 97002 | | | 75.00 |
| | 97110 | | | 138.00 |
| | G8994.CK | | | 0.01 |
| | G8995.CH | | | 0.01 |
| 11-17-2015 | 97110 | | | 204.00 |
| | 97140 | | | 130.00 |
| 11-19-2015 | 97110 | | | 204.00 |
| | 97140 | | | 130.00 |
| 11-24-2015 | 97110 | | | 204.00 |
| | 97140 | | | 130.00 |
| 11-30-2015 | Payment | Anchor Claims Management paid 151.06 for DOS 10/20/2015-10/20/2015 via check # 14086, Batch # 113015PTRDEP1JH. | | -151.06 |
| 11-30-2015 | Payment | Anchor Claims Management paid 147.77 for DOS 10/01/2015-10/01/2015 via check # 14086, Batch # 113015PTRDEP1JH. | | -147.77 |
| 11-30-2015 | Payment | Anchor Claims Management paid 147.77 for DOS 10/08/2015-10/08/2015 via check # 14086, Batch # 113015PTRDEP1JH. | | -147.77 |

# Patient Statement Inquiry

Patient : 24329 ~ Newbrough, William H

| Date | Type | Description | Units | Amount |
|------|------|-------------|-------|--------|
| 11-30-2015 | Payment | Anchor Claims Management paid 145.40 for DOS 10/06/2015-10/06/2015 via check # 14066, Batch # 113015PTRDEP1JH. | | -145.40 |
| 11-30-2015 | Payment | Anchor Claims Management paid 191.84 for DOS 10/15/2015-10/15/2015 via check # 14066, Batch # 113015PTRDEP1JH. | | -191.84 |
| 11-30-2015 | Payment | Anchor Claims Management paid 191.84 for DOS 10/13/2015-10/13/2015 via check # 14066, Batch # 113015PTRDEP1JH. | | -191.84 |
| 11-30-2015 | Discount | Discount of $86.94 for DOS 10/20/2015-10/20/2015, Batch # 113015PTRDEP1JH. | | -86.94 |
| 11-30-2015 | Discount | Discount of $87.23 for DOS 10/01/2015-10/01/2015, Batch # 113015PTRDEP1JH. | | -87.23 |
| 11-30-2015 | Discount | Discount of $87.23 for DOS 10/08/2015-10/08/2015, Batch # 113015PTRDEP1JH. | | -87.23 |
| 11-30-2015 | Discount | Discount of $65.62 for DOS 10/06/2015-10/06/2015, Batch # 113015PTRDEP1JH. | | -65.62 |
| 11-30-2015 | Discount | Discount of $111.16 for DOS 10/15/2015-10/15/2015, Batch # 113015PTRDEP1JH. | | -111.16 |
| 11-30-2015 | Discount | Discount of $111.16 for DOS 10/13/2015-10/13/2015, Batch # 113015PTRDEP1JH. | | -111.16 |
| 12-10-2015 | Payment | Anchor Claims Management paid 217.07 for DOS 10/22/2015-10/22/2015 via check # 14126, Batch # 121015PTRDEP1SD. | | -217.07 |
| 12-10-2015 | Discount | Discount of $119.93 for DOS 10/22/2015-10/22/2015, Batch # 1210'5PTRDEP1SD. | | -119.93 |
| 12-16-2015 | Payment | Anchor Claims Management paid 213.78 for DOS 11/19/2015-11/19/2015 via check # 14148, Batch # 121615PTRDEP1SD. | | -213.78 |
| 12-16-2015 | Payment | Anchor Claims Management paid 213.78 for DOS 11/17/2015-11/17/2015 via check # 14141, Batch # 121615PTRDEP1SD. | | -213.78 |
| 12-16-2015 | Discount | Discount of $120.22 for DOS 11/19/2015-11/19/2015, Batch # 121615PTRDEP1SD. | | -120.22 |
| 12-16-2015 | Discount | Discount of $120.22 for DOS 11/17/2015-11/17/2015, Batch # 121615PTRDEP1SD. | | -120.22 |
| | | Total Charges on Account: | | 4485.06 |
| | | Total Payments on Account: | | -2509.36 |
| | | Total Discounts on Account: | | -1430.68 |
| | | Total Account Adjustments: | | 0.00 |
| | | Total Account Charge Reversals: | | 0.00 |
| | | Account Balance Due: | | 545.02 |

01/05/2016   10:20                                          (FAX)2103664791          P.004/004

STATE OF TEXAS                §
                              §
COUNTY OF _____         §

### AFFIDAVIT CONCERNING COST AND NECESSITY OF MEDICAL OR OTHER SERVICES

BEFORE ME, the undersigned authority, on this day personally appeared
_____, who by me being duly sworn deposes as follows:

"My name is _____. I am over 18 years of age, of sound mind, capable of making this affidavit, and personally acquainted with the facts stated below..

I am the person in charge of the PATIENT ACCOUNT RECORDS for
_____ and as such, I am familiar with reasonable and necessary charges for those services. Attached to this Affidavit are records that provide an itemized statement for the service and the charge for the service that _____ provided to The Law Offices of Miller & Bicklein on the date of _____. The attached records are a part of this Affidavit.

The attached records are kept by _____ in the regular course of business, and it was the regular course of business of _____ for an employee or representative of _____, with knowledge of the service provided, to make the record or to transmit information to be included in the record. The records were made in the regular course of business at or near the time or reasonably soon after the time the service was provided. The records are the original or a duplicate of the original.

The services were provided were necessary and the amount charged for the services were reasonable at the time and place that the services were provided.

The total amount paid for the services was $ _____ and the amount currently unpaid but which _____ has a right to be paid after any adjustments or credits is $ _____



_____
AFFIANT

SUBSCRIBED AND SWORN TO BEFORE ME on this, the _____ day of _____
2015, by the said _____, Affiant

_____
NOTARY PUBLIC, STATE OF TEXAS

Patricia Ann Rodriguez
Notary Public
State of Texas
Expires:06-19-2018

Appendix 70

## Billing Summary: NEWBROUGH, WILLIAM H #21955 (E#21955)

**FIRST PHYSICIANS,**
**MICHAEL V SHELTON MD**
**PA**

*printed 01/12/2016 09:41 AM*

MICHAEL V SHELTON MD PA
PO BOX 14704
BELFAST, ME 04915-4042
*billing phone: (432) 552-5656*



| GUARANTOR NAME AND ADDRESS | | PATIENT # | PATIENT NAME |
|---|---|---|---|
| WILLIAM H NEWBROUGH | | | WILLIAM H NEWBROUGH |
| | | DOB | HOME TELEPHONE |

## Billing Summary

| Claim ID | Procedure | Date of Service | Post Date | Type | Reason | Plan | Supervising Provider | Ins 1 | Ins 2 | Patient |
|---|---|---|---|---|---|---|---|---|---|---|
| **Claim ID 3306** | | | | | | | | | | |
| 3306 | 36415 | 02/17/2015 | 02/17/2015 | CHARGE | 36415 | BCBS-TX: BCBS OF TX (PPO) | CHRISTINE WAN | $18.00 | | |
| 3306 | 36415 | 02/17/2015 | 02/25/2015 | PAYMENT | ACH ***********4110 | BCBS-TX: BCBS OF TX (PPO) | CHRISTINE WAN | $-3.00 | | |
| 3306 | 36415 | 02/17/2015 | 02/25/2015 | ADJUSTMENT | CONTRACTUAL (18245) | BCBS-TX: BCBS OF TX (PPO) | CHRISTINE WAN | $-15.00 | | |
| | | | | | | OUTSTANDING | | $0.00 | $0.00 | $0.00 |
| 3306 | 80053 | 02/17/2015 | 02/17/2015 | CHARGE | 80053 | BCBS-TX: BCBS OF TX (PPO) | CHRISTINE WAN | $75.00 | | |
| 3306 | 80053 | 02/17/2015 | 02/25/2015 | PAYMENT | ACH ***********4110 | BCBS-TX: BCBS OF TX (PPO) | CHRISTINE WAN | $-32.30 | | |
| 3306 | 80053 | 02/17/2015 | 02/25/2015 | ADJUSTMENT | CONTRACTUAL (18245) | BCBS-TX: BCBS OF TX (PPO) | CHRISTINE WAN | $-42.70 | | |
| | | | | | | OUTSTANDING | | $0.00 | $0.00 | $0.00 |
| 3306 | 83718 | 02/17/2015 | 02/17/2015 | CHARGE | 83718 | BCBS-TX: BCBS OF TX (PPO) | CHRISTINE WAN | $37.00 | | |
| 3306 | 83718 | 02/17/2015 | 02/25/2015 | PAYMENT | ACH ***********4110 | BCBS-TX: BCBS OF TX (PPO) | CHRISTINE WAN | $-6.16 | | |
| 3306 | 83718 | 02/17/2015 | 02/25/2015 | ADJUSTMENT | CONTRACTUAL (18245) | BCBS-TX: BCBS OF TX (PPO) | CHRISTINE WAN | $-30.84 | | |
| | | | | | | OUTSTANDING | | $0.00 | $0.00 | $0.00 |
| 3306 | 84443 | 02/17/2015 | 02/17/2015 | CHARGE | 84443 | BCBS-TX: BCBS OF TX (PPO) | CHRISTINE WAN | $65.00 | | |
| 3306 | 84443 | 02/17/2015 | 02/25/2015 | ADJUSTMENT | GLOBAL (37762) | BCBS-TX: BCBS OF TX (PPO) | CHRISTINE WAN | $-65.00 | | |
| | | | | | | OUTSTANDING | | $0.00 | $0.00 | $0.00 |
| 3306 | 85025 | 02/17/2015 | 02/17/2015 | CHARGE | 85025 | BCBS-TX: BCBS OF TX (PPO) | CHRISTINE WAN | $35.00 | | |
| 3306 | 85025 | 02/17/2015 | 02/25/2015 | ADJUSTMENT | GLOBAL (37762) | BCBS-TX: BCBS OF TX (PPO) | CHRISTINE WAN | $-35.00 | | |
| | | | | | | OUTSTANDING | | $0.00 | $0.00 | $0.00 |
| 3306 | 99000 | 02/17/2015 | 02/17/2015 | CHARGE | 99000 | BCBS-TX: BCBS OF TX (PPO) | CHRISTINE WAN | $30.00 | | |
| 3306 | 99000 | 02/17/2015 | 02/25/2015 | ADJUSTMENT | GLOBAL (37762) | BCBS-TX: BCBS OF TX (PPO) | CHRISTINE WAN | $-30.00 | | |
| | | | | | | OUTSTANDING | | $0.00 | $0.00 | $0.00 |
| 3306 | 99213 | 02/17/2015 | 02/17/2015 | CHARGE | 99213 | BCBS-TX: BCBS OF TX (PPO) | CHRISTINE WAN | $130.00 | | |
| 3306 | 99213 | 02/17/2015 | 02/25/2015 | PAYMENT | ACH | BCBS-TX: BCBS | CHRISTINE | $-41.01 | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 3306 | 99213 | 02/17/2015 | 02/25/2015 | ADJUSTMENT | CONTRACTUAL (18245) | ********4110 BCBS-TX; BCBS OF TX (PPO) | CHRISTINE WAN | $-53.99 | | |
| 3306 | 99213 | 02/17/2015 | 02/25/2015 | TRANSFERIN | DEDUCTIBLE | PATIENT | CHRISTINE WAN | $-35.00 | | $35.00 |
| 3306 | 99213 | 02/17/2015 | 02/25/2015 | PAYMENT | UNAPPLIED | PATIENT | CHRISTINE WAN | | | $-35.00 |
| | | | | | | | OUTSTANDING | $0.00 | $0.00 | $0.00 |
| **Claim ID 28730** | | | | | | | | | | |
| 28730 | 73030 | 06/23/2015 | 06/23/2015 | CHARGE | 73030 | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $90.00 | | |
| 28730 | 73030 | 06/23/2015 | 07/29/2015 | PAYMENT | CHECK 13796 | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $-41.33 | | |
| 28730 | 73030 | 06/23/2015 | 07/29/2015 | ADJUSTMENT | CONTRACTUAL | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $-48.67 | | |
| | | | | | | | OUTSTANDING | $0.00 | $0.00 | $0.00 |
| 28730 | 99080,73 | 06/23/2015 | 06/23/2015 | CHARGE | 99080,73 | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $35.00 | | |
| 28730 | 99080,73 | 06/23/2015 | 07/29/2015 | PAYMENT | CHECK 13796 | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $-15.00 | | |
| 28730 | 99080,73 | 06/23/2015 | 07/29/2015 | ADJUSTMENT | CONTRACTUAL | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $-20.00 | | |
| | | | | | | | OUTSTANDING | $0.00 | $0.00 | $0.00 |
| 28730 | 99203 | 06/23/2015 | 06/23/2015 | CHARGE | 99203 | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $220.00 | | |
| 28730 | 99203 | 06/23/2015 | 07/29/2015 | PAYMENT | CHECK 13796 | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $-122.34 | | |
| 28730 | 99203 | 06/23/2015 | 07/29/2015 | ADJUSTMENT | CONTRACTUAL | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $-97.66 | | |
| | | | | | | | OUTSTANDING | $0.00 | $0.00 | $0.00 |
| 28730 | A4565 | 06/23/2015 | 06/23/2015 | CHARGE | A4565 | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $30.00 | | |
| 28730 | A4565 | 06/23/2015 | 07/29/2015 | PAYMENT | CHECK 13796 | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $-9.19 | | |
| 28730 | A4565 | 06/23/2015 | 07/29/2015 | ADJUSTMENT | CONTRACTUAL | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $-20.81 | | |
| | | | | | | | OUTSTANDING | $0.00 | $0.00 | $0.00 |
| **Claim ID 29061** | | | | | | | | | | |
| 29061 | NONNIDA | 06/23/2015 | 08/25/2015 | CHARGE | NONNIDA | CENTRAL FREIGHT | CHRISTINE WAN | $25.00 | | |
| | | | | | | | OUTSTANDING | $25.00 | $0.00 | $0.00 |
| **Claim ID 30986** | | | | | | | | | | |
| 30986 | 99080,73 | 07/07/2015 | 07/07/2015 | *CHARGE* | 99080,73 | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $0.00 | | |
| | | | | | | | OUTSTANDING | $0.00 | $0.00 | $0.00 |
| 30986 | 99213 | 07/07/2015 | 07/07/2015 | CHARGE | 99213 | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $130.00 | | |
| 30986 | 99213 | 07/07/2015 | 08/14/2015 | PAYMENT | CHECK 13832 | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $-66.51 | | |
| 30986 | 99213 | 07/07/2015 | 08/14/2015 | ADJUSTMENT | CONTRACTUAL | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $-63.49 | | |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | OUTSTANDING | | $0.00 | $0.00 | $0.00 |

**Claim ID 33272**

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 33272 | 99080,73 | 07/20/2015 | 07/20/2015 | CHARGE | 99080,73 | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $0.00 | | |
| | | | | | | OUTSTANDING | | $0.00 | $0.00 | $0.00 |
| 33272 | 99213 | 07/20/2015 | 07/20/2015 | CHARGE | 99213 | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $130.00 | | |
| 33272 | 99213 | 07/20/2015 | 09/08/2015 | PAYMENT | CHECK 13870 | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $-66.51 | | |
| 33272 | 99213 | 07/20/2015 | 09/08/2015 | ADJUSTMENT | CONTRACTUAL | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $-63.49 | | |
| | | | | | | OUTSTANDING | | $0.00 | $0.00 | $0.00 |

**Claim ID 36410**

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 36410 | 99080,73 | 08/04/2015 | 08/04/2015 | CHARGE | 99080,73 | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $35.00 | | |
| 36410 | 99080,73 | 08/04/2015 | 09/08/2015 | PAYMENT | CHECK 13870 | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $-15.00 | | |
| 36410 | 99080,73 | 08/04/2015 | 09/08/2015 | ADJUSTMENT | CONTRACTUAL | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $-20.00 | | |
| | | | | | | OUTSTANDING | | $0.00 | $0.00 | $0.00 |
| 36410 | 99213 | 08/04/2015 | 08/04/2015 | CHARGE | 99213 | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $130.00 | | |
| 36410 | 99213 | 08/04/2015 | 09/08/2015 | PAYMENT | CHECK 13870 | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $-66.51 | | |
| 36410 | 99213 | 08/04/2015 | 09/08/2015 | ADJUSTMENT | CONTRACTUAL | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $-63.49 | | |
| | | | | | | OUTSTANDING | | $0.00 | $0.00 | $0.00 |

**Claim ID 41501**

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 41501 | 36415 | 08/31/2015 | 08/31/2015 | CHARGE | 36415 | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $20.00 | | |
| 41501 | 36415 | 08/31/2015 | 11/20/2015 | PAYMENT | CHECK 14074 | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $-4.64 | | |
| 41501 | 36415 | 08/31/2015 | 11/20/2015 | ADJUSTMENT | CONTRACTUAL | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $-15.36 | | |
| | | | | | | OUTSTANDING | | $0.00 | $0.00 | $0.00 |
| 41501 | 71020 | 08/31/2015 | 08/31/2015 | CHARGE | 71020 | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $98.00 | | |
| 41501 | 71020 | 08/31/2015 | 11/20/2015 | PAYMENT | CHECK 14074 | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $-41.21 | | |
| 41501 | 71020 | 08/31/2015 | 11/20/2015 | ADJUSTMENT | CONTRACTUAL | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $-56.79 | | |
| | | | | | | OUTSTANDING | | $0.00 | $0.00 | $0.00 |
| 41501 | 80053 | 08/31/2015 | 08/31/2015 | CHARGE | 80053 | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $75.00 | | |
| 41501 | 80053 | 08/31/2015 | 11/20/2015 | PAYMENT | CHECK 14074 | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $-18.86 | | |
| 41501 | 80053 | 08/31/2015 | 11/20/2015 | ADJUSTMENT | CONTRACTUAL | ANCHOR CLAIM DEPT - COMBINED | CHRISTINE WAN | $-56.14 | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | GROUP | OUTSTANDING | $0.00 | $0.00 | $0.00 |
| 41501 | 81000 | 08/31/2015 | 08/31/2015 | CHARGE | 81000 | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $19.00 | | |
| 41501 | 81000 | 08/31/2015 | 11/20/2015 | PAYMENT | CHECK 14074 | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $-5.80 | | |
| 41501 | 81000 | 08/31/2015 | 11/20/2015 | ADJUSTMENT | CONTRACTUAL | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $-13.20 | | |
| | | | | | | | OUTSTANDING | $0.00 | $0.00 | $0.00 |
| 41501 | 85025 | 08/31/2015 | 08/31/2015 | CHARGE | 85025 | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $35.00 | | |
| 4150 | 85025 | 08/31/2015 | 11/20/2015 | PAYMENT | CHECK 14074 | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $-14.03 | | |
| 41501 | 85025 | 08/31/2015 | 11/20/2015 | ADJUSTMENT | CONTRACTUAL | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $-20.97 | | |
| | | | | | | | OUTSTANDING | $0.00 | $0.00 | $0.00 |
| 41501 | 85610 | 08/31/2015 | 08/31/2015 | CHARGE | 85610 | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $22.00 | | |
| 41501 | 85610 | 08/31/2015 | 11/20/2015 | PAYMENT | CHECK 14074 | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $-6.77 | | |
| 41501 | 85610 | 08/31/2015 | 11/20/2015 | ADJUSTMENT | CONTRACTUAL | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $-15.23 | | |
| | | | | | | | OUTSTANDING | $0.00 | $0.00 | $0.00 |
| 41501 | 85730 | 08/31/2015 | 08/31/2015 | CHARGE | 85730 | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $28.00 | | |
| 41501 | 85730 | 08/31/2015 | 11/20/2015 | PAYMENT | CHECK 14074 | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $-10.64 | | |
| 41501 | 85730 | 08/31/2015 | 11/20/2015 | ADJUSTMENT | CONTRACTUAL | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $-17.36 | | |
| | | | | | | | OUTSTANDING | $0.00 | $0.00 | $0.00 |
| 41501 | 93000 | 08/31/2015 | 08/31/2015 | CHARGE | 93000 | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $75.00 | | |
| 41501 | 93000 | 08/31/2015 | 11/20/2015 | PAYMENT | CHECK 14074 | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $-25.48 | | |
| 41501 | 93000 | 08/31/2015 | 11/20/2015 | ADJUSTMENT | CONTRACTUAL | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $-49.52 | | |
| | | | | | | | OUTSTANDING | $0.00 | $0.00 | $0.00 |
| 41501 | 99242,25 | 08/31/2015 | 08/31/2015 | CHARGE | 99242,25 | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $210.00 | | |
| 41501 | 99242,25 | 08/31/2015 | 11/20/2015 | PAYMENT | CHECK 14074 | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $-116.08 | | |
| 41501 | 99242,25 | 08/31/2015 | 11/20/2015 | ADJUSTMENT | CONTRACTUAL | ANCHOR CLAIM DEPT - COMBINED GROUP | CHRISTINE WAN | $-93.92 | | |
| | | | | | | | OUTSTANDING | $0.00 | $0.00 | $0.00 |
| Claim ID 60264 | | | | | | | | | | |
| 60264 | 99456 | 12/01/2015 | 12/01/2015 | CHARGE | 99456 | CENTRAL FREIGHT | CHRISTINE WAN | $95.00 | | |
| | | | | | | | OUTSTANDING | $95.00 | $0.00 | $0.00 |
| | | | | | | TOTAL CHARGE OUTSTANDING AS OF 01/12/2016 | | $120.00 | $0.00 | $0.00 |

01/05/2016   10:22                                       (FAX)2103664791          P.004/004

STATE OF TEXAS                    §
                                  §
COUNTY OF _Ector_                 §

### AFFIDAVIT CONCERNING COST AND NECESSITY OF
### MEDICAL OR OTHER SERVICES

BEFORE ME, the undersigned authority, on this day personally appeared
_Rose Hawkins_, who by me being duly sworn deposes as follows:

"My name is _Rose Hawkins_, I am over 18 years
of age, of sound mind, capable of making this affidavit, and personally acquainted
with the facts stated below.

I am the person in charge of the PATIENT ACCOUNT RECORDS for
_Basin Orthopedy_ and as such, I am familiar with reasonable and necessary
charges for those services. Attached to this Affidavit are records that provide an
itemized statement for the service and the charge for the service that
_Basin Orthopedic_ provided to The Law Offices of Miller & Bicklein on the
date of _march 2, 2016_. The attached records are a part of this
Affidavit.

The attached records are kept by _Basin Orthopedic_ in the regular
course of business, and it was the regular course of business of
_Basin Orthopedic_ for an employee or representative of
_Basin Orthopedic_, with knowledge of the service provided, to
make the record or to transmit information to be included in the record. The
records were made in the regular course of business at or near the time or
reasonably soon after the time the service was provided. The records are the
original or a duplicate of the original.

The services were provided were necessary and the amount charged for the
services were reasonable at the time and place that the services were provided.

The total amount paid for the services was $ _4,121.04_ and the amount
currently unpaid but which _Basin Orthopedic_ has a right to be paid after any
adjustments or credits is $ _- 0 -_.

_Rose Hawkins_
AFFIANT

SUBSCRIBED AND SWORN TO BEFORE ME on this, the _2nd_ day of _March_
_2016_
2015, by the said _Rose Hawkins_, Affiant

_Gaylene McNeal Sanders_
NOTARY PUBLIC, STATE OF TEXAS

GAYLENE MCNEAL SANDERS
Notary Public, State of Texas
My Commission Expires
October 26, 2017

Appendix 75

Basin Ortho Surgical Specialists
Patient Account History  5/22/2013  To  3/1/2016
Account : WC7077

Patient : William H Newbrough   # WC7077

**08/19/15 - Summary**

| | | |
|---|---|---|
| Charges: | 408.00 | |
| Adjs: | 121.94 | |
| Insurance Payment: | 286.06 | [ 09/15/2015, Anchor Claims Management ] |
| Allowed: 286.06  W/O: 121.94  Copay: 0.00  Deduct: 0.00  Co-ins: 0.00  WH: 0.00  Other: 0.00 | | |
| Balance: | 0.00 | |

**08/19/15 - Financial Details**

| Service | Diagnoses | Billing Provider | Service Location | Charge Amt. | Ins.Pending | Pat.Due |
|---|---|---|---|---|---|---|
| ▮▮▮▮▮▮▮▮▮▮▮ | | Bradley  Dyrstad | Basin Orthopedic Surgical Specialists | 95.00 | 0.00 | 0.00 |

| Payment Type | Amount | |
|---|---|---|
| Insurance Payment: | 42.53 | [ 09/15/2015, Anchor Claims Management ] |
| Allowed: 42.53  W/O: 52.47  Copay: 0.00  Deduct: 0.00  Co-ins: 0.00  WH: 0.00  Other: 0.00 | | |
| Insurance Adjs.: | 52.47 | |

| Service | Diagnoses | Billing Provider | Service Location | Charge Amt. | Ins.Pending | Pat.Due |
|---|---|---|---|---|---|---|
| ▮▮▮▮▮▮▮▮▮▮▮ | | Bradley  Dyrstad | Basin Orthopedic Surgical Specialists | 25.00 | 0.00 | 0.00 |

| Payment Type | Amount | |
|---|---|---|
| Insurance Payment: | 21.25 | [ 09/15/2015, Anchor Claims Management ] |
| Allowed: 21.25  W/O: 3.75  Copay: 0.00  Deduct: 0.00  Co-ins: 0.00  WH: 0.00  Other: 0.00 | | |
| Insurance Adjs.: | 3.75 | |

| Service | Diagnoses | Billing Provider | Service Location | Charge Amt. | Ins.Pending | Pat.Due |
|---|---|---|---|---|---|---|
| ▮▮▮▮▮▮▮▮▮▮▮ | | Bradley  Dyrstad | Basin Orthopedic Surgical Specialists | 25.00 | 0.00 | 0.00 |

| Payment Type | Amount | |
|---|---|---|
| Insurance Payment: | 15.00 | [ 09/15/2015, Anchor Claims Management ] |
| Allowed: 15.00  W/O: 10.00  Copay: 0.00  Deduct: 0.00  Co-ins: 0.00  WH: 0.00  Other: 0.00 | | |
| Insurance Adjs.: | 10.00 | |

*RE: Wm Newbrough*

| 99203 | 840.4 726.2 | Bradley Dyrstad | Basin Orthopedic Surgical Specialists | 175.00 | 0.00 | 0.00 |

| Payment Type | Amount |
| --- | --- |
| Insurance Payment: | 163.25 | [ 09/15/2015, Anchor Claims Management ] |
| | Allowed: 163.25 W/O: 11.75 Copay: 0.00 Deduct: 0.00 Co-ins: 0.00 WH: 0.00 Other: 0.00 |
| Insurance Adjs.: | 11.75 |

| | | Bradley Dyrstad | Basin Orthopedic Surgical Specialists | 88.00 | 0.00 | 0.00 |

| Payment Type | Amount |
| --- | --- |
| Insurance Payment: | 44.03 | [ 09/15/2015, Anchor Claims Management ] |
| | Allowed: 44.03 W/O: 43.97 Copay: 0.00 Deduct: 0.00 Co-ins: 0.00 WH: 0.00 Other: 0.00 |
| Insurance Adjs.: | 43.97 |

## 08/26/15 - Summary

| Charges: | 140.00 |
| --- | --- |
| Adjs: | 15.49 |
| Insurance Payment: | 124.51 | [ 09/24/2015, Anchor Claims Management ] |
| | Allowed: 124.51 W/O: 15.49 Copay: 0.00 Deduct: 0.00 Co-ins: 0.00 WH: 0.00 Other: 0.00 |
| Balance: | 0.00 |

## 08/26/15 - Financial Details

| Service | Diagnoses | Billing Provider | Service Location | Charge Amt. | Ins.Pending | Pat.Due |
| --- | --- | --- | --- | --- | --- | --- |
| | | Bradley Dyrstad | Basin Orthopedic Surgical Specialists | 25.00 | 0.00 | 0.00 |

| Payment Type | Amount |
| --- | --- |
| Insurance Payment: | 15.00 | [ 09/24/2015, Anchor Claims Management ] |
| | Allowed: 15.00 W/O: 10.00 Copay: 0.00 Deduct: 0.00 Co-ins: 0.00 WH: 0.00 Other: 0.00 |
| Insurance Adjs.: | 10.00 |

| | | Bradley Dyrstad | Basin Orthopedic Surgical Specialists | 115.00 | 0.00 | 0.00 |

| Payment Type | Amount |
| --- | --- |
| Insurance Payment: | 109.51 | [ 09/24/2015, Anchor Claims Management ] |
| | Allowed: 109.51 W/O: 5.49 Copay: 0.00 Deduct: 0.00 Co-ins: 0.00 WH: 0.00 Other: 0.00 |
| Insurance Adjs.: | 5.49 |

*RE: Wm Newbrough*

**09/03/15 - Summary**

| | |
|---|---|
| Charges: | 115.00 |
| Adjs: | 5.49 |
| Insurance Payment: | 109.51 [ 09/25/2015, Anchor Claims Management ] |
| | Allowed: 109.51 W/O: 5.49 Copay: 0.00 Deduct: 0.00 Co-ins: 0.00 WH: 0.00 Other: 0.00 |
| Balance: | 0.00 |

**09/03/15 - Financial Details**

| Service | Diagnoses | Billing Provider | Service Location | Charge Amt. | Ins.Pending | Pat.Due |
|---|---|---|---|---|---|---|
| ███████████████ | | Bradley Dyrstad | Basin Orthopedic Surgical Specialists | 115.00 | 0.00 | 0.00 |
| ██████████ | | | | | | |

| Payment Type | Amount | |
|---|---|---|
| Insurance Payment: | 109.51 | [ 09/25/2015, Anchor Claims Management ] |
| | Allowed: 109.51 W/O: 5.49 Copay: 0.00 Deduct: 0.00 Co-ins: 0.00 WH: 0.00 Other: 0.00 | |
| Insurance Adjs.: | 5.49 | |

*RE: Wm. Newbrough*

**09/08/15 - Summary**

| | |
|---|---|
| Charges: | 6,571.00 |
| Adjs: | 2,999.04 |
| Insurance Payment: | 3,571.96   [ 11/19/2015, Anchor Claims Management ] |
| Allowed: 3,571.96  W/O: 2,999.04  Copay: 0.00  Deduct: 0.00  Co-Ins: 0.00  WH: 0.00  Other: 0.00 | |
| Balance: | 0.00 |

**09/08/15 - Financial Details**

| Service | Diagnoses | Billing Provider | Service Location | Charge Amt. | Ins.Pending | Pat.Due |
|---|---|---|---|---|---|---|
| ▓▓▓▓ | ▓▓▓▓ | Bradley Dyrstad | Odessa Regional Hospital - OP | 2,238.00 | 0.00 | 0.00 |

| Payment Type | Amount |
|---|---|
| Insurance Payment: | 2,039.02   [ 11/19/2015, Anchor Claims Management ] |
| Allowed: 2,039.02  W/O: 198.98  Copay: 0.00  Deduct: 0.00  Co-Ins: 0.00  WH: 0.00  Other: 0.00 | |
| Insurance Adjs.: | 198.98 |

| Service | Diagnoses | Billing Provider | Service Location | Charge Amt. | Ins.Pending | Pat.Due |
|---|---|---|---|---|---|---|
| ▓▓▓▓ | ▓▓▓▓ | Bradley Dyrstad | Odessa Regional Hospital - OP | 2,687.00 | 0.00 | 0.00 |

| Payment Type | Amount |
|---|---|
| Insurance Payment: | 1,189.11   [ 11/19/2015, Anchor Claims Management ] |
| Allowed: 1,189.11  W/O: 1,497.89  Copay: 0.00  Deduct: 0.00  Co-Ins: 0.00  WH: 0.00  Other: 0.00 | |
| Insurance Adjs.: | 1,497.89 |

| Service | Diagnoses | Billing Provider | Service Location | Charge Amt. | Ins.Pending | Pat.Due |
|---|---|---|---|---|---|---|
| ▓▓▓▓ | | Bradley Dyrstad | Odessa Regional Hospital - OP | 1,646.00 | 0.00 | 0.00 |

| Payment Type | Amount |
|---|---|
| Insurance Payment: | 343.83   [ 11/19/2015, Anchor Claims Management ] |
| Allowed: 343.83  W/O: 1,302.17  Copay: 0.00  Deduct: 0.00  Co-Ins: 0.00  WH: 0.00  Other: 0.00 | |
| Insurance Adjs.: | 1,302.17 |

*RE: Wm. Newbrough*

**09/21/15 - Summary**

| | |
|---|---|
| Charges: | 25.00 |
| Adjs: | 10.00 |
| Insurance Payment: | 15.00  [ 10/16/2015, Anchor Claims Management ] |
| | Allowed: 15.00  W/O: 10.00  Copay: 0.00  Deduct: 0.00  Co-ins: 0.00  WH: 0.00  Other: 0.00 |
| Balance: | 0.00 |

**09/21/15 - Financial Details**

| Service | Diagnoses | Billing Provider | Service Location | Charge Amt. | Ins. Pending | Pat.Due |
|---|---|---|---|---|---|---|
| ████████████ | ████████ | Bradley Dyrstad | Basin Orthopedic Surgical Specialists | 25.00 | 0.00 | 0.00 |

████████████████

| Payment Type | Amount | | | | | |
|---|---|---|---|---|---|---|
| Insurance Payment: | 15.00 | [ 10/16/2015, Anchor Claims Management ] | | | | |
| | Allowed: 15.00  W/O: 10.00  Copay: 0.00  Deduct: 0.00  Co-ins: 0.00  WH: 0.00  Other: 0.00 | | | | | |
| Insurance Adjs.: | 10.00 | | | | | |
| ████████████████ | | Bradley Dyrstad | Basin Orthopedic Surgical Specialists | 0.00 | 0.00 | 0.00 |

████████████████

| | | | | |
|---|---|---|---|---|
| Insurance Payment: | 0.00 | [ 10/16/2015, Anchor Claims Management ] | | |
| Allowed: 0.00  W/O: 0.00  Copay: 0.00  Deduct: 0.00  Co-ins: 0.00  WH: 0.00  Other: 0.00 | | | | |

*Re: Wm. Newbrough*

**10/19/15 - Summary**

| | |
|---|---|
| Charges: | 25.00 |
| Adjs: | 10.00 |
| Insurance Payment: | 15.00   [ 11/17/2015, Anchor Claims Management ] |
| | Allowed: 15.00 W/O: 10.00 Copay: 0.00 Deduct: 0.00 Co-ins: 0.00 WH: 0.00 Other: 0.00 |
| Balance: | 0.00 |

**10/19/15 - Financial Details**

| Service | Diagnoses | Billing Provider | Service Location | Charge Amt. | Ins.Pending | Pat.Due |
|---|---|---|---|---|---|---|
| ████████ | | Bradley Dyrstad | Basin Orthopedic Surgical Specialists | 0.00 | 0.00 | 0.00 |

Insurance Payment:       0.00      [ 11/17/2015, Anchor Claims Management ]
     Allowed: 0.00 W/O: 0.00 Copay: 0.00 Deduct: 0.00 Co-ins: 0.00 WH: 0.00 Other: 0.00

| Service | Diagnoses | Billing Provider | Service Location | Charge Amt. | Ins.Pending | Pat.Due |
|---|---|---|---|---|---|---|
| ████████ | | Bradley Dyrstad | Basin Orthopedic Surgical Specialists | 25.00 | 0.00 | 0.00 |

| Payment Type | Amount |
|---|---|
| Insurance Payment: | 15.00   [ 11/17/2015, Anchor Claims Management ] |
| | Allowed: 15.00 W/O: 10.00 Copay: 0.00 Deduct: 0.00 Co-ins: 0.00 WH: 0.00 Other: 0.00 |
| Insurance Adjs.: | 10.00 |

**11/30/15 - Summary**

| | |
|---|---|
| Charges: | 0.00 |
| Adjs: | 0.00 |
| Balance: | 0.00 |

**11/30/15 - Financial Details**

| Service | Diagnoses | Billing Provider | Service Location | Charge Amt. | Ins.Pending | Pat.Due |
|---|---|---|---|---|---|---|
| ████████ | | Bradley Dyrstad | Basin Orthopedic Surgical Specialists | 0.00 | 0.00 | 0.00 |

| Total: | Charges | Pat.Pmts | Ins.Pmts | Adjs | Balance | Ins.Pending | Pat.Due |
|---|---|---|---|---|---|---|---|
| | 7,284.00 | 0.00 | 4,122.04 | 3,161.96 | 0.00 | 0.00 | 0.00 |

# Exhibit C



# Release and Agreement

Claim Number: 08CPP0802904

Know All Men By These Present That:

For and in consideration of the sum of Thirty-five Thousand DOLLARS, ($35,000.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, the undersigned, Newcrough; William, for themselves, their heirs, executors, administrators, estate, legal representatives, assigns and all others claiming under them (hereinafter the "Releasing Parties") do hereby compromise, settle remise, release and forever discharge without limitation Smoker's Outlet, Inc, and, Republic Underwriters, their agents, servants, legal representatives, and employees and any and all other persons, firms, organizations or corporations in privity therewith, whether named herein or not (hereinafter the "Released Parties"), of and from any and all claims, debts, demands, actions, causes of action, suits, sums of money, judgments and liabilities whatsoever, both in law and in equity (hereinafter "Claims"), which the Releasing Parties ever had or now have against any of the Released Parties, jointly or severally, for or by reason of any matter, cause or thing whatsoever occurring prior to the date of this instrument, whether known or unknown, suspected or unsuspected, and including, without in any way limiting the generality of the foregoing, any Claims which in any way relate to, arise out of or are in any way connected with the alleged injuries and damages sustained by the undersigned on or about the 23rd day of June, 2015, at or near Odessa, TX.

For the same consideration, the releasing parties hereby agree on behalf of themselves and their assigns never to bring suit in any court against the released parties with respect to any of the allegations related to the occurrence described herein and which occurred on or about the 23rd day of June, 2015, and to hold the released parties harmless from and to defend and indemnify the released parties against all further claims, demands, costs or expenses incurred by them in the event the releasing parties institute suit against the released parties with respect to the allegations that are the subject matter of the above-mentioned occurrence; such indemnification shall include, but is not limited to, the amounts of said claims and the costs of defending them, including attorneys' fees and court costs.

The undersigned further acknowledge that the Released Parties have denied and continue to deny all allegations made by the Releasing Parties in or in connection with the above-described occurrence and that the settlement of the claims asserted in connection therewith, the payment of the above-described sums and any other actions taken by the Released Parties are taken in order to compromise and settle the matter.

The undersigned represent that they are the owners of the Claims being released herein, and that they have not transferred, assigned or otherwise encumbered said Claims or any part thereof.

The undersigned further state that they understand this to be a full, final and complete settlement and one which cannot be reopened at any time in the future regardless of what might take place or later occur.

In making this agreement of settlement and compromise, the undersigned have not relied upon any statements or representations pertaining to this matter made by the Released Parties or by any person or persons representing them.

The undersigned further state that they have carefully read the foregoing Release and Agreement and know the contents thereof, that they have conferred fully with their attorneys concerning the contents and legal consequences of the execution thereof and that they execute this Release and Agreement of their own free will.

The terms of this Release and Agreement are contractual and not a mere recital.

All releases, agreements, promises, undertaking, representations, acknowledgements, statements or other actions taken by the undersigned in or pursuant to the terms of this Release and Agreement shall be binding

Release and Agreement (01-09)

upon the undersigned and the other Releasing Parties and their respective heirs, executors, administrators, estates, legal representatives, agents and assigns.

The undersigned further understand and agree that the undersigned will pay or be solely responsible for paying all doctor, hospital, drug or other medical expenses, past and future, incurred by, for or on behalf of the undersigned, and the undersigned do expressly agree to indemnify and hold harmless and any and all of the released parties and all other persons, firms, organizations or corporations in privity herewith, whether named herein or not, and their agents, representatives, successors, assigns and attorneys from any liability or claim of liability for the payment of such doctor, hospital, drug and other medical expenses, and from and liability or claim of liability that may be alleged under any federal, state or municipal law, statute or ordinance.

| William Newbrough | X Harold Newbrough |
| Printed Name | Signature |

| | |
| Printed Name | Signature |

Approved as to form and content

| | |
| Signature | Attorney for |

| | |
| State of | County of |

Subscribed and sworn to before me this 20 day of May 2016

Month 8/2/18     Year

Notary Public     My Commission Expires

DELIA S. DIAZ
Notary Public, State of Texas
My Commission Expires
August 02, 2018

# 12834852

# Exhibit D

# Anchor

## *Risk and Claims Management*

**Texas Nonsubscription**

P.O. Box 819045   Dallas, Texas 75381-9045   www.combinedgroup.com
14785 Preston Rd., Suite 350   Dallas, Texas 75254
214-295-1600   Fax 214-295-1700   800-275-3193   Fax 800-275-3194

May 13, 2016                    James.rushing@republicgroup.com

Republic Group
P.O. Box 809056
Dallas, TX 75380

Our Insured:   Central Freight Lines, Inc.
Our Claim #   TPA1572107-William Newbrough
D/Loss:       06/23/15
Your Insured: Smoker's Outlet

Dear Mr. Rushing,

Mr. Newbrough was injured while in his course and scope of employment when he fell into a hole injuring his left arm. We are pursuing the medical and lost time costs associated with this Injury.

We are the third party claims administrators for Central Freight Lines, Inc. and assist them in administering their Occupational Injury Benefit Plan.

Our current lien amount is $52,881.79.

Please contact me directly at 214-295-1540, if you need any additional information.

Sincerely,

Debora Harvey
Sr. Claims Adjuster

**EXHIBIT
D**

Print Date:   05/13/2016

# Detail Check Register

(Pyramid Claims System)

Page   1

| Check Number | Claim Number | Payee Name | Trans Dat | From Date | To Date | Cov | Pmt Cat | Paid |
|---|---|---|---|---|---|---|---|---|
| 130735 | TPA1572107-001 | WILLIAM H NEWBROUGH | 07/02/2015 | 06/23/2015 | 06/27/2015 | WKDIS | 30 | 469.20 |
| | | | | | | | Check Total: | 469.20 |
| 130932 | TPA1572107-001 | WILLIAM H NEWBROUGH | 07/16/2015 | 06/28/2015 | 07/11/2015 | WKDIS | 30 | 1,094.80 |
| | | | | | | | Check Total: | 1,094.80 |
| 131462 | TPA1572107-001 | WILLIAM H NEWBROUGH | 08/13/2015 | 07/26/2015 | 08/08/2015 | WKDIS | 30 | 1,564.00 |
| 131462 | TPA1572107-001 | WILLIAM H NEWBROUGH | 08/13/2015 | 07/12/2015 | 07/25/2015 | WKDIS | 30 | 625.60 |
| | | | | | | | Check Total: | 2,189.60 |
| 132033 | TPA1572107-001 | WILLIAM H NEWBROUGH | 09/04/2015 | 08/09/2015 | 08/26/2015 | WKDIS | 30 | 1,564.00 |
| | | | | | | | Check Total: | 1,564.00 |
| 132242 | TPA1572107-001 | WILLIAM H NEWBROUGH | 09/18/2015 | 08/23/2015 | 09/05/2015 | WKDIS | 30 | 1,564.00 |
| | | | | | | | Check Total: | 1,564.00 |
| 132622 | TPA1572107-001 | WILLIAM H NEWBROUGH | 10/01/2015 | 09/06/2015 | 09/19/2015 | WKDIS | 30 | 1,564.00 |
| | | | | | | | Check Total: | 1,564.00 |
| 132873 | TPA1572107-001 | WILLIAM H NEWBROUGH | 10/15/2015 | 09/20/2015 | 10/03/2015 | WKDIS | 30 | 1,564.00 |
| | | | | | | | Check Total: | 1,564.00 |
| 133313 | TPA1572107-001 | WILLIAM H NEWBROUGH | 11/05/2015 | 10/04/2015 | 10/17/2015 | WKDIS | 30 | 1,564.00 |
| 133313 | TPA1572107-001 | WILLIAM H NEWBROUGH | 11/05/2015 | 10/18/2015 | 10/31/2015 | WKDIS | 30 | 1,564.00 |
| | | | | | | | Check Total: | 3,128.00 |
| 133758 | TPA1572107-001 | WILLIAM H NEWBROUGH | 11/24/2015 | 11/01/2015 | 11/14/2015 | WKDIS | 30 | 1,564.00 |
| | | | | | | | Check Total: | 1,564.00 |
| 133909 | TPA1572107-001 | WILLIAM H NEWBROUGH | 12/07/2015 | 11/15/2015 | 11/28/2015 | WKDIS | 30 | 1,564.00 |
| | | | | | | | Check Total: | 1,564.00 |
| 134362 | TPA1572107-001 | WILLIAM H NEWBROUGH | 12/29/2015 | 11/29/2015 | 12/12/2015 | WKDIS | 30 | 469.20 |
| | | | | | | | Check Total: | 469.20 |
| | | | | | | Total for Coverage | WKDIS | 16,734.80 |
| 13796 | TPA1572107-001 | ▮▮▮▮▮▮ MD PA | 07/16/2015 | 06/23/2015 | 06/23/2015 | ACCMED | 21 | 187.86 |
| | | | | | | | Check Total: | 187.86 |
| 13797 | TPA1572107-001 | ▮▮▮▮▮▮ | 07/16/2015 | 06/25/2015 | 06/25/2015 | ACCMED | 23 | 114.29 |

CLM_Detail_Check_Register

Appendix 87

Print Date:   05/13/2016

# Detail Check Register
(Pyramid Claims System)

Page     2

| Check Number | Claim Number | Payee Name | Trans Dat | From Date | To Date | Cov | Pmt Cat | Paid |
|---|---|---|---|---|---|---|---|---|
| 13797 | TPA1572107-001 | ▓▓▓▓▓▓▓ | 07/16/2015 | 06/29/2015 | 06/30/2015 | ACCMED | 23 | 472.54 |
| | | | | | | | Check Total: | 586.83 |
| 13820 | TPA1572107-001 | ANCHOR CLAIMS MANAGEM | 07/28/2015 | 06/23/2015 | 06/23/2015 | ACCMED | 10 | 47.60 |
| 13820 | TPA1572107-001 | ANCHOR CLAIMS MANAGEM | 07/28/2015 | 06/25/2015 | 06/25/2015 | ACCMED | 10 | 2.33 |
| 13820 | TPA1572107-001 | ANCHOR CLAIMS MANAGEM | 07/28/2015 | 06/29/2015 | 06/30/2015 | ACCMED | 10 | 5.08 |
| | | | | | | | Check Total: | 55.01 |
| 13824 | TPA1572107-001 | ▓▓▓▓▓▓▓▓ | 07/28/2015 | 06/23/2015 | 06/23/2015 | ACCMED | 24 | 146.15 |
| | | | | | | | Check Total: | 146.15 |
| 13832 | TPA1572107-001 | ▓▓▓▓ MD PA | 07/30/2015 | 07/07/2015 | 07/07/2015 | ACCMED | 21 | 66.51 |
| | | | | | | | Check Total: | 66.51 |
| 13844 | TPA1572107-001 | ▓▓▓▓ | 08/03/2015 | 07/01/2015 | 07/02/2015 | ACCMED | 23 | 472.54 |
| | | | | | | | Check Total: | 472.54 |
| 13870 | TPA1572107-001 | ▓▓▓▓ MD PA | 08/24/2015 | 07/20/2015 | 07/20/2015 | ACCMED | 21 | 66.51 |
| 13870 | TPA1572107-001 | ▓▓▓▓ MD PA | 08/24/2015 | 08/04/2015 | 08/04/2015 | ACCMED | 21 | 81.51 |
| | | | | | | | Check Total: | 148.02 |
| 13881 | TPA1572107-001 | ANCHOR CLAIMS MANAGEM | 08/26/2015 | 07/20/2015 | 07/20/2015 | ACCMED | 10 | 20.73 |
| 13881 | TPA1572107-001 | ANCHOR CLAIMS MANAGEM | 08/26/2015 | 07/01/2015 | 07/02/2015 | ACCMED | 10 | 5.08 |
| 13881 | TPA1572107-001 | ANCHOR CLAIMS MANAGEM | 08/26/2015 | 07/07/2015 | 07/07/2015 | ACCMED | 10 | 20.73 |
| 13881 | TPA1572107-001 | ANCHOR CLAIMS MANAGEM | 08/26/2015 | 08/04/2015 | 08/04/2015 | ACCMED | 10 | 25.06 |
| | | | | | | | Check Total: | 71.60 |
| 13882 | TPA1572107-001 | ANCHOR CLAIMS MANAGEM | 08/26/2015 | 07/24/2015 | 07/24/2015 | ACCMED | 10 | 7.55 |
| 13882 | TPA1572107-001 | ANCHOR CLAIMS MANAGEM | 08/26/2015 | 07/30/2015 | 07/30/2015 | ACCMED | 10 | 283.00 |
| | | | | | | | Check Total: | 290.55 |
| 13892 | TPA1572107-001 | ▓▓▓▓▓ | 08/26/2015 | 07/30/2015 | 07/30/2015 | ACCMED | 20 | 294.85 |
| | | | | | | | Check Total: | 294.85 |
| 13908 | TPA1572107-001 | ▓▓▓▓ | 09/01/2015 | 07/06/2015 | 07/07/2015 | ACCMED | 22 | 472.62 |
| | | | | | | | Check Total: | 472.62 |
| 13926 | TPA1572107-001 | ▓▓▓▓▓ | 09/15/2015 | 08/19/2015 | 08/19/2015 | ACCMED | 21 | 286.06 |
| | | | | | | | Check Total: | 286.06 |
| 13947 | TPA1572107-001 | ▓▓▓▓▓ | 09/24/2015 | 08/26/2015 | 08/26/2015 | ACCMED | 21 | 124.51 |

CLM_Detail Check Register

Print Date:    05/13/2016

# Detail Check Register

(Pyramid Claims System)

Page    3

| Check Number | Claim Number | Payee Name | Trans Dat | From Date | To Date | Cov | Pmt Cat | Paid |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Check Total: | 124.51 |
| 13950 | TPA1572107-001 | ANCHOR CLAIMS MANAGEM | 09/25/2015 | 09/03/2015 | 09/03/2015 | ACCMED | 10 | 1.19 |
| 13950 | TPA1572107-001 | ANCHOR CLAIMS MANAGEM | 09/25/2015 | 08/26/2015 | 08/26/2015 | ACCMED | 10 | 3.36 |
| | | | | | | | Check Total: | 4.55 |
| 13951 | TPA1572107-001 | ANCHOR CLAIMS MANAGEM | 09/25/2015 | 08/19/2015 | 08/19/2015 | ACCMED | 10 | 26.40 |
| 13951 | TPA1572107-001 | ANCHOR CLAIMS MANAGEM | 09/25/2015 | 07/06/2015 | 07/07/2015 | ACCMED | 10 | 5.07 |
| | | | | | | | Check Total: | 31.47 |
| 13962 | TPA1572107-001 | ███████████████ | 09/25/2015 | 09/03/2015 | 09/03/2015 | ACCMED | 21 | 109.51 |
| | | | | | | | Check Total: | 109.51 |
| 14002 | TPA1572107-001 | ███████████████ | 10/16/2015 | 09/21/2015 | 09/21/2015 | ACCMED | 21 | 15.00 |
| | | | | | | | Check Total: | 15.00 |
| 14011 | TPA1572107-001 | ███████████████ | 10/23/2015 | 09/08/2015 | 09/08/2015 | ACCMED | 22 | 485.79 |
| | | | | | | | Check Total: | 485.79 |
| 14017 | TPA1572107-001 | ███████████████ | 10/26/2015 | 09/15/2015 | 09/15/2015 | ACCMED | 23 | 147.77 |
| 14017 | TPA1572107-001 | | 10/26/2015 | 09/10/2015 | 09/10/2015 | ACCMED | 23 | 150.20 |
| 14017 | TPA1572107-001 | | 10/26/2015 | 09/29/2015 | 09/29/2015 | ACCMED | 23 | 147.77 |
| 14017 | TPA1572107-001 | | 10/26/2015 | 09/24/2015 | 09/24/2015 | ACCMED | 23 | 147.77 |
| 14017 | TPA1572107-001 | | 10/26/2015 | 09/21/2015 | 09/21/2015 | ACCMED | 23 | 147.77 |
| 14017 | TPA1572107-001 | | 10/26/2015 | 09/17/2015 | 09/17/2015 | ACCMED | 23 | 147.77 |
| | | | | | | | Check Total: | 889.05 |
| 14027 | TPA1572107-001 | ANCHOR CLAIMS MANAGEM | 10/27/2015 | 09/08/2015 | 09/08/2015 | ACCMED | 10 | 1,226.52 |
| 14027 | TPA1572107-001 | ANCHOR CLAIMS MANAGEM | 10/27/2015 | 09/21/2015 | 09/21/2015 | ACCMED | 10 | 21.55 |
| 14027 | TPA1572107-001 | ANCHOR CLAIMS MANAGEM | 10/27/2015 | 09/21/2015 | 09/21/2015 | ACCMED | 10 | 2.17 |
| | | | | | | | Check Total: | 1,250.24 |
| 14033 | TPA1572107-001 | ANCHOR CLAIMS MANAGEM | 10/27/2015 | 09/17/2015 | 09/17/2015 | ACCMED | 10 | 21.55 |
| 14033 | TPA1572107-001 | ANCHOR CLAIMS MANAGEM | 10/27/2015 | 09/24/2015 | 09/24/2015 | ACCMED | 10 | 21.55 |
| 14033 | TPA1572107-001 | ANCHOR CLAIMS MANAGEM | 10/27/2015 | 09/29/2015 | 09/29/2015 | ACCMED | 10 | 21.55 |
| 14033 | TPA1572107-001 | ANCHOR CLAIMS MANAGEM | 10/27/2015 | 09/15/2015 | 09/15/2015 | ACCMED | 10 | 21.55 |
| 14033 | TPA1572107-001 | ANCHOR CLAIMS MANAGEM | 10/27/2015 | 09/10/2015 | 09/10/2015 | ACCMED | 10 | 21.07 |
| | | | | | | | Check Total: | 107.27 |
| 14051 | TPA1572107-001 | ███████████ | 11/02/2015 | 09/14/2015 | 09/14/2015 | ACCMED | 22 | 63.92 |
| | | | | | | | Check Total: | 63.92 |

CLM_Detail_Check_Register

| Print Date: | 05/13/2016 | | **Detail Check Register** | | | | | Page | 4 |
|---|---|---|---|---|---|---|---|---|---|
| | | | (Pyramid Claims System) | | | | | | |

| Check Number | Claim Number | Payee Name | Trans_Dat | From Date | To Date | Cov | Pmt Cat | Paid |
|---|---|---|---|---|---|---|---|---|
| 14054 | TPA1572107-001 | MED CTR | 11/03/2015 | 09/08/2015 | 09/08/2015 | ACCMED | 22 | 19,528.65 |
| | | | | | | | Check Total: | 19,628.65 |
| 14074 | TPA1572107-001 | MD PA | 11/10/2015 | 08/31/2015 | 08/31/2015 | ACCMED | 21 | 243.51 |
| | | | | | | | Check Total: | 243.51 |
| 14086 | TPA1572107-001 | | 11/16/2015 | 10/20/2015 | 10/20/2015 | ACCMED | 23 | 151.06 |
| 14086 | TPA1572107-001 | | 11/16/2015 | 10/15/2015 | 10/15/2015 | ACCMED | 23 | 191.84 |
| 14086 | TPA1572107-001 | | 11/16/2015 | 10/13/2015 | 11/13/2015 | ACCMED | 23 | 191.84 |
| 14086 | TPA1572107-001 | | 11/16/2015 | 10/06/2015 | 10/06/2015 | ACCMED | 23 | 145.40 |
| 14086 | TPA1572107-001 | | 11/16/2015 | 10/01/2015 | 10/01/2015 | ACCMED | 23 | 147.77 |
| 14086 | TPA1572107-001 | | 11/16/2015 | 10/08/2015 | 10/08/2015 | ACCMED | 23 | 147.77 |
| | | | | | | | Check Total: | 975.68 |
| 14092 | TPA1572107-001 | | 11/17/2015 | 10/19/2015 | 10/19/2015 | ACCMED | 21 | 15.00 |
| | | | | | | | Check Total: | 15.00 |
| 14102 | TPA1572107-001 | | 11/19/2015 | 09/08/2015 | 09/08/2015 | ACCMED | 22 | 3,571.96 |
| | | | | | | | Check Total: | 3,571.96 |
| 14111 | TPA1572107-001 | ANCHOR CLAIMS MANAGEM | 11/23/2015 | 10/15/2015 | 10/15/2015 | ACCMED | 10 | 27.53 |
| 14111 | TPA1572107-001 | ANCHOR CLAIMS MANAGEM | 11/23/2015 | 10/20/2015 | 10/20/2015 | ACCMED | 10 | 21.55 |
| 14111 | TPA1572107-001 | ANCHOR CLAIMS MANAGEM | 11/23/2015 | 08/31/2015 | 08/31/2015 | ACCMED | 10 | 80.48 |
| | | | | | | | Check Total: | 129.56 |
| 14116 | TPA1572107-001 | ANCHOR CLAIMS MANAGEM | 11/23/2015 | 10/19/2015 | 10/19/2015 | ACCMED | 10 | 2.17 |
| 14116 | TPA1572107-001 | ANCHOR CLAIMS MANAGEM | 11/23/2015 | 10/06/2015 | 10/06/2015 | ACCMED | 10 | 16.82 |
| 14116 | TPA1572107-001 | ANCHOR CLAIMS MANAGEM | 11/23/2015 | 10/08/2015 | 10/08/2015 | ACCMED | 10 | 21.55 |
| 14116 | TPA1572107-001 | ANCHOR CLAIMS MANAGEM | 11/23/2015 | 10/13/2015 | 10/13/2015 | ACCMED | 10 | 27.53 |
| 14116 | TPA1572107-001 | ANCHOR CLAIMS MANAGEM | 11/23/2015 | 10/01/2015 | 10/01/2015 | ACCMED | 10 | 21.55 |
| | | | | | | | Check Total: | 89.62 |
| 14117 | TPA1572107-001 | ANCHOR CLAIMS MANAGEM | 11/23/2015 | 09/08/2015 | 09/08/2015 | ACCMED | 10 | 2,539.98 |
| 14117 | TPA1572107-001 | ANCHOR CLAIMS MANAGEM | 11/23/2015 | 09/08/2015 | 09/08/2015 | ACCMED | 10 | 649.29 |
| | | | | | | | Check Total: | 3,189.27 |
| 14126 | TPA1572107-001 | | 11/25/2015 | 10/22/2015 | 10/22/2015 | ACCMED | 23 | 217.07 |
| | | | | | | | Check Total: | 217.07 |
| 14133 | TPA1572107-001 | | 11/30/2015 | 09/22/2015 | 09/22/2015 | ACCMED | 22 | 43.95 |
| | | | | | | | Check Total: | 43.95 |

CLM_Detail_Check_Register

Print Date:    05/13/2016

# Detail Check Register
(Pyramid Claims System)

Page    5

| Check Number | Claim Number | Payee Name | Trans Dat | From Date | To Date | Cov | Pmt Cat | Paid |
|---|---|---|---|---|---|---|---|---|
| 14141 | TPA1572107-001 | ████████ | 12/07/2015 | 11/17/2015 | 11/17/2015 | ACCMED | 23 | 213.78 |
| | | | | | | | Check Total: | 213.78 |
| 14148 | TPA1572107-001 | ████████ | 12/08/2015 | 11/19/2015 | 11/19/2015 | ACCMED | 23 | 213.78 |
| | | | | | | | Check Total: | 213.78 |
| 14156 | TPA1572107-001 | ████████ | 12/11/2015 | 09/08/2015 | 09/08/2015 | ACCMED | 21 | 783.99 |
| | | | | | | | Check Total: | 783.99 |
| 14174 | TPA1572107-001 | ████████ | 12/21/2015 | 11/24/2015 | 11/24/2015 | ACCMED | 23 | 213.78 |
| | | | | | | | Check Total: | 213.78 |
| 14184 | TPA1572107-001 | ANCHOR CLAIMS MANAGEM | 12/23/2015 | 11/19/2015 | 11/19/2015 | ACCMED | 10 | 29.88 |
| 14184 | TPA1572107-001 | ANCHOR CLAIMS MANAGEM | 12/23/2015 | 11/17/2015 | 11/17/2015 | ACCMED | 10 | 29.88 |
| 14184 | TPA1572107-001 | ANCHOR CLAIMS MANAGEM | 12/23/2015 | 09/08/2015 | 09/08/2015 | ACCMED | 10 | 55.82 |
| | | | | | | | Check Total: | 115.58 |
| 14191 | TPA1572107-001 | ANCHOR CLAIMS MANAGEM | 12/23/2015 | 10/22/2015 | 10/22/2015 | ACCMED | 10 | 29.89 |
| 14191 | TPA1572107-001 | ANCHOR CLAIMS MANAGEM | 12/23/2015 | 11/24/2015 | 11/24/2015 | ACCMED | 10 | 29.88 |
| | | | | | | | Check Total: | 59.77 |
| 14205 | TPA1572107-001 | ████████ | 12/31/2015 | 11/10/2015 | 11/10/2015 | ACCMED | 22 | 43.95 |
| | | | | | | | Check Total: | 43.95 |
| 14398 | TPA1572107-001 | ████████ | 03/24/2016 | 03/07/2016 | 03/07/2016 | ACCMED | 21 | 111.18 |
| | | | | | | | Check Total: | 111.18 |
| 14404 | TPA1572107-001 | ANCHOR CLAIMS MANAGEM | 03/28/2016 | 03/07/2016 | 03/07/2016 | ACCMED | 10 | .82 |
| | | | | | | | Check Total: | .82 |
| 14492 | TPA1572107-001 | ████████ | 04/28/2016 | 04/18/2016 | 04/18/2016 | ACCMED | 21 | 126.18 |
| | | | | | | | Check Total: | 126.18 |

Total for Coverage     ACCMEI               36,146.99

Grand Total for Claim Number     TPA1572107          52,881.79

CLM Detail Check Register

# Exhibit E

CAUSE NO. D-16-05-0545-CV

| | | |
|---|---|---|
| WILLIAM NEWBROUGH | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | 358TH JUDICIAL DISTRICT |
| | § | |
| ANCHOR RISK MANAGEMENT AND | § | |
| CENTRAL FREIGHT LINES, INC. | § | ECTOR COUNTY, TEXAS |

AFFIDAVIT OF BLAKE A. BAILEY

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TARRANT | § |

Before me, the undersigned authority, personally appeared Blake A. Bailey, who is known to me and on his oath deposed and stated:

1.     "My name is Blake A. Bailey. I am over the age of eighteen (18) years and legally competent to make this affidavit, which is based on my personal knowledge. The statements contained herein are true and correct.

2.     The following describes my experience and expertise in this area of law: I have been licensed to practice in the State of Texas since 1986 and am admitted to all State and Federal Courts in the State of Texas. I served as a law clerk for the Honorable John R. Brown, on the United States Court of Appeals for the Fifth Circuit in 1986 and 1987. I have represented clients in commercial litigation disputes for thirty years, practicing in state and federal courts. As a result, I am very familiar with the hourly rates charged by Texas attorneys with my level of experience in Texas.

3.     It was necessary for Anchor Risk and Claims Management ("Anchor") to retain an attorney to represent it in this matter.

4.     Anchor agreed to compensate Phelps Dunbar, LLP for legal work based on an hourly rate of $350 per hour for my time and $245 per hour for Brad Timms' time.

5.     We have spent approximately 43 hours in defending this case in which the plaintiff requests a declaratory judgment. This time includes reviewing plaintiff's pleading, investigating the allegations and underlying facts, reviewing relevant documents, filing an answer, reviewing documents produced by the plaintiff, responding to the plaintiff's discovery requests, and preparing a motion for summary judgment. Anchor has incurred attorney fees in the amount of $11,581.50 to date, plus expenses of $34.50. The attorney services and fees charged in this case were necessary, were reasonable, and were incurred in the defense of this declaratory judgment action.

6.      The Affidavits Concerning Cost and Necessity of Medical or Other Services and the Republic Group Release Agreement, which are attached to Anchor's motion for summary judgement, are true and correct copies of documents produced by plaintiff in response to written discovery, but have had specific medical treatment information redacted prior to filing them as a matter of public record."



Blake A. Bailey

SUBSCRIBED and SWORN TO BEFORE ME, the undersigned authority, on this the 22 day of March, 2017, to certify which, witness my hand and seal of office.

NOTARY PUBLIC FOR
THE STATE OF TEXAS

VANESSA BENCH
Notary Public, State of Texas
Comm. Expires 02-09-2019
Notary ID 2708234

My commission expires: 2/9/19

PD.20743388.1

**FILED FOR RECORD**
**Cause No.: D-16-05-0545-CV**
Ector County - 358th District Court
Ector County, Texas
3/22/2017 3:14:57 PM
**Clarissa Webster**
**District Clerk**
By: Marlet Caraveo, Deputy

## CAUSE NO. D-16-05-0545-CV

| | | |
|---|---|---|
| WILLIAM NEWBROUGH | §<br>§<br>§ | IN THE DISTRICT COURT |
| VS. | §<br>§<br>§ | 358TH JUDICIAL DISTRICT |
| ANCHOR RISK MANAGEMENT AND<br>CENTRAL FREIGHT LINES, INC. | §<br>§ | ECTOR COUNTY, TEXAS |

## DEFENDANT CENTRAL FREIGHT LINES, INC.'S
## <u>CERTIFICATE OF WRITTEN DISCOVERY</u>

### TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, DEFENDANT CENTRAL FREIGHT LINES, INC.

and certifies that the following discovery was served on all counsel of record on

the 22nd day of March, 2017.

1. *Defendant Central Freight Lines, Inc.'s First Amended Responses to Plaintiff's Request for Disclosure.*

Respectfully submitted,

CHAMBLEE, RYAN, KERSHAW &
ANDERSON, P.C.

By: _____

William H. Chamblee
State Bar No. 04086100
wchamblee@crka.law
Douglas R. Lewis
State Bar No. 12275800
dlewis@crka.law

2777 Stemmons Freeway, Suite 1157
Dallas, Texas  75207
(214) 905-2003
(214) 905-1213 (Facsimile)

ATTORNEYS FOR DEFENDANT
CENTRAL FREIGHT LINES, INC.

CERTIFICATE OF SERVICE

I do hereby certify that on March 22, 2017, a true and correct copy of
the above and foregoing document has been forwarded via the Court's
efiling system and email to all counsel of record.

_____
Douglas R. Lewis

Certificate of Written Discovery – Page 2

CAUSE NO. D-16-05-0545-CV

| WILLIAM NEWBROUGH | § | IN THE DISTRICT COURT |
|---|---|---|
| | § | |
| v. | § | 358TH JUDICIAL DISTRICT |
| | § | |
| ANCHOR RISK MANAGEMENT AND | § | |
| CENTRAL FREIGHT LINES, INC. | § | ECTOR COUNTY, TEXAS |

## ORDER SETTING HEARING DATE

IT IS ORDERED THAT the hearing on Defendant Anchor Risk Management's Motion

for Summary Judgment is set for 9:30 a.m. on April 27, 2017, in the 358th Judicial District Court,

Ector County, Texas.

SIGNED this ___March 24___, 2017.

_____
Judge Presiding

FILED FOR RECORD
Cause No.: D-16-05-0545-CV
Ector County - 358th District Court
Ector County, Texas
3/27/2017 10:25:25 AM
Clarissa Webster
District Clerk
By: Natalie Guthrie, Deputy

## CAUSE NO. D-16-05-0545-CV

| | | |
|---|---|---|
| **WILLIAM NEWBROUGH** | § | **IN THE DISTRICT COURT** |
| *Plaintiff* | § | |
| | § | |
| **VS.** | § | |
| | § | |
| **ANCHOR RISK MANAGEMENT AND CENTRAL FREIGHT LINES, INC.** | § | |
| *Defendants* | § | |
| **AND** | § | **358TH JUDICIAL DISTRICT** |
| | § | |
| **CENTRAL FREIGHT LINES, INC.** | § | |
| *Counter - Plaintiff* | § | |
| **VS.** | § | |
| **WILLIAM NEWBROUGH** | § | **ECTOR COUNTY, TEXAS** |
| *Counter - Defendant* | § | |

## COUNTER-PLAINTIFF CENTRAL FREIGHT LINES, INC.'S COUNTER-CLAIM AGAINST COUNTER-DEFENDANT WILLIAM NEWBROUGH

## TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW, Central Freight Lines, Inc., Counter-Plaintiff in the above-styled and numbered cause, and files this, its Counter-Claim against Counter-

Defendant Central Freight Lines Counter-Claim - Page 1

Page 1

Defendant William Newbrough, and would respectfully show the Court the following:

## I.   PARTIES

1.1   Counter-Plaintiff Central Freight Lines, Inc. does business as a trucking/transportation company, and it is a Texas corporation with its principal place of business in the State of Texas.

1.2   Counter-Defendant William Newbrough is an individual and resident of the State of Texas who is already a party to this lawsuit, having sued Anchor Risk Management and Central Freight Lines, Inc.

## II.   RELIEF

2.1   Counter-Plaintiff seeks monetary relief of $100,000 or less, including damages, penalties, court costs, expenses, prejudgment and post judgment interest, and attorney fees. Tex. R. Civ. P. 47(c)(1).

## III.   JURISDICTION AND VENUE

3.1   This Court has jurisdiction in this cause because the damages to Counter-Plaintiff Central Freight Lines, Inc. are within the jurisdictional limits of this Court. Additionally, the Court has jurisdiction over the parties because Counter-Defendant is a Texas resident. Further, the claim arises from the same transaction or occurrence as Plaintiff William Newbrough's claim, which is already before the Court.

3.2   Plaintiff William Newbrough has pled sufficient venue facts to fix this action in Ector County, Texas, as the majority of events surrounding the initial lawsuit occurred within Ector County.

**Defendant Central Freight Lines Counter-Claim - Page 2**

3.3    This claim is properly joined in this suit under Texas Rules of Civil Procedure 97(a) and (e) because Counter-Plaintiff's cause of action arises out of the same transaction or occurrence that is the subject matter of the original action.

## IV.    T.R.C.P. RULE 47 STATEMENT

4.1    In conformance with the requirements of Rule 47 of the Texas Rules of Civil Procedure, Counter-Plaintiff hereby provides notice that, by this suit, it is seeking monetary relief of $100,000 or less.

## V.    FACTS

5.1    On or about June 23, 2015, Counter-Defendant Newbrough was making a customer delivery to Smoker's Outlet, Inc., in or near Odessa, Ector County, Texas. During the delivery, Counter-Defendant was acting in the course and scope of his employment with Counter-Plaintiff Central. During his delivery, on information and belief, Counter-Defendant stepped or slipped in a hole, causing him to trip and fall. As a result, he reportedly injured his shoulder and incurred medical expenses.

5.2    Counter-Plaintiff Central is a non-subscriber under Texas law, providing benefits to its employees for work-related injuries in accordance with its ERISA-approved Employee Injury Benefit Plan ("The Plan"). Counter-Plaintiff is the Administrator of The Plan. Pursuant to The Plan, Counter-Plaintiff Central paid medical and wage loss benefits to Counter-Defendant Newbrough, a participant in The Plan, in the amount of $54,983.67.

5.3    Paragraphs 9.3, 9.4, and 9.5 of The Plan place certain duties upon

**Defendant Central Freight Lines Counter-Claim - Page 3**

Counter-Defendant. Specifically, 9.3 states in relevant part:

> [i]f a Payee becomes entitled to or directly or indirectly receives Plan
> benefits for any Injury caused by the negligence or other act or omission
> of any person or organization (including, but not limited to, an
> Employer), and is (or later becomes) entitled to or otherwise collects any
> damages or other compensation in connection with such Injury . . .
> whether by insurance, litigation, settlement or other proceedings, the
> Payee shall automatically be required to (i) subrogate his, her or its right
> to and reimburse the Plan out of said damages or other compensation
> for all medical management, investigation, attorneys' fees, costs of
> recovery, and other expenses related to the claim for benefits (including
> any subrogation proceeding). . . . If (i) a Payee fails, refuses or neglects to
> reimburse the Plan or otherwise comply with the provisions of this
> Section, or (ii) payments are made under the Plan based on fraudulent
> information or otherwise in excess of the amount necessary to satisfy the
> provisions of the Plan, then the Plan shall still have all remedies and
> rights of recovery specified herein. . . . The Plan shall have the first lien
> recovery against any benefits paid or to be paid by the Plan. The Plan
> shall also have the right to bring a lawsuit and assert a constructive trust
> or other interest against any and all persons that have assets that the Plan
> can claim rights to. The Plan has the right of first recovery from any
> judgment, settlement or other payment, regardless of whether the Payee
> has been "made whole." The Plan's subrogation rights and first lien will
> not be reduced by attorneys' fees or expenses incurred by any party in
> pursuing recovery against a third party and the "common fund" doctrine
> shall not apply. Any attorneys' fees and/or expenses incurred by or at
> the request of the Payee or his, her or its attorneys in a third party or
> other action shall be the sole responsibility of such party.

Specifically, 9.4 states in relevant part:

> A Payee shall provide the Claims Administrator with Prior written notice
> of the involvement of such party in any lawsuit, settlement discussion or
> other proceeding, one of the principal purposes of which is recovering,
> from any person or organization, damages or other compensation in any
> way related to any Injury for which such Payee has received (or may in
> the future file a claim to receive) Plan benefits. The Plan shall have the
> right to intervene for itself and on behalf of a Payee in any such lawsuit,
> settlement discussion or other proceeding.

Specifically, 9.5 states in relevant part:

**Defendant Central Freight Lines Counter-Claim – Page 4**

By participating in this Plan, a Participant obligates himself or herself, as well as all other Payees (in both their individual and representative capacities), to the provisions of this Plan. . . .

5.4    In or about May, 2015, Counter-Defendant engaged in negotiations to settle all potential claims that he had related to the slip and fall in question, releasing Smoker's Outlet and its carrier from all liability upon payment to Counter-Defendant. No notice of these negotiations was provided by Counter-Defendant to Counter-Plaintiff. On information and belief, these settlement negotiations were purposefully conducted without the knowledge of Counter-Plaintiff. In doing so, Counter-Defendant directly violated the terms of the Plan.

5.5    Counter-Plaintiff has a first lien recovery interest, a right to reimbursement, a right of subrogation and a contractual right, as Plan Administrator, to all amounts paid or to be paid, by Counter-Plaintiff to Counter-Defendant, which arise out of the incident in question.

## VI.    COUNTER-DEFENDANT WILLIAM NEWBROUGH

6.1    The relationship of Counter-Plaintiff Central and Counter-Defendant, in this context, is detailed in The Plan, which is attached as Exhibit A. The Plan requires that Counter-Defendant reimburse Counter-Plaintiff Central as alleged above. Counter-Defendant has not done so. Thus, Counter-Defendant is in violation and breach of The Plan and liable for damages as a result. Additionally, Counter-Plaintiff Central is entitled to recover all of its expenses and fees in seeking said damages and prosecuting this suit.

Defendant Central Freight Lines Counter-Claim - Page 5

## VII.   <u>DAMAGES</u>

7.1   As a result of the incident made the basis of this lawsuit and Counter-Claim described in the preceding paragraphs, Counter-Plaintiff Central has sustained significant damages, involving benefits paid pursuant to The Plan, as well as expenses, and attorney fees, which fees are expected to increase during the pendency of this lawsuit. Counter-Plaintiff requests judgment pursuant to the provisions, terms, obligations, and contractual requirements of The Plan.

7.2   Because of all of the above and foregoing, Counter-Plaintiff Central has suffered actual damages in excess of the minimum jurisdictional limits of the Court for which damages Counter-Plaintiff Central now brings suit.

## VIII. <u>JURY DEMAND</u>

8.1   Pursuant to Rule 216 of the Texas Rules of Civil Procedure, Counter-Plaintiff Central respectfully demands a trial by jury and has previously submitted the jury fee.

## IX.   <u>PRAYER</u>

**WHEREFORE, PREMISES CONSIDERED,** Counter-Plaintiff Central prays that that upon final trial and hearing hereof, Counter-Plaintiff Central recover its damages, as alleged above and in accordance with the evidence, that Counter-Plaintiff Central recover costs of court, attorney fees, all pre-judgment and post-judgment interest permitted by law, and such other and further relief, both in law and in equity, to which Counter-Plaintiff Central may be justly entitled.

Defendant Central Freight Lines Counter-Claim - Page 6

Respectfully submitted,

CHAMBLEE, RYAN, KERSHAW & ANDERSON, P.C.

By: _____

William H. Chamblee
State Bar No. 04086100
wchamblee@crka.law
Douglas R. Lewis
State Bar No. 12275800
dlewis@crka.law

2777 Stemmons Freeway, Suite 1157
Dallas, Texas  75207
(214) 905-2003
(214) 905-1213 (Facsimile)

ATTORNEYS FOR DEFENDANT/COUNTER-
PLAINTIFF
CENTRAL FREIGHT LINES, INC.

## CERTIFICATE OF SERVICE

I do hereby certify that on March 21, 2017 a true and correct copy of the above and foregoing document has been forwarded by court's e-filing service to all counsel of record.

_____

Douglas R. Lewis

Defendant Central Freight Lines Counter-Claim - Page 7

# EXHIBIT A

# EMPLOYEE INJURY BENEFIT PLAN

## OFFICIAL PLAN DOCUMENT

©Copyright 2007 Gibson, McClure, Wallace & Daniels
NAC Revised 11/8/07

# TABLE OF CONTENTS

Page

ARTICLE I – PARTICIPATION IN THE PLAN ......................................................................... 1

ARTICLE II – MAKING A CLAIM FOR BENEFITS ................................................................ 1
   2.1     Notice of Injury ............................................................................................................ 1
   2.2     Providing Required Information................................................................................... 1
   2.3     Filing a Claim for Benefits .......................................................................................... 1

ARTICLE III – MEDICAL MANAGEMENT ............................................................................ 1
   3.1     Approved Provider and Pre-Authorization Requirements........................................... 1
   3.2     Covered and Non-Covered Medical Expenses ............................................................ 2
   3.3     Medical Determinations and Treatment ...................................................................... 2
   3.4     Initial Treatment and Denial ....................................................................................... 2
   3.5     Medical Provider Referrals.......................................................................................... 2
   3.6     No Interference with Patient-Provider Relationship.................................................... 2
   3.7     Professional Medical Review And
              Quality/Efficiency Features................................................................................... 2
   3.8     Second Medical Opinions............................................................................................ 3
   3.9     Use and Disclosure of Protected Health Information .................................................. 3

ARTICLE IV – COVERED INJURIES ...................................................................................... 3
   4.1     Covered Injuries .......................................................................................................... 3
   4.2     Non-Covered Injuries .................................................................................................. 3

ARTICLE V – BENEFITS ........................................................................................................... 4
   5.1     Medical Benefits.......................................................................................................... 5
   5.2     Total Disability Benefits.............................................................................................. 5
   5.3     Death Benefits ............................................................................................................. 5
   5.4     Dismemberment Benefits ............................................................................................ 6

ARTICLE VI – OTHER LIMITATIONS ON BENEFITS ......................................................... 6
   6.1     Coordination Of Benefits ............................................................................................ 6
   6.2     Taxes, Garnishments and Payroll Deferrals ............................................................... 7
   6.3     Discharge for Benefit Payments.................................................................................. 7
   6.4     Spendthrift Provision................................................................................................... 7

ARTICLE VII – CONTINUING BENEFITS .............................................................................. 7

ARTICLE VIII – DETAILED CLAIMS FILING AND APPEAL PROCEDURES.................... 8
   8.1     What is a Claim ........................................................................................................... 8
   8.2     Who is a Claimant ....................................................................................................... 8
   8.3     Information to Submit .................................................................................................. 8
   8.4     Submission of Medical Bills for Payments................................................................. 8
   8.5     Incomplete Claim Submissions .................................................................................. 8
   8.6     Claims Review ............................................................................................................ 9

ARTICLE IX – NATURE OF PAYMENTS AND SUBROGATION.......................................... 12
   9.1     Nature of Payments ..................................................................................................... 12
   9.2     Participants Who Signed Pre-Injury Waivers of Negligence Claims Prior to June 17, 2001 ...... 12
   9.3     Recovery From Third Parties and Excess Payments ................................................... 13
   9.4     Notice of Legal Proceedings ....................................................................................... 13
   9.5     Assignment of Rights .................................................................................................. 13
   9.6     Final Compromise and Settlement............................................................................... 14

© Copyright 2007 Gibson, McIlvee, Wallace & Daniels
NAC Revised 11/8/07

i

Appendix 107

Page

ARTICLE X - ADMINISTRATION .......................................................................... 14
    10.1    Plan Administrator.......................................................................... 14
    10.2    Claims Administrator and Committee Indemnity ............................ 15
    10.3    Funding Policy And Method ........................................................... 15
    10.4    Participation By Affiliates .............................................................. 15

ARTICLE XI - DEFINITIONS .............................................................................. 15
    11.1    Accident or Accidental .................................................................. 15
    11.2    Adverse Benefit Determination ..................................................... 15
    11.3    Approved Provider ........................................................................ 15
    11.4    Beneficiary ................................................................................... 16
    11.5    Benefits Schedule ........................................................................ 16
    11.6    Claims Administrator .................................................................... 16
    11.7    Committee .................................................................................... 16
    11.8    Company ...................................................................................... 16
    11.9    Covered Employee ....................................................................... 16
    11.10   Covered Medical Expense ............................................................ 16
    11.11   Cumulative Trauma ...................................................................... 16
    11.12   Death Benefits ............................................................................. 16
    11.13   Determination .............................................................................. 16
    11.14   Dismemberment Benefits ............................................................. 16
    11.15   Emergency Care .......................................................................... 17
    11.16   Employee ..................................................................................... 17
    11.17   Employer ...................................................................................... 17
    11.18   Gross Misconduct ........................................................................ 17
    11.19   Hospital ....................................................................................... 17
    11.20   Injury ........................................................................................... 17
    11.21   Maximum Coverage Period .......................................................... 17
    11.22   Medical Benefits .......................................................................... 17
    11.23   Medically Necessary .................................................................... 17
    11.24   Occupational Disease .................................................................. 17
    11.25   Occurrence .................................................................................. 18
    11.26   Participant .................................................................................... 18
    11.27   Payroll ......................................................................................... 18
    11.28   Plan ............................................................................................. 18
    11.29   Plan Administrator ........................................................................ 18
    11.30   Plan Year ..................................................................................... 18
    11.31   Post-Service Claim ...................................................................... 18
    11.32   Pre-Service Claim ....................................................................... 18
    11.33   Rehabilitation ............................................................................... 18
    11.34   Relevant ...................................................................................... 18
    11.35   Scope of Employment .................................................................. 19
    11.36   Skilled Nursing Facility ................................................................. 19
    11.37   Total Disability Benefits ................................................................ 19
    11.38   Totally Disabled or Total Disability ............................................... 19
    11.39   Urgent Care Claim ....................................................................... 19
    11.40   Usual and Customary .................................................................. 20

ARTICLE XII - GENERAL PROVISIONS ............................................................. 20
    12.1    Termination and Amendment ........................................................ 20
    12.2    Employment Noncontractual ......................................................... 20
    12.3    Plan Documents Control ............................................................... 20
    12.4    Construction ................................................................................. 20
    12.5    Separability .................................................................................. 20
    12.6    Applicable Law ............................................................................. 20
APPENDIX A:  USE AND DISCLOSURE OF PROTECTED HEALTH INFORMATION

©Copyright 2007 Cokinos, McClure, Wallace & Daniels
N/C Revised 1-25/07

# EMPLOYEE INJURY BENEFIT PLAN

The Company (and any Participating Employers identified on the Benefits Schedule) establishes or updates this Employee Injury Benefit Plan which is intended to conform to the requirements for an employee welfare benefit plan under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). The Employer has rejected coverage for its Texas employees under the Texas Workers' Compensation Act and establishes a separate employee injury benefit plan by signing the Benefits Schedule. The provisions of this Plan apply solely to a Participant who suffers an Injury on or after the Plan's Effective Date and any beneficiaries, spouse, heirs, legal representatives and assigns of such Participant.

## ARTICLE I
## PARTICIPATION IN THE PLAN

Each Covered Employee shall become a Participant in this Plan as of the later of (A) 12:01 a.m. on the Effective Date specified in Item 8 of the Benefits Schedule, or (B) the time and date of his or her employment as a Covered Employee. Except to the limited extent provided under Article V regarding the continuation of certain benefit payments, if a Participant ceases to be a Covered Employee, he or she shall thereupon cease to participate in this Plan; provided, however, that if such Participant is thereafter reemployed as a Covered Employee, he or she shall resume participating in the Plan as of the time and date of such reemployment.

## ARTICLE II
## MAKING A CLAIM FOR BENEFITS

2.1    **Notice of Injury.**  The Participant (or a person acting on his or her behalf) must report every incident or fact that the Participant believes results, or might reasonably be expected to result, in an Injury. The Participant must provide verbal notice immediately after being injured at work to his or her supervisor then on duty, no matter how minor the Injury appears to be.  For **Injury due to an Accident, or for a known exposure to an Occupational Disease, verbal notice must be provided by the end of the workshift for the date of the Injury.  For an actual Injury due to Occupational Disease or Cumulative Trauma, verbal notice must be provided within the earlier of (1) 24 hours after being medically diagnosed, or (2) 30 days after the Participant should have known of the Injury.  Any provision in the Plan to the contrary notwithstanding, no benefits are payable under this Plan unless notice of Injury is provided by the Participant as described above not later than 24 months from the date of the Occurrence.**

2.2    **Providing Required Information:**  An injured Participant (or a person acting on his or her behalf) and such Participant's supervisor then on duty (or such other person as the Claims Administrator may specify) must complete such Injury report, investigation, and authorization forms, file such written statements, provide such recorded statements (whether sworn or unsworn), and provide such proof and demonstrations (relating to the Injury or any prior or subsequent damage or harm suffered by the Participant, in or out of the Scope of Employment), in such manner and within such periods, as the

Claims Administrator may from time-to-time direct.  **The written incident report must be provided within 24 hours after the Injury is reported as required under Section 2.1 above.  No benefits will be payable under the Plan if all information is not provided as required above, unless the Claims Administrator determines that good cause exists for failure to provide such information in a complete and timely manner.**

2.3    **Filing a Claim for Benefits.**  A claim for Medical Benefits, Total Disability Benefits, or Dismemberment Benefits under the Plan shall be initiated by a Participant by (i) complying with the notice requirements of Section 2.1, (ii) providing required information pursuant to Section 2.2, and (iii) submitting to medical treatment in accordance with ARTICLE III. A claim for Medical Benefits can also be directly submitted on the behalf of a Participant to the Claims Administrator by a health care professional.  A claim for Death Benefits under the Plan shall be initiated by a Beneficiary providing notice of entitlement thereto to the Claims Administrator within 90 days after the date of the Participant's death.

## ARTICLE III
## MEDICAL MANAGEMENT

3.1    **Approved Provider and Pre-Authorization Requirements.**  The cost of a service or supply shall be a Covered Medical Expense (as further described in Section 3.2) only if:

(a)  treatment is pre-approved by the Claims Administrator and furnished by or under the direction of an Approved Provider, acting within the scope of the Approved Provider's license.  Such pre-approval may include authorization for multiple visits to an Approved Provider, and may be verbal, in writing, or by electronic notice. The Claims Administrator will not deny a claim for failure to obtain a prior approval under circumstances that would make obtaining such prior approval impossible or where application of the prior approval process could seriously jeopardize the life or health of the Participant; provided, however, that this exception to the pre-approval requirement does not change the requirement that care be provided by or under the direction of an Approved Provider; or

(b)  (1) treatment is provided as Emergency Care; and

©Copyright 2007 Gibson, McClure, Wallace & Daniels
MAC Revised 11-2002

1

(2) an Approved Provider is not available or is not within a reasonable distance from the location of the Participant at the time of Injury (taking into account available transportation and the nature of the Injury); and

(3) the Claims Administrator receives notification of such Emergency Care within the later of 24 hours of the Participant's receipt of such care or the next business day; and

(4) after receiving primary Emergency Care, subsequent treatments are provided by, or at the direction of, an Approved Provider in accordance with paragraph (1) above.

**3.2    Covered and Non-Covered Medical Expenses.** The Plan pays 100% of expenses incurred during the Maximum Coverage Period by a Participant for medical or dental services, procedures or supplies prescribed by or provided under the direction of an Approved Provider or for Emergency Care (as described in Section 3.1) that are Medically Necessary (as determined by the Approved Provider), Usual and Customary, and do not exceed the charge specified in any fee schedule approved or adopted by the Claims Administrator. Covered Medical Expenses shall include, but not be limited to, confinement within a Hospital or Skilled Nursing Facility and the Usual and Customary cost of Medically Necessary supplies, and ambulance hire, and those expenses incurred for Rehabilitation; but shall not include charges for:

(a) biofeedback and other forms of self-care or self-help training or any related diagnostic testing;

(b) hypnosis, acupuncture, chiropractic treatment or chiropractic therapy;

(c) the purchase, rental or repair of environmental control devices, including, but not limited to, air conditioners, humidifiers, or air purifiers; or

(d) services performed by a person who normally lives with the Participant, the spouse of the Participant, a parent of the Participant or of the Participant's spouse, a child of the Participant or of the Participant's spouse, or a brother or sister of the Participant or of the Participant's spouse.

**3.3    Medical Determinations and Treatment.** All determinations relating to the physical condition of a Participant, upon which the continued payment of benefits is based (for example, inability to return to work or results of a prior injury), must be made by an Approved Provider. The Participant must follow fully and completely the advice of, and the course of medical treatment prescribed by, the treating Approved Provider, and must keep all scheduled appointments to fulfill the prescribed medical treatment plan. The Claims Administrator may require that the Participant present an

authorization and report form to, and submit to any form of drug and alcohol testing by, the treating Approved Provider or Emergency Care provider at the time of primary medical treatment. The Claims Administrator shall have the right to require the Participant to be examined or reexamined by an Approved Provider (including, but not limited to an autopsy, where not prohibited by law) as often as the Claims Administrator determines to be reasonably necessary or appropriate during the pendency of a claim for benefits under the Plan.

**3.4    Initial Treatment and Denial.** Any provision of this Plan to the contrary notwithstanding, an Employer may render first aid, or the Plan may pay for Emergency Care, Total Disability Benefits or for a medical evaluation or treatment of a Participant, and the Plan can still make a subsequent determination that the Participant has not suffered a covered Injury or otherwise deny any or all further benefits under the provisions of this Plan.

**3.5    Medical Provider Referrals.** If the treating Approved Provider finds it necessary to refer a Participant to another healthcare provider, the treating Approved Provider must notify such Participant and the Claims Administrator of his or her desire to make the referral and the objectives of such referral. The Claims Administrator will provide advance approval or disapproval of all referrals (and may rescind any such approval at any time) based upon such criteria as the Claims Administrator may determine for the effective administration of the Plan. It is the Participant's responsibility to determine the status of any such approval or disapproval, and the expense of services or supplies relating to any disapproved referral shall be solely the responsibility of the Participant.

**3.6    No Interference with Patient-Provider Relationship.** Although benefits under this Plan are conditioned on a Participant's use of only Approved Providers, a Participant remains entitled to seek any medical care he or she deems appropriate from any provider of his or her choice at his or her expense. The Employer, the Plan Administrator, the Claims Administrator, and the Committee, and their respective directors, officers, agents and delegates, shall not have any responsibility for the actual medical or other healthcare services provided by any Approved Provider or other healthcare service provider. Healthcare providers are not agents of the Plan, Employer, Plan Administrator, Claims Administrator, or Committee, and they are not liable or responsible for the acts or omissions of any healthcare provider. The actual medical treatment or rehabilitation of any Injury remains the sole prerogative and responsibility of the attending Approved Provider and other healthcare providers based on their independent judgment for the provision of health care.

**3.7    Professional Medical Review and Quality/Efficiency Features.** The Claims Administrator shall have the discretion to assign Approved Providers and other healthcare providers or firms to a Participant's case in order to

©Copyright 2007 Groom, McClure, Wallace & Daniels
HAC doc v.1.1.8/07

2

(1) coordinate and expedite medical treatment of the Participant, in consultation with the treating Approved Provider, (2) facilitate such case management, quality, and efficiency measures and procedures as the Claims Administrator deems appropriate, based upon particular facts and circumstances, and (3) review the propriety of any and all treatment, services, and supplies, including charges for such treatment, services, and supplies.

**3.8    Second Medical Opinions.**  The Plan reserves the right to require a second medical opinion from an Approved Provider selected by the Claims Administrator for purposes of obtaining an Independent Medical Evaluation (IME) or for any other reason relating to the payment of Medical Benefits, Total Disability Benefits, or any other benefits under this Plan. If a Participant refuses to be examined by an Approved Provider selected by the Claims Administrator for the second opinion, all benefits under the Plan shall be suspended. The Claims Administrator will weigh the findings of the treating Approved Provider and the Approved Provider providing the second opinion and make a benefit determination under the Plan. However, if the Participant is in disagreement with the diagnosis or treatment recommended by the Approved Provider whose opinion is accepted by the Claims Administrator ("Physician A"), then the Participant shall have the right to be examined at his or her own expense by another physician ("Physician B"). If the diagnosis and treatment recommended by Physician B is contrary to that of Physician A, then the Claims Administrator shall designate a peer review physician who will evaluate the medical records and advise the Claims Administrator, and who may designate another Approved Provider for a further medical examination. If the Participant refuses to be so examined, all benefits under the Plan may be suspended. The diagnosis and/or recommended treatment of the peer review physician or this last Approved Provider will be controlling. The fees and related expenses of the peer review physician and this last Approved Provider will be paid by the Plan (although the Participant shall have the option of paying up to one-half of such fees and expenses).

**3.9    Use and Disclosure of Protected Health Information.**  See Appendix A attached hereto.

## ARTICLE IV
## COVERED INJURIES

**4.1    Covered Injuries.**  "Covered Injuries" shall mean an Injury that meets the following conditions: The Occurrence of the Injury must be on or after the Effective Date specified in Item 8 of the Benefits Schedule. The Injury must be incurred in, and directly and solely result from, an Occurrence in the Scope of Employment that takes place within the United States of America (including its territories and possessions), Puerto Rico or Canada. All Injuries sustained by a Participant that relate to (a) an Accident, or related series of Accidents, (b) exposure to an environmental or physical hazard that causes an Occupational Disease, or (c)

repetitious, physically traumatic activities that result in Cumulative Trauma shall be considered a single Injury for purposes of the Plan.

**4.2    Non-Covered Injuries.**  Any provision of this Plan to the contrary notwithstanding, the term Injury shall not include any damage or harm arising out of:

(a)  liability arising out of employment relationships including, without limitation, claims for any type of discrimination, discharge, coercion, criticism, demotion, reassignment, discipline, defamation, harassment, humiliation, sexual harassment, claims arising under the U.S. Americans with Disabilities Act, claims arising out of the Texas Labor Code, and all other claims affecting or arising out of the employment relationship whether arising out of state or federal statutes or regulations or the common law (except as otherwise specifically covered in this Plan);

(b)  the Participant's willful intention and attempt to injure himself or herself or to injure another person, whether the Participant was sane or insane;

(c)  the Participant's participation in --

(1)  an assault or a felony, except an assault committed in defense of an Employer's business or property;

(2)  any act of terrorism;

(3)  any illegal act; or

(4)  service in the military of any country or any civilian non-combatant unit serving with such forces;

(d)  directly or indirectly, contributed by, caused by, resulting from, or in connection with any of the following, regardless of any other cause or event contributing concurrently or in any other sequence of the loss:

(1)  war, invasion, acts of foreign enemies, hostilities or warlike operations (whether war be declared or not), civil war, mutiny, revolution, rebellion, insurrection, uprising, military or usurped power, confiscation by order of any public authority or government de jure or de facto, martial law; or

(2)  riots, strikes, or civil commotion;

This exclusion also excludes from coverage all actual or alleged losses, liabilities, damages, injuries, defense costs, costs or expenses directly or indirectly arising out of, contributed by, caused by, resulting from, or in connection with any action taken in controlling, preventing, suppressing, retaliating against or responding to (1) or (2) above;

©Copyright 2007 Gibson, McClure, Wallace & Daniels
MAC Revised 1/18/07

(e)  any act of terrorism not "certified," as defined under the Terrorism Risk Insurance Act of 2002;

(f)  Accidental bodily injury, Occupational Disease or Cumulative Trauma occurring while the Participant was deemed to be legally intoxicated by a law enforcement official;

(g)  Accidental bodily injury, Occupational Disease or Cumulative Trauma occurring while the Participant was under the influence of any chemical substance that was obtained or consumed in violation of the U.S. Controlled Substances Act in force at the time and location of the Occurrence;

(h)  Accidental bodily injury, Occupational Disease or Cumulative Trauma to the Participant while employed in violation of any law;

(i)  the use of or caused by --

(1)  asbestos, asbestos fibers or asbestos products;

(2)  lead or lead based products;

(3)  the hazardous properties, including radioactive, toxic or explosive properties, of nuclear material; or

(4)  any and all medical conditions that are associated with silica related conditions, including exposure to any and all material, which also is known as silica dust, exposures to respirable crystalline silica, exposure to silicosis, exposure to material that may cause lung cancer, pulmonary tuberculosis, and airway diseases, autoimmune disorders, chronic renal disease, or other health conditions that are associated with exposure to silica based materials;

(j)  the following common law causes of action by a Participant:

(1)  breach of any contract of employment, whether written, oral or implied;

(2)  breach of duty of good faith and fair dealing;

(3)  breach of any non-competition agreements;

(4)  tortious interference with contractual relations;

(5)  negligent or intentional infliction of emotional distress;

(6)  negligent hiring, negligent promotion, or negligent retention; or

(7)  claims based on assault and battery, defamation, invasion of privacy, false light publicity, negligent invasion of privacy, misrepresentation, fraud, false imprisonment, false arrest, malicious prosecution, unreasonable search or retaliatory discharge;

(k)  a heart attack, unless the heart attack was proximately caused by and arose out of an Accident in the Scope of Employment; or

(l)the Participant's voluntary participation in any recreational, social or athletic activity not constituting part of the Participant's Scope of Employment, whether or not such participation occurs on an Employer's premises or during an Employer's normal business hours;

(m)  the injured Participant's ownership, operation, maintenance, use, loading or unloading, or entrustment to others of any aircraft owned or operated by or rented by or rented or loaned to the Company. Loading or unloading means the handling of property:

(1)  after it is moved from the place where it is accepted for movement into or onto an aircraft;

(2)  while it is in or on an aircraft; or

(3)  while it is being moved from an aircraft to the place where it is finally delivered; provided, however, loading or unloading does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft.

## ARTICLE V
## BENEFITS

Participants shall be entitled to receive under this Plan the benefits described in this Article V with respect to any Injury incurred (i) in the Scope of Employment by an Employer, and (ii) during his or her participation in this Plan. Any provision of this Plan to the contrary notwithstanding, if an Employer has purchased an insurance policy described in Section 10.3, the purpose of which (in whole or in part) is to indemnify the Employer for Plan benefits, then benefit payments under this Plan shall not be payable or shall immediately cease in the event that benefits coverage is not available to

©Copyright 2003 Gibson, McClure, Wallace & Daniels
NAE Revised 11/8/07

4

the Employer or ceases under such policy for any reason (other than the need to satisfy any self-insured retention).

5.1    Medical Benefits.    Subject to the medical management and other provisions of this Plan, the Plan shall pay Medical Benefits to, or with respect to, a Participant for an Injury in an amount equal to all Covered Medical Expense incurred during the Maximum Coverage Period; provided, however, that Medical Benefits shall cease upon the earliest of:

(a)    the expiration of the Maximum Coverage Period specified in Item 9 of the Benefits Schedule. This Maximum Coverage Period is calculated continuously from the date of the Occurrence, without regard to whether the Participant regularly requires medical treatment during such period or otherwise receives Medical Benefits continuously throughout such period;

(b)    the date the Combined Benefit Limit is reached;

(c)    involuntary termination of employment of the Participant with an Employer for Gross Misconduct; or

(d)    as otherwise provided under ARTICLE VII.

5.2    Total Disability Benefits.    If a Participant becomes Totally Disabled during the Maximum Coverage Period as the result of an Injury for the number of consecutive working days specified in Item 10.a. of the Benefits Schedule as the "Waiting Period" (days on which the Participant would normally be at work), then the Plan shall begin payment of Total Disability Benefits as of the Participant's next scheduled working day equal to his or her Percentage of Payroll specified in Item 10.b. on the Benefits Schedule; provided, however, that (1) such benefit payments shall be reduced as described in Article VI, (2) such benefit payments shall not exceed the Maximum Weekly Disability Benefit Amount specified in Item 10.c. of the Benefits Schedule; and (3) no Total Disability Benefits shall be payable to any Participant who is entitled to receive Death Benefits or Dismemberment Benefits.

(a)    Total Disability Benefits are calculated on a weekly basis, and paid on regular paydays. Payments for portions of a week shall be prorated. Only the Participant's normal, scheduled workdays shall be considered in calculating benefits (based upon his or her employment status as of the date of Total Disability). All Total Disability Benefits must be incurred during the Maximum Coverage Period specified in Item 9. of the Benefits Schedule.

(b)    Total Disability Benefits shall continue until the earliest of:

(1)    the expiration of the Maximum Coverage Period specified in Item 9. of the Benefits Schedule. This Maximum Coverage Period for

Total Disability Benefits is calculated continuously from the date of the Occurrence, without regard to whether the Participant qualifies as Totally Disabled at all times during such period or receives Total Disability Benefits continuously throughout such period;

(2)    the date the Participant is certified by the treating Approved Provider to no longer be Totally Disabled, without regard to whether the Participant returns to regular or light or modified duty on that date;

(3)    the date the Combined Benefit Limit is reached;

(4)    termination of the Participant's status as a Covered Employee; provided, however, that this paragraph (4) shall not apply if termination of employment is solely due to -

(A)    application of a duration limit in the Employer's leave of absence policy, or

(B)    elimination of the Participant's employment position;

(5)    the date the Participant is placed in jail, has left the local area for an extended period of time, or is similarly unavailable for work; provided, however, that this paragraph (5) shall operate to cease Total Disability Benefits only for such period of time that such Participant is unavailable for work;

(6)    the date any Death Benefit or Dismemberment Benefit becomes payable to or with respect to the Participant; or

(7)    as otherwise provided under ARTICLE VII.

5.3    Death Benefits.    In the event that a Participant dies during the Maximum Coverage Period as the direct and sole result of an Injury, then the Plan shall pay such Participant's Beneficiary a Death Benefit equal to the lesser of (1) 7.5 times the Participant's annualized Payroll, or (2) the Death or Dismemberment Benefit Limit specified in Item 11 of the Benefits Schedule; provided, however that this Death Benefit amount shall be reduced by the amount of any Total Disability Benefits paid or payable with respect to the Covered Injury and to the extent necessary to avoid exceeding the Combined Benefit Limit.    The Death Benefit shall be paid to the Participant's Beneficiary as follows:

(a)    20% of the benefit shall be paid in a lump sum cash payment as soon as administratively possible

©Copyright 2007 Gibson, McCune, Walker, & Daniels
NAC Revised 11/8/07

5

following the death of the Participant and the determination of the proper Beneficiary; and

    (b) the remainder of the Death Benefit shall be paid in 35 equal monthly installments (without interest), commencing on the first day of the month following the initial lump sum payment.

Death Benefits payable under this Plan shall be in addition to Medical Benefits and Dismemberment Benefits paid or payable to, or with respect to, the Participant; provided, however, that (1) the Combined Benefit Limit shall not be exceeded, (2) the combination of Death Benefits and Dismemberment Benefits paid or payable to and with respect to a Participant shall not exceed the Death or Dismemberment Benefit Limit specified in Item 11 of the Benefits Schedule, and (3) no interest in future Dismemberment Benefits survives after a Participant's death which results in the payment of benefits under this Section 5.3. In addition to the Death Benefits set forth above, but subject to the Combined Benefit Limit, the Plan shall reimburse reasonable burial expenses to any person who incurs liability therefor, up to $5,000.

    5.4   **Dismemberment Benefits**. In the event a Participant suffers a loss described in the Schedule of Losses below during the Maximum Coverage Period as the direct and sole result of an Injury, then the Plan shall pay the Participant an amount equal to the applicable Benefit Percentage from the schedule below times the lesser of (1) 7.5 times the Participant's annualized Payroll, or (2) the Death or Dismemberment Benefit Limit specified in Item 11 of the Benefits Schedule; provided, however, that this Dismemberment Benefit amount shall be reduced by the amount of any Total Disability Benefits paid or payable with respect to the Injury and to the extent necessary to avoid exceeding the Combined Benefit Limit. The Dismemberment Benefit shall be paid as follows:

    (a) 20% of the Dismemberment Benefit shall be paid in a lump sum cash payment as soon as administratively possible following the date of loss; and

    (b) the remainder of the Dismemberment Benefit shall be paid in 35 equal monthly installments (without interest), commencing on the first day of the month following the initial lump sum payment.

## SCHEDULE OF LOSSES

| Loss of: | Benefit Percentage: |
| --- | --- |
| Both Hands | 100% |
| Both Feet | 100% |
| Sight of Both Eyes | 100% |
| One Hand and One Foot | 100% |
| One Hand and Sight of One Eye | 100% |
| One Foot and Sight of One Eye | 100% |
| Speech and Hearing | 100% |
| One Hand | 50% |
| One Foot | 50% |
| Sight of One Eye | 50% |
| Speech | 50% |
| Hearing | 50% |
| Finger or Toe (two joints) | 10% |
| Finger or Toe (one joint) | 5% |

    (a) If the Participant suffers more than one Injury described above from any one Accident, related series of Accidents, or Occupational Disease or Cumulative Trauma exposure, only one of the applicable Dismemberment Benefits listed above, the largest single amount, will be payable with respect to such Accident or exposure.

    (b) Total and permanent loss of use of a member of the body is the same as loss of such member. Prior to payment of the benefit, loss of use must be certified following the care of an Approved Provider for 12 straight months from the date the loss of use began. At the end of this time it must be medically determined by an Approved Provider that the loss of use is total, permanent and not reversible.

    (c) Loss of Hand or Foot means the complete and permanent severance through or above the wrist or ankle joint. Loss of Sight means legally blind. Such loss correctable by surgery or lenses will not result in payment of a Dismemberment Benefit. Loss of Speech means the total and permanent loss of speech. Loss of Hearing means the total and permanent loss of hearing in both ears.

    (d) The above-described loss of "Finger or Toe (two joints)" must be at or above the joint at the proximal end of the middle phalanx of the finger or toe; except that for the thumb or great toe, such loss must be at or above the metacarpophalangeal joint. The above-described loss of "Finger or Toe (one joint)" must be at or above the joint at the distal end of the middle phalanx of the finger or toe; except that for the thumb or great toe, such loss must be at or above the joint at the distal end of the proximal phalanx.

    (e) Dismemberment Benefits shall be in addition to Medical Benefits; provided, however, that (1) the Combined Benefit Limit shall not be exceeded; and (2) payment of Dismemberment Benefits will cease in the event of the death of the Participant which results in the payment of Death Benefits.

## ARTICLE VI
## OTHER LIMITATIONS ON BENEFITS

    6.1   **Coordination Of Benefits**. The Total Disability Benefits and Medical Benefits payable under the Plan shall be reduced by any amount paid or available with respect to the Participant's Injury under the Social Security Act, the Railroad Retirement Act, any workers' compensation, unemployment

compensation, occupational disease, or other law, or any other benefit plans, including, but not limited to, a policy or policies of automobile (including, but not limited to medical payment coverage, personal injury protection coverage, uninsured motorists coverage and under-insured motorist coverage), disability, or health insurance purchased by the Participant or an Employer; provided, however, the fact that a Participant is eligible for or is provided medical assistance under a state plan will not be taken into account in making payment under this Plan. If a Participant is covered under one or more such benefit plans, then (unless otherwise subject to Section 9.2) the benefits payable under this Plan will be either regular benefits or reduced benefits that, when added to the benefits of the other plan(s), will not exceed 100% of the amount described herein. The Participant must cooperate with the Employer in furnishing to such Employer copies of other policies, coverages or plans which may be applicable to the Injury and in completing and returning to such Employer any questionnaire or forms inquiring about, or assigning rights to recover under, other policies, coverages or plans which may cover or be applicable to such Participant.

6.2 **Taxes, Garnishments and Payroll Deferrals.** Benefit payments under this Plan shall be reduced by the amount of any applicable federal or state income, employment, or other taxes that are required by law to be withheld. Total Disability Benefit payments under this Plan shall also be reduced by the Participant's earnings from any employer after the Total Disability begins, amounts legally garnished, and amounts that are contributed by an Employer, at the Participant's election, to a 401(k) plan, cafeteria plan, or other pre-tax salary deferral employee benefit plan.

6.3 **Discharge for Benefit Payments.** If the Claims Administrator determines that a Participant is unable to apply a benefit payment under this Plan in furtherance of his or her own interest and advantage, the Claims Administrator may direct all or any portion of such payment to be made (i) to the guardian of the person, managing conservator or guardian of the estate of the Participant, (ii) to a relative or friend of the Participant, to be expended for the Participant's benefit, (iii) to a custodian for the Participant under any Uniform Gifts to Minors Act, or (iv) to a trust established for the Participant. The Claims Administrator shall not be obligated to see to the proper application or expenditure of any payment so made. Any payment made pursuant to the power herein conferred upon the Claims Administrator or Committee shall operate as a complete discharge of all obligations of the Plan and the Claims Administrator and Committee, to the extent of the payments so made.

6.4 **Spendthrift Provision.** Except as expressly provided for in this Plan, no right or interest of any Participant or Beneficiary under this Plan may be assigned, transferred or alienated, in whole or in part, either directly or by operation of law, and no such right or interest shall be liable for or subject to

any debt, obligation or liability of such Participant or Beneficiary.

## ARTICLE VII
## CONTINUING BENEFITS

The Claims Administrator may deny a claim for, or suspend or terminate the payment of, Plan benefits otherwise due a Participant if:

(a) the Participant refuses to submit to any required drug or alcohol testing, or refuses to provide the Company and its designated representatives with (or access to) drug and alcohol testing information related to an Injury;

(b) the Participant does not receive prior approval for all medical care other than Emergency Care;

(c) the Participant utilizes a non-approved physician or facility other than for Emergency Care;

(d) the Participant refuses to submit to examination by an Approved Provider selected by the Claims Administrator (other than the treating Approved Provider) as required by the Claims Administrator with respect to any surgical procedure or other diagnosis or treatment opinion rendered by the treating Approved Provider for which the Claims Administrator considers a second medical opinion advisable;

(e) the Participant is persistently nonresponsive to treatment, including, but not limited to, nonresponsiveness due to the need for Participant behavioral modification recommended by the treating Approved Provider;

(f) the Participant fails to provide accurate information to, or fails to follow the directions (including, but not limited to, any recommended treatment, therapy, course of action, abstinence, or rehabilitation program) of, or ceases to be under the care of, a treating Approved Provider;

(g) the Participant fails or refuses to allow an authorized representative of an Employer to accompany the Participant to an appointment with a health care provider;

(h) the Participant repeatedly fails to keep, or is late for, a scheduled appointment with a health care provider;

(i) the Participant engages in conduct following an Injury which is determined by the treating Approved Provider to be an injurious practice that is hindering the Participant's recovery from the Injury;

(j) the Participant fails or refuses to report in to the Participant's supervisor periodically, as directed, until able to return to work, including notice of expected recovery time after each appointment with the treating Approved Provider;

© Copyright 2007 Gulcur, McClure, Wallace & Daniels
NAIC Revises 11/8/07

7

(k) the Participant fails to immediately inform the Participant's supervisor that he or she has been released by an Approved Provider to return to full or light or modified duty, or fails to timely report to work in accordance with such work release;

(l) the Participant fails to personally pick up his or her check for Total Disability Benefits provided under the Plan. This requirement may be waived by the Claims Administrator upon a showing that the Participant is physically or geographically unable to comply, in which case the benefit check shall be personally delivered or mailed (in the discretion of the Claims Administrator) directly to the Participant;

(m) the Participant receives benefits with respect to the Injury from, or the incident creates any liability for an Employer under, any workers' compensation law (whether or not any coverage for benefits is actually in force under such law), occupational disease law, unemployment compensation law, disability benefits law, or other similar law;

(n) the Participant has been untruthful in regard to any aspect of the required information supplied as part of the injury reporting or employment process;

(o) the Participant is untruthful or otherwise fails to fully cooperate with the Claims Administrator (including, but not limited to, failure to comply with the provisions of Section 2.2) or demonstrates bad faith in connection with the administration of the Plan, including, but not limited to, subrogation or coordination of benefits procedures; or

(p) the Participant fails or refuses to comply with any of the provisions of the Plan or the rules and procedures adopted by the Claims Administrator for the administration of the Plan.

## ARTICLE VIII
## DETAILED CLAIMS FILING AND APPEAL PROCEDURES

**8.1   What is a Claim.**  Each (i) medical service or supply for which payment is requested, (ii) Total Disability Benefit for a particular payroll period, or (iii) claim for Death Benefits or Dismemberment Benefits, shall be deemed a separate "claim" for benefits that is subject to a Determination under the Plan. The Plan's payment of a particular claim (for example, payment for an initial medical evaluation, even on a claim that may have been reported late) does not waive or otherwise prejudice the Claims Administrator's or Committee's right to deny another particular claim or all future claims for benefits under the Plan. As stated above, any failure by the Claims Administrator or Committee to apply any provisions of this Plan to any particular situation shall not represent a waiver of the Claims Administrator's or Committee's authority to apply such provisions thereafter.

**8.2   Who is a Claimant.**  A claimant or a claimant's authorized representative may file a claim for benefits under the Plan, as well as an appeal of an Adverse Benefit Determination. References Article VIII to "claimant" shall include a Participant, a medical provider seeking payment for a service or supply, a Beneficiary, or a claimant's authorized representative, as applicable. The Plan shall have the right to establish reasonable procedures for determining whether and to what extent an individual has been authorized to act on behalf of a claimant. However, with respect to an Urgent Care Claim, a physician or other health care provider licensed, accredited and certified to perform specified health services consistent with state law and with knowledge of a Participant's medical condition shall be permitted to act as the authorized representative of the Participant.

**8.3   Information to Submit.**  Claims must include the information required by this Section, Section 2.2 and such other reasonable information requested by the Claims Administrator, such as medical records or a written statement from an independent service provider evidencing the date, type of services rendered, and the total cost of such services. In addition, the Claims Administrator may require the claimant to provide a written and signed statement which provides that the Covered Medical Expense has not been reimbursed, or is not reimbursable under any other plan or program. Further, the Claims Administrator may also request that the claimant file all appropriate claims and requests for payment from any other plan or program maintained by the claimant prior to making any payments under this Plan. The Claims Administrator may rely upon all such information furnished by the claimant, including the claimant's current mailing address, and shall have no obligation or duty to locate a claimant.

**8.4   Submission of Medical Bills for Payment.**  Approved Providers will be requested to invoice all health care-related charges directly to the Claims Administrator (or an Employer, which shall immediately transmit such invoice to the Claims Administrator). However, in the event that a Participant receives such an invoice or pays such a charge, all requests for payment or reimbursement of Covered Medical Expense must be filed with the Claims Administrator within 30 days from the date such expenses are incurred or, if later, the date such Participant receives an invoice from an Approved Provider or other health care provider (in the case of Emergency Care) for such expenses not to exceed the Maximum Coverage Period.

**8.5   Incomplete Claim Submissions.**  In the event that a claim, as originally submitted, is not complete, the Claims Administrator shall notify the claimant in the manner described below, and the claimant shall have the responsibility for providing the missing information. Notwithstanding the foregoing, the period of time within which a benefit Determination must be made shall begin at the time that a claim is filed in accordance with this Plan, without regard to whether all the information necessary to make a benefit Determination accompanies the claimant's

©Copyright 2007 Gibson, McCabe, Wallace & Daniels<br>NAC Revised 11/8/07

8

filing. In the event that the period of time for a particular claim is extended in accordance with the applicable provisions of this ARTICLE due to a claimant's failure to submit information necessary to decide a claim, the period for making the benefit determination shall be suspended from the date on which the notification of the extension is sent to the claimant until the date on which the Claims Administrator receives the claimant's response to the request for additional information not to exceed the Maximum Coverage Period.

### 8.6   Claims Review.

(a) **Notice of Initial Benefit Determination** - The Claims Administrator shall provide notice to the claimant of its initial benefit Determination as follows:

(1) **Urgent Care, Pre-Service Medical Claims** – In the case of a Pre-Service Claim for Medical Benefits that is an Urgent Care Claim, the Claims Administrator shall notify the claimant of the Plan's initial Determination (whether adverse or not) as soon as possible, taking into account the medical exigencies of the particular claim, but not later than 72 hours after receipt of the claim. A Determination that such claim will be covered can be communicated to the claimant verbally, in writing, or by electronic notice; but an Adverse Benefit Determination must be provided in writing or by electronic notice as described further in 8.6 (b)(1)below. If the claimant (i) fails to follow the Plan's procedures for filing an Urgent Care Claim, or (ii) otherwise fails to provide sufficient information to determine whether, or to what extent, benefits are covered or payable under the Plan on an Urgent Care Claim, then:

(A) The Claims Administrator shall notify the claimant as soon as possible, but not later than 24 hours after its receipt of the claim, of the procedure to follow or the specific information necessary to complete the claim. Notification may be oral, unless the claimant requests a written notice. This notice requirement shall only apply to the extent that such failure is a communication by a claimant that is received by the Claims Administrator, and the communication names a specific claimant, a specific medical condition or symptom, and a specific treatment, service or product for which approval is requested.

(B) The claimant shall then be given a reasonable amount of time, taking into account the circumstances, but not less than 48 hours, to correct such failure.

(C) The Claims Administrator shall then notify the claimant of the Plan's initial benefit Determination as soon as possible, but not later than 48 hours after the earlier of (i) the Claims Administrator's receipt of the specified information necessary to complete the claim, or (ii) the end of the time period given the claimant to provide such information.

(2) **Concurrent Medical Care Decisions** – If the Claims Administrator has approved an ongoing course of medical treatment to be provided over a period of time or number of treatments not to exceed the Maximum Coverage Period:

(A) The Claims Administrator shall notify the claimant of any reduction or termination by the Plan of such course of treatment. Such reduction or termination shall be considered an Adverse Benefit Determination and the Claims Administrator shall notify the claimant sufficiently in advance of the reduction or termination to allow the claimant to appeal and obtain a benefit Determination on review before the course of treatment is actually reduced or terminated.

(B) Any request by a claimant to extend the course of treatment beyond the prescribed period of time or number of treatments previously approved by the Plan that is an Urgent Care Claim shall be decided as soon as possible, taking into account the medical exigencies of the claim. The Claims Administrator shall make an initial benefit Determination, whether adverse or not, within 24 hours after its receipt of the claim, provided that any such claim is made at least 24 hours prior to the expiration of the prescribed period of time or number of treatments. If such claim is not made Plan within such 24-hour period, the request shall be treated as an Urgent Care Claim and be decided within the normal Urgent Care Claim timeframes (i.e., as soon as possible, taking into account the medical exigencies of the claim, but not later than 72 hours after receipt).

(C) Any request by a claimant to extend the course of treatment beyond the prescribed period of time or number of treatments previously approved by the Plan that is not an Urgent Care Claim shall be treated as a new benefit claim and decided within the timeframe appropriate to the type of claim

(i.e., as a Pre-Service Claim or a Post-Service Claim).

Notification of any Adverse Benefit Determination concerning a request to extend the course of treatment, whether involving an Urgent Care Claim or not, shall be made in accordance with the provisions of this Section.

(3) **Non-Urgent Care, Pre-Service Medical Claims** – In the case of a Pre-Service Claim for Medical Benefits that is not an Urgent Care Claim, the Claims Administrator shall notify the claimant of the Plan's benefit Determination (whether adverse or not) within a reasonable period of time appropriate to the medical circumstances, but not later than 15 days after its receipt of the claim. The Claims Administrator may extend this 15-day period up to an additional 15 days if it determines that, due to matters beyond the control of the Plan, an initial benefit Determination cannot be made within the first 15-day period, and notifies the claimant of the special circumstances requiring the extension and the date by which the Plan expects to render a decision. However, if the claimant (i) fails to follow the Plan's procedures for filing a non-urgent care, Pre-Service Claim, or (ii) otherwise fails to provide sufficient information to determine whether, or to what extent, benefits are covered or payable under the Plan on a non-urgent care, Pre-Service Claim, then:

(A) The Claims Administrator shall notify the claimant as soon as possible, but not later than 5 days after its receipt of the claim, of the procedure to follow or the specific information necessary to complete the claim. Notification may be oral, unless the claimant requests a written notice. This notice requirement shall only apply to the extent that such failure is a communication by a claimant that is received by the Claims Administrator, and the communication names a specific claimant, a specific medical condition or symptom, and a specific treatment, service or product for which approval is requested.

(B) The claimant shall then be given at least 45 days to correct such failure.

(C) The Claims Administrator shall then notify the claimant of the Plan's initial benefit Determination within the 15-day (or, if extended, up to 30-day) time frame set forth above.

A Determination that a claim will be covered can be communicated to the claimant verbally, in writing, or by electronic notice; but an Adverse Benefit Determination must be provided in writing or by electronic notice as described further in 8.6(b) below.

(4) **Post-Service Medical Benefit, Total Disability Benefit, Death Benefit, and Dismemberment Benefit Claims** – In the case of a Post-Service Claim for Medical Benefits or a claim for Total Disability Benefits, Death Benefits or Dismemberment Benefits, the Claims Administrator shall notify the claimant of the Plan's benefit Determination (whether adverse or not) within 30 days after its receipt of the claim. A Determination that such claim will be covered can be communicated to the claimant verbally, in writing, or by electronic notice; but an Adverse Benefit Determination must be provided in writing or by electronic notice as described further in 8.6(b) below. The Claims Administrator may extend this period up to an additional 15 days if the Claims Administrator determines that an extension is necessary due to matters beyond the control of the Plan. Notice of such extension must be provided to the claimant prior to the expiration of the initial 30-day period and state (i) the special circumstances requiring the extension, and (ii) the date by which the Plan expects to render a decision. If the extension relates to a claim for Total Disability Benefits, such notice shall also state (i) the standards on which entitlement to benefits is based, and (ii) unresolved issues that prevent a benefit Determination on the claim and what additional information is needed to resolve those issues. If additional information is requested with the extension notice, the claimant shall have 45 days from the date of the notice of extension in order to provide the specified information.

(b) **Manner and Content of Adverse Benefit Determinations** – If the initial benefit Determination is an Adverse Benefit Determination, the Claims Administrator shall provide a written or electronic notice to the claimant that satisfies the following requirements:

(1) Any electronic notice shall satisfy ERISA regulations that specify the standards for electronic disclosure of benefit plan information;

(2) The notice shall be written in a manner calculated to be understood by the claimant;

(3) The notice shall set forth the specific reason or reasons for the Adverse Benefit Determination, making reference to the specific Plan provisions on which the Adverse Benefit Determination is based;

(4) If an internal rule, guideline, protocol or other similar criterion was relied upon in making an Adverse Benefit Determination on a claim for Medical

© copyright 2007 Gilbert, McGone, Wallace & Dziedis
SAC Revised 11/2007

Benefits or Total Disability Benefits, the notice shall state that such rule, guideline, protocol or other similar criterion was relied upon in making the Adverse Benefit Determination and that a copy thereof shall be provided free of charge to the claimant upon request;

(5) If the Adverse Benefit Determination of a Medical or Total Disability Benefits claim is based upon medical necessity, an experimental treatment or similar exclusion or limit, the notice shall provide either an explanation of the scientific or clinical judgment for the Adverse Benefit Determination, applying the terms of the Plan to the Participant's medical circumstances, or a statement that such explanation will be provided free of charge upon request;

(6) The notice shall include a statement that in the case of an Adverse Benefit Determination on review by the Committee, the Plan offers no further voluntary levels of appeal and that the claimant can pursue his or her right to bring an action under ERISA section 502(a);

(7) If the initial Adverse Benefit Determination involves an Urgent Care Claim, the notice shall provide a description of the expedited review process applicable to such claims. Notification of an Adverse Benefit Determination that involves an Urgent Care Claim may be provided to the claimant orally within the time frames specified above, provided that the oral notification satisfies the requirements of this subsection and that a written or electronic notice satisfying the requirements of this subsection is furnished to the claimant not later than 3 days after the oral notification;

(8) The notice shall describe any additional materials or information necessary for the claimant to perfect the claim and explain why such material or information is necessary; and

(9) The notice shall provide a description of the Plan's review procedures (including the time limits applicable to these review procedures).

(c) **Appeal of Adverse Benefit Determinations** -- The claimant may appeal in writing an Adverse Benefit Determination to the Committee within the following number of days following his or her receipt of the Adverse Benefit Determination from the Claims Administrator:

(1) 180 days for a Medical Benefits or Total Disability Benefits claim; or

(2) 60 days for a Death Benefit or Dismemberment Benefit claim.

If the Adverse Benefit Determination involves an Urgent Care Claim for Medical Benefits, the claimant may request orally or in writing for an expedited review of the Adverse Benefit Determination and all necessary information, including the Plan's benefit Determination on review, shall be transmitted between the Plan and the claimant by telephone, facsimile or other available expeditious method.

(d) **Committee Consideration** -- When reviewing the appeal of an Adverse Benefit Determination, the Committee shall comply with the following requirements:

(1) The claimant may submit written comments, documents, records, and other information relating to the claim for benefits, and the Committee shall take all of such information into account when reviewing such claim, without regard to whether such information was submitted or considered in the initial benefit Determination;

(2) The claimant may receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information that is Relevant to the claimant's claim for benefits (as determined by the Committee);

(3) The review of an Adverse Benefit Determination on a claim for Medical Benefits or Total Disability Benefits shall not give any deference to the initial Adverse Benefit Determination.

(4) If the appeal request on a Medical Benefits or Total Disability Benefits claim is based in whole or in part on a medical judgment, including Determinations with regard to whether a particular treatment, drug or other item is experimental, investigational or not Medically Necessary or appropriate, the Committee shall consult with an Approved Provider who has appropriate training and experience in the field of medicine involved in the medical judgment. This Approved Provider shall not be an individual who was consulted in connection with the initial Adverse Benefit Determination or a subordinate of such individual.

(5) Upon request of a claimant, the Committee shall identify the individual names of any medical or vocational experts whose advice was obtained in connection with an initial Adverse Benefit Determination, without regard to whether the advice of such experts was relied upon in making the benefit Determination.

(e) **Timing of Notice of Benefit Determination on Review** The Committee shall provide notice to the claimant, as described in subsection (f) below, of the

©Copyright 2007 Gibson, McClure, Wallace & Daniels
VAC Revised 11/8/07

11

Plan's benefit Determination on review in accordance with the following timeframes:

(1) **Urgent Care, Pre-Service Medical Claims** – In the case of a Pre-Service Claim for Medical Benefits that is an Urgent Care Claim, the Committee shall notify the claimant of the Plan's benefit Determination on review as soon as possible, taking into account the medical exigencies of the claim, but not later than 72 hours after its receipt of the claimant's appeal request. No extension of time is available for Committee Determinations on the review of claims for Medical Benefits.

(2) **Non-Urgent Care, Pre-Service Medical Claims** – In the case of a Pre-Service Claim for Medical Benefits that is not an Urgent Care Claim, the Committee shall notify the claimant of the Plan's benefit Determination on review within a reasonable period of time appropriate to the medical circumstances, but not later than 30 days after its receipt of the appeal request. No extension of time is available for Committee Determinations on the review of claims for Medical Benefits.

(3) **Post-Service Medical Benefit, Total Disability Benefit, Death Benefit, and Dismemberment Benefit Claims** – In the case of a Post-Service Claim for Medical Benefits or a claim for Total Disability Benefits, Death Benefits or Dismemberment Benefits, the Committee shall notify the claimant of the Plan's benefit Determination on review within 45 days after its receipt of the appeal request. The Committee may extend this period up to an additional 45 days on a claim for Total Disability Benefits, Death Benefits, or Dismemberment Benefits if the Committee determines that an extension is necessary due to matters beyond the control of the Plan. Written or electronic notification of an extension must be provided to the claimant prior to the expiration of the initial 45-day period and indicate the special circumstances requiring the extension and the date by which the Plan expects to render a decision.

(f) **Manner and Content of Benefit Determination on Review** – The Committee shall provide a claimant with written or electronic notification of the Plan's benefit Determination on review. If the decision on review is an Adverse Benefit Determination, the notice must satisfy all the requirements set forth in subsection (b)(1) through (6) above, and also state that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information Relevant to the claimant's claim for Plan benefits.

(g) **Extension of Time Frames Allowed by Law or Agreement** – In the event that ERISA rules and regulations permit additional time for decisions or actions by the Claims Administrator or Committee, the Claims Administrator or Committee may exercise their discretion to utilize (but not exceed) those extended time frames; provided, however, that this discretion shall only be exercised when necessary to provide a full and fair review of a claimant's right to benefits in accordance with the terms of this Plan (e.g., additional time needed to obtain an appointment and results of a medical examination). Upon request by the Plan, a claimant may also voluntarily agree to an extension or further extension of any time period within which the Plan must decide a claim.

(h) **Exhaustion of Administrative Remedies:** No legal action can be brought by or with respect to a Participant to recover benefits under the Plan before the foregoing claims procedure has been exhausted.

## ARTICLE IX
## NATURE PAYMENTS AND SUBROGATION

### 9.1 Nature of Payments.

(a) **No Admission of Liability:** The Plan has been established and is maintained by the Employer to protect themselves from certain liabilities as nonsubscribers to the Texas workers' compensation insurance system. Payments made under this Plan by an Employer shall not in any way constitute an admission of liability or responsibility by an Employer for an Injury and any such liability or responsibility is specifically denied.

(b) **No Collateral Source:** Benefit payments made under or on behalf of the Plan, however made, shall be considered to be made by the Employer of a Participant and shall not be considered payment from a "collateral source" as that term has been defined under any applicable rule, statute, judicial decision, or directive. All benefits paid under this Plan shall be offset against any alleged liability of the Employer, its officers, directors, or agents to a Participant or Participant's Beneficiaries, heirs, or assigns due to an Injury.

### 9.2 Participants Who Signed Pre-Injury Waivers of Negligence Claims Prior to June 17, 2001: If a Participant signed a waiver or any other form of agreement (a "Waiver Agreement") prior to June 17, 2001, one of the principle purposes of which was to waive the Participant's rights to sue for Employer negligence that causes a future injury in exchange for eligibility for all or certain benefits under an injury benefit plan that was a predecessor to this Plan, then:

(a) **Agreement Still Effective.** Such Participant shall continue to be bound by the negligence waiver provisions of such Waiver Agreement on and after June 17, 2001 in all respects.

(b) **Effect of Election.** By agreeing to the negligence waiver provisions of a Waiver Agreement prior to June 17, 2001, the Participant has given up any right the Participant has to recover from the Employer, its directors, officers, shareholders, employees, and agents for all injuries or death to the Participant arising out of the course and scope of the Participant's employment by the Employer or any of its affiliates. This means that if the Participant is injured or killed in the course and scope of his or her employment (before, on, or after June 17, 2001), the Participant's only relief against an Employer or such other persons will be to receive the benefits provided by this Plan. Such a benefits election was not made as a condition of employment, and this Plan will now be the only source of injury-related benefits or other recovery provided by the Employers to such Participants and their spouses, children, beneficiaries, representatives, executors, administrators, guardians, heirs or assigns.

(c) **Rights upon Re-employment.** The Waiver Agreement signed by such Participant survives any termination of employment or other cessation of such Participant's participation in this Plan or the predecessor injury benefit plan, and shall remain in full force and effect as described above after any re-employment and renewed participation in this Plan by such Participant with respect to any subsequent injury.

**9.3 Recovery From Third Parties And Excess Payments.** For purposes of Section 9.3, 9.4, and 9.5 of this Plan, the term "Payee" means a Participant or Beneficiary or their family members, heirs, estate, or other representative (in their individual or representative capacity), singularly or collectively as the context may require to give the Plan the broadest possible rights of recovery. If a Payee becomes entitled to or directly or indirectly receives Plan benefits for any Injury caused by the negligence or other act or omission of any person or organization (including, but not limited to, an Employer), and is (or later becomes) entitled to or otherwise collects any damages or other compensation in connection with such Injury (including, but not limited to, damages for negligence, survival, wrongful death or other legal or equitable action), whether by insurance, litigation, settlement or other proceeding, the Payee shall automatically be required to (i) subrogate his, her or its right to and reimburse the Plan out of said damages or other compensation to the extent of the Plan benefits paid to, or with respect to, the Payee and (ii) subrogate his, her or its right to and reimburse the Plan out of said damages or other compensation for all medical management, investigation, attorneys' fees, costs of recovery, and other expenses related to the claim for benefits (including any subrogation proceeding). The subrogation rights of this Plan even apply with respect to a Payee who is (or later becomes) entitled to or otherwise collects any damages or other compensation in connection with such Injury but has not and will not receive any Plan benefits if such person's claim for damages or other

compensation is dependent on whether the Participant had or has a valid claim against a third party. Upon request of the Plan, the Payee shall provide the Plan written confirmation of this subrogation right, including execution of any assignment, lien form or other document requested by the Claims Administrator to enable the Plan to recover such Plan benefits and related expenses. Any failure of a Payee to give written confirmation of the Plan's subrogation rights does not adversely affect its rights of subrogation because the Plan's right of subrogation arises automatically once payment under this Plan is made to or on behalf of the Payee. If (i) a Payee fails, refuses or neglects to reimburse the Plan or otherwise comply with the provisions of this Section, or (ii) payments are made under the Plan based on fraudulent information or otherwise in excess of the amount necessary to satisfy the provisions of the Plan, then the Plan shall still have all remedies and rights of recovery specified herein. The Plan shall also have the right to terminate or suspend benefit payments and/or recover the reimbursement of all amounts above due to the Plan by withholding, offsetting and recovering such amounts out of any future Plan benefits or amounts otherwise due from the Plan to or with respect to such Payee. The Plan shall have the first lien recovery against any benefits paid or to be paid by the Plan. The Plan shall also have the right to bring a lawsuit and assert a constructive trust or other interest against any and all persons that have assets that the Plan can claim rights to. The Plan has the right of first recovery from any judgment, settlement or other payment, regardless of whether the Payee has been "made whole." The Plan's subrogation rights and first lien will not be reduced by attorneys' fees or expenses incurred by any party in pursuing recovery against a third party and the "common fund" doctrine shall not apply. Any attorneys' fees and/or expenses incurred by or at the request of the Payee or his, her or its attorneys in a third party or other action shall be the sole responsibility of such party.

**9.4 Notice Of Legal Proceedings.** A Payee shall provide the Claims Administrator with prior written notice of the involvement of such party in any lawsuit, settlement discussion or other proceeding, one of the principal purposes of which is recovering, from any person or organization, damages or other compensation in any way related to any Injury for which such Payee has received (or may in the future file a claim to receive) Plan benefits. The Plan shall have the right to intervene for itself and on behalf of a Payee in any such lawsuit, settlement discussion or other proceeding. If a Payee neglects, fails or refuses to seek a recovery from any person or organization for any Injury caused by the negligence or other act or omission of such person or organization, the Plan shall have the right to institute a lawsuit or other proceeding or do any other act that in the opinion of the Claims Administrator may be necessary or desirable to recover the Plan benefits paid (and to be paid in the future) to the Payee, plus any costs and expenses incurred by the Plan in pursuing such recovery.

**9.5 Assignment Of Rights.** By participating in this Plan, a Participant obligates himself or herself, as well as all

©Copyright 2002 Gibson, McClure, Wallace & Daniels
NAC Revised 11/6/07

13

other Payees (in both their individual and representative capacities), to the provisions of this Plan, including, without limitation, Sections 9.3, 9.4, and 9.5 hereof. Upon the request of the Claims Administrator, a Payee shall assign to the Plan the right to intervene in or institute any lawsuit, settlement discussion, or other proceeding described in Section 9.3 and/or 9.4, and to use the name of such party for such purpose. The Plan shall have the right to select legal counsel of its own choice and such counsel shall have complete control over the conduct of any such lawsuit, settlement discussion, or other proceeding without the consent or participation of any such Payee. Whenever the Plan shall intervene in or institute any lawsuit or other proceeding as permitted by the provisions of this Section, the Plan may pursue same to a final determination and the Plan expressly reserves the right to appeal from any adverse judgment or decision. The Payee shall give the Plan all reasonable aid in any such lawsuit, settlement discussion, or other proceeding in effecting settlement, in securing evidence, in obtaining witnesses, or as may otherwise be requested by the Claims Administrator. The Payee shall release the Plan, the Employer, the Plan Administrator, the Claims Administrator, the Committee, and their respective directors, officers, agents, attorneys, and employees from all claims, causes of action, damages and liabilities of whatever kind or character that may directly or indirectly arise out of the pursuit or handling by the Plan of any such lawsuit, settlement discussion or other proceeding.

**9.6   Final Compromise And Settlement.** At the Claims Administrator's option within five years after the date of the Occurrence, and at any time thereafter if the Claims Administrator elects to extend such five-year period after the date of the Occurrence, the Claims Administrator may notify the Participant of the Plan's intention to be released from any further known and unknown benefit and all other injury-related claims by such Participant and pay a final claim settlement to, or with respect to, such Participant in exchange for the Participant's agreement to a release of liability in favor of the Plan, Employers, Claims Administrator, Committee, and other interested parties with respect to such claims. In that event, the Claims Administrator may appoint an actuary, appraiser, and/or Approved Provider to investigate, determine, and capitalize such claims. The payment by the Plan and/or Employer of the value of such claims (as finally determined by the Claims Administrator) shall be made in such manner as the Claims Administrator may determine. No additional claims will be subsequently accepted with respect to such Injury. Any actuary or appraiser shall apply such rules, standards, and assumptions (present value discount, inflation, and mortality rates, etc.) as the Claims Administrator may reasonably determine. The Participant must appoint and provide all information, sign such forms and agreements, and submit to all medical examinations as may be requested by the Claims Administrator to arrive at a valuation and settlement of the Participant's claims. No further benefits will be payable to, or with respect to, a Participant who fails or refuses to accept the Claims Administrator's claim valuation, sign the release agreement presented by the Claims Administrator, or otherwise comply

with the requirements of this Section or other provisions of the Plan. Prior or subsequent to the Claims Administrator's evaluation and determination of the value of a Participant's claims, the Claims Administrator may determine to not capitalize and satisfy any such claim as described above and to instead continue eligibility for benefit payments and defer the above valuation and settlement.

# ARTICLE X
# ADMINISTRATION

**10.1   Plan Administrator.**

(a)   **Administrator:** The Company shall be the Plan Administrator of the Plan. The Plan shall be administered on behalf of the Company and all other Employers by the Claims Administrator and Committee. Each Claims Administrator or member of the Committee so appointed shall serve in such office until his or her death, resignation, or removal by the Company. The Company may remove any Claims Administrator or member of the Committee with or without cause at any time, and may fill any vacancies in the Claims Administrator position or with respect to Committee membership or add additional Claims Administrators or members to the Committee at any time and from time to time. The Committee shall act by a majority of its members at the time in office. The Committee may by such majority action authorize any one or more of its members to execute any document or documents on behalf of the Committee. The Claims Administrator and Committee shall keep such records of their proceedings and acts as they deem to be necessary or appropriate for the purposes of the Plan. The Claims Administrator and Committee shall cause such information, documents or reports to be prepared, provided and/or filed as may be necessary to comply with the provisions of ERISA, or any other applicable law. Members of the Committee shall receive no remuneration from the Plan for their services as Committee members. The Plan shall operate and keep its records on the basis of the Plan Year.

(b)   **Administrative Authority:** Subject to the Plan claims procedures, the Claims Administrator and Committee shall have discretionary and final authority to interpret and implement the provisions of the Plan, including, but not limited to, making all factual and legal determinations, correcting any defect, reconciling any inconsistency and supplying any omission, and making any and all determinations that may impact a claim for benefits hereunder. The Claims Administrator and Committee shall perform all of the duties and may exercise all of the powers and discretion that the Claims Administrator and Committee deem necessary or appropriate for the proper administration of the Plan, and shall do so in a uniform,

©Copyright 2007 Gibson, McClure, Wallace & Daniels
SAC Revised 11/30/07

14

nondiscriminatory manner. Any failure by the Claims Administrator or Committee to apply any provisions of this Plan to any particular situation shall not represent a waiver of the Claims Administrator's or Committee's authority to apply such provisions thereafter. Every interpretation, choice, determination or other exercise by the Claims Administrator or Committee of any power or discretion given either expressly or by implication to it shall be conclusive and binding upon all parties having or claiming to have an interest under the Plan or otherwise directly or indirectly affected by such action, without restriction, however, on the right of the Claims Administrator or Committee to reconsider and redetermine such action. There shall be no *de novo* review by any arbitrator or court of any decision rendered by the Committee and any review of such decision shall be limited to determining whether the decision was so arbitrary and capricious as to be an abuse of discretion. The Claims Administrator and/or Committee may adopt such rules and procedures for the administration of the Plan as are consistent with the terms hereof.

(e) **Delegation of Responsibilities:** The Claims Administrator's and Committee's authority shall include, but not be limited to, the power to allocate or delegate fiduciary and non-fiduciary responsibilities or duties among the members of the Committee or to Employees or third persons, including any insurer or contract administrator, and, except as is otherwise provided by applicable law, those persons to whom such responsibilities and duties have not been allocated or delegated shall not be liable for any act or omission of those persons to whom such responsibilities and duties have been allocated or delegated. Except as otherwise provided under ERISA, neither an Employer, the directors, officers, partners, managers, or supervisors of an Employer, the Plan Administrator, the Claims Administrator or the Committee nor any person designated to carry out fiduciary responsibilities pursuant to this Plan shall be liable for any act, or failure to act, which is made in good faith pursuant to the provisions of the Plan.

10.2 **Claims Administrator and Committee Indemnity.** The Employers shall indemnify and hold harmless the actual Claims Administrator and the actual Committee, each actual member thereof, and any other Employee of an Employer to whom the Claims Administrator or Committee has delegated administrative authority with respect to the Plan against any claim, cost, expense (including reasonable attorneys' fees), judgment or liability (including any sum paid in settlement of a claim with the approval of the Company) arising out of any act or omission to act of the Claims Administrator or Committee or such a member or Employee under this Plan, except in the case of willful misconduct. The Employers shall be jointly and severally liable for any amounts owed pursuant to this Section.

10.3 **Funding Policy And Method.** All benefits payable to or with respect to a Participant under this Plan shall be paid or provided for by the Employer who was the employer of such

Participant at the time of his or her Injury. Said benefits shall be paid by or on behalf of such Employer at the direction of the Claims Administrator or Committee or its designated representative solely out of the general assets of such Employer or its insurer. The Employers shall have no obligation to establish any fund or trust for the payment of benefits under this Plan. The Employers shall obtain an insurance contract through The Combined Group that may (depending upon the terms of such policy) provide funds to reimburse or pay on behalf of an Employer for a benefit payable under this Plan. **Benefits under this Plan shall not be payable or shall immediately cease in the event that such insurance coverage is not available (for reasons other than the need to satisfy a self-insured retention) or ceases under such policy for any reason.** All benefit obligations under this Plan must be incurred during the Maximum Coverage Period and all payments of benefits under this Plan must be made not later than 90 days following expiration of the Maximum Coverage Period; and the Employer shall be under no obligation to pay any benefits which, in the exercise of reasonable diligence, cannot be finally determined and paid by the Claims Administrator within such timeframe. Any such insurance policy proceeds shall not be considered "plan assets" for purposes of ERISA. Payments by an Employer shall be from its general assets. The Employer that applied for the contract shall own any such insurance contract. If any insurance benefits are paid directly by an insurance company to a Participant or beneficiary with respect to an Injury covered under this Plan, such payments shall be deemed to be made under this Plan by an Employer or shall otherwise be subject to the provisions of Section 6.1 or ARTICLE IX, as determined by the Claims Administrator.

10.4 **Participation By Affiliates.** With the consent of the Company, any incorporated or unincorporated trade or business which is a member of a control group (within the meaning of Section 3(40) of ERISA) with respect to which the Company is also a member may adopt and become an Employer under this Plan by signing the Benefits Schedule.

## ARTICLE XI
## DEFINITIONS

11.1 **"Accident" or "Accidental"** means an event which:

(a) was sudden, unforeseen, unplanned, and unexpected;

(b) occurred at a specifically identifiable time and place in the Scope of Employment;

(c) occurred by chance or from unknown causes; and

(d) results in physical injury to the Participant.

©Copyright 2007 Gibson, McClure, Wallace & Daniels
AC Revised 11/8/07

Accidental bodily Injury does not include Occupational Disease or Cumulative Trauma unless it results directly from an Accident.

11.2 "**Adverse Benefit Determination**" means a denial, reduction or termination of, or a failure to provide or make payment (in whole or in part) for, a Plan benefit.

11.3 "**Approved Provider**" means a person duly licensed under Texas law as a Medical Doctor or Doctor of Osteopathy and either expressly approved by the Claims Administrator or included on an approved list of physicians adopted by the Claims Administrator. "Approved Provider" also includes a hospital, other medical care facility or medical service or supply provider either expressly approved by the Claims Administrator or included on an approved list of facilities adopted by the Claims Administrator. The Claims Administrator reserves the right to add to, delete from, or otherwise amend any designation or list of Approved Providers at any time.

11.4 "**Beneficiary**" means the person or persons determined in the following priority:

(a) If there is an Eligible Spouse, all Death Benefits shall be paid to the Eligible Spouse.

(b) If there is no Eligible Spouse, Death Benefits shall be paid in equal shares to the Eligible Children. If an Eligible Child has predeceased the Participant, Death Benefits that would have been paid to that child if he or she had survived the Participant shall be paid in equal shares per stirpes to the children of such deceased child.

(c) If the Participant is not survived by an Eligible Spouse or Eligible Child, any Death Benefits shall be paid to a surviving dependent (as determined in accordance with the support criteria set forth in section 152 of the Internal Revenue Code and such other rules as the Claims Administrator may prescribe) of the Participant who is a parent, sibling, or grandparent of the deceased Participant. If more than one of those dependents survives the Participant, any Death Benefits shall be divided among them in equal shares.

(d) If the Participant is not survived by an Eligible Spouse, Eligible Child, or dependent who is a parent, sibling, or grandparent, no Death Benefits shall be payable.

(e) For purposes of this Section:

(1) "Eligible Spouse" means the surviving spouse of the deceased Participant, recognized by a marriage certificate issued under the laws of the State of Texas or similar government authority, or by a Texas court decree of common law marriage (obtained at such person's sole initiative and expense).

(2) "Eligible Child" means a surviving child of the deceased Participant, whether by blood, marriage, or legal adoption, if the child is:

(A) under 18 years of age;

(B) enrolled as a full-time student in an accredited educational institution and is less than 25 years of age; or

(C) because of a physical or mental handicap, a dependent (as determined in accordance with the support criteria set forth in section 152 of the Internal Revenue Code and such other rules as the Claims Administrator may prescribe) of the deceased Participant at the time of the Participant's death.

11.5 "**Benefits Schedule**" means the page(s) attached to the front of this Plan document, setting forth certain Company information and benefit limits, and signed by the Company and any participating Employers adopting this Plan. The Benefits Schedule and the other terms of this Plan shall be construed as a single document. Each provision of the Benefits Schedule corresponds to the referencing provisions in this Plan and the related Summary Plan Description booklet.

11.6 "**Claims Administrator**" means the individual or individuals or entity appointed by the Company to make initial Determinations of benefit claims under this Plan on behalf of the Company and all other Employers.

11.7 "**Committee**" means the individual or individuals appointed by the Company to make Determinations on appeal of benefit claims. The Claims Administrator cannot serve as the Committee or as a member of the Committee, and no individual who is a subordinate of the Claims Administrator can serve as the Committee or as a member of the Committee.

11.8 "**Company**" means the entity named in Item 1 of the Benefits Schedule or any successor thereto.

11.9 "**Covered Employee**" means an Employee whose employment with the Employer is principally located within the State of Texas.

11.10 "**Covered Medical Expense**" means an amount described in Section 3.2.

11.11 "**Cumulative Trauma**" means damage to the physical structure of the Participant's body occurring as a result of repetitious, physically traumatic activities that occur in the Scope of Employment. Cumulative Trauma does not include Accidental bodily Injury or Occupational Disease.

©Copyright 2007 Gibson, McClure, Wallace & Daniels
SPAC Revision 11/4/07

Appendix 124

11.12 **"Death Benefits"** means any benefit payable under Section 5.3.

11.13 **"Determination"** means a decision of the Claims Administrator or Committee on whether benefits are payable to or with respect to a claimant under the Plan.

11.14 **"Dismemberment Benefits"** means a dismemberment benefit payable under Section 5.4.

11.15 **"Emergency Care"** means a service or supply provided with respect to a medical condition manifesting itself by a sudden and unexpected onset of acute symptoms of sufficient severity that in the absence of immediate medical attention could reasonably be expected to (i) result in death, disfigurement, or permanent disability, or (ii) result in substantial impairment of any bodily organ, part, or function of a Participant. This Emergency Care determination solely relates to satisfaction of the Plan's approved medical provider requirements, and the exception for Emergency Care. Urgent Care Claims may not arise to the level of involving Emergency Care. A Participant's decision to seek treatment from an urgent care clinic or hospital emergency room does not necessarily result in an Urgent Care Claim or involve Emergency Care. That determination shall be made within the sole administrative discretion of the Claims Administrator or Committee, with such advice and consultation from an Approved Provider as the Claims Administrator or Committee deems appropriate.

11.16 **"Employee"** means:

(a) a person who is employed in the regular business of, is under the direction and control of, and receives his or her pay by means of a salary, wage or commission directly from, an Employer and for whom an Employer files a Form W-2 with the Internal Revenue Service; or

(b) a person (and any class of substantially similarly situated persons) determined to be a common law employee of an Employer by a court of competent jurisdiction, by an arbitrator (where a sole arbitrator presides), or by an arbitration panel majority.

Provided, however, the term "Employee" specifically includes executive officers unless excluded by an endorsement to an insurance policy referred to in Section 10.3. Provided, further that under no circumstances shall the term "Employee" include a leased employee, an independent contractor or third-party agent.

11.17 **"Employer"** means the Company and any other related trade or business that adopts the Plan pursuant to Section

10.4 by signing the Benefits Schedule as a Participating Employer.

11.18 **"Gross Misconduct"** means the Employee's gross misconduct within the meaning of Section 4980B of the Internal Revenue Code, or any successor provision of law.

11.19 **"Hospital"** means a lawful institution which:

(a) is licensed as a hospital if required in its location;

(b) is open at all times;

(c) functions chiefly for the care and treatment of sick and injured persons as admitted inpatients;

(d) has a staff of one or more licensed physicians present at all times;

(e) provides 24-hour services of nurses; and

(f) has on its premises, or available on a prearranged basis, organized facilities for diagnosis and major surgery.

11.20 **"Injury"** means an identifiable damage or harm to the physical structure of the body resulting from an Occurrence in the Scope of Employment and caused solely as the result of either (1) an Accident, (2) Cumulative Trauma, or (3) an Occupational Disease. The Plan provisions for Covered Injuries or non-Covered Injuries are described in ARTICLE IV. The term "Injury", as used herein, shall have the same meaning as "Covered Injuries" described in ARTICLE IV.

11.21 **"Maximum Coverage Period"** means the maximum amount of time any form of benefits expense is incurred under this Plan as specified in Item 9 of the Benefits Schedule. Such period is calculated continuously from the date of the Occurrence. The Claims Administrator shall have discretion to determine the computation and timing of all expense incurrals and payments hereunder.

11.22 **"Medical Benefits"** means any benefit payable under Section 5.1.

11.23 **"Medically Necessary"** means the medical services, procedures or supplies, which are:

(a) required, recognized, and professionally accepted nationally by physicians as the usual, customary and effective means of diagnosing or treating the condition;

(b) the most economical supplies or levels of service that are appropriate and available for the safe and effective treatment of the Participant; and

©Copyright 2007 Gibson, McClure, Wallace & Daniels
ISAC Revised 110807

17

(c) not primarily for the convenience of a Participant, the Participant's family, an Approved Provider or other provider of medical services, supplies or procedures.

Even if the service, supply or procedure is Medically Necessary or may have been prescribed by an Approved Provider, this Plan will not cover services, supplies or procedures excluded from coverage under the terms of this Plan.

11.24 "**Occupational Disease**" means a condition marked by a pronounced deviation from the normal healthy state of a Participant arising out of such Participant's assigned duties in the Scope of Employment. Occupational Disease does not include ordinary diseases of life to which the general public is exposed outside of a Participant's assigned duties in the Scope of Employment or a disease resulting directly from an Accident.

11.25 "**Occurrence**" means an Accident or related series of Accidents arising out of one event or incident. As respects Occupational Disease or Cumulative Trauma, "Occurrence" means the Participant's last day of last exposure to the conditions causing or aggravating such Occupational Disease or Cumulative Trauma. Any provision of this Plan to the contrary notwithstanding, in order to be subject to this Plan document:

(a) the Occurrence must take place within the United States of America, including its territories and possessions, Puerto Rico or Canada);

(b) the date of such Occurrence must be (1) on or after the Effective Date specified in Item 8 of the Benefits Schedule, and (2) during the policy period on an insurance policy referred to in Section 10.3; and

(c) a claim for benefits on an Injury due to Occupational Disease or Cumulative Trauma must in all events be made in accordance with ARTICLE II and not later than 24 months from the date of the Occurrence. In no event will benefits for such a claim extend beyond (i.e., they must be incurred within) the Maximum Coverage Period.

11.26 "**Participant**" means a Covered Employee who becomes eligible for benefits in accordance with ARTICLE I.

11.27 "**Payroll**" means money or substitutes for money, and includes --

(a) base pay, prior to reduction for any Employee-authorized payment into an employee benefit plan, such as a 401(k), cafeteria or flexible benefit plan;

For purposes of calculating a Total Disability Benefit, the average weekly compensation to a Participant shall be determined, according to the definition of Payroll above, for the most recent six-week period, or short period if employed less than six weeks, prior to the Occurrence giving rise to the Total Disability. In respect of each executive officer, Payroll is limited to a maximum of $62,400.

11.28 "**Plan**" means the employee injury benefit plan established or continued by the Employers in the form of this document, including the Benefits Schedule. The name of the Plan is set forth at the top of the Benefits Schedule. The Plan created by each adopting Employer is a separate Plan, independent from the plan of any other employer adopting this document, unless the adopting Employer is adopting the same Plan sponsored by a related member of a control group (within the meaning of Section 3(40) of ERISA), as provided in Section 10.4.

11.29 "**Plan Administrator**" means the Company.

11.30 "**Plan Year**" means a 12 calendar month period beginning on the Effective Date in Item 8 of the Benefits Schedule and each anniversary thereafter; provided, however, that the Company may specify a different Plan Year for past, current, or future years by formal written action of a representative authorized to act on behalf of the Company and communicated to Participants in writing.

11.31 "**Post-Service Claim**" means any claim for a Medical Benefit that is not a Pre-Service Claim.

11.32 "**Pre-Service Claim**" means any claim for Medical Benefits with respect to which this Plan requires Claims Administrator approval in advance of obtaining medical care (i.e., any such claim that does not involve Emergency Care).

11.33 "**Rehabilitation**" means only those procedures which are performed for the purpose of restoring the function of motion, speech or vision lost as a result of a covered Accidental bodily Injury, Occupational Disease or Cumulative Trauma.

11.34 "**Relevant**" shall mean, with respect to the relation of a document, record or other information to a Participant's or beneficiary's claim, that such document, record or other information:

(a) was relied upon in making a benefit Determination on the claimant's claim;

(b) was submitted, considered, or generated in the course of making the benefit Determination, without regard to whether such document, record or other information was relied upon in making the actual benefit Determination;

©Copyright 2007 Gibson, McClure, Wallace & Daniels
SAC Revised 11/30/07

18

(c)   demonstrates compliance with the Plan's administrative processes and safeguards required for making the benefit Determination; or

(d)   constitutes a statement of policy or guidance with respect to the Plan concerning the denied treatment option or benefit for the Participant's diagnosis, without regard to whether such advice or statement was relied upon in making the benefit Determination.

The individual records or information specific to the resolution of one claimant's claim shall not be considered relevant to another claimant's claim.

11.35   "Scope of Employment" means an activity of any kind or character that has to do with and originates in the work, business, trade or profession of an Employer, and that is performed by a Participant while engaged in or about the furtherance of the business of an Employer, including activities conducted on the premises of an Employer or at other locations designated by the Employer. This term does not include a Participant's transportation to and from his or her place of employment, unless:

(1)   the transportation is furnished as part of the employment arrangement or is paid for by an Employer, or the means of the transportation are under the control of an Employer; or

(2)   the Participant is directed in his or her employment to proceed from one place to another place.

11.36   "Skilled Nursing Facility" means a section, ward, or wing of a hospital, or a free-standing healthcare facility, which:

(a)   provides room and board;

(b)   provides nursing care by or under the supervision of a nurse;

(c)   provides physical, occupational, and speech therapy furnished by the facility or by others under arrangements made by the facility;

(d)   provides medical social services;

(e)   provides drugs, biologicals, supplies, appliances and equipment ordinarily furnished for use in such a facility;

(f)   provides medical services by staff physicians;

(g)   has an agreement with a Hospital for diagnostic and therapeutic services, the transfer of patients, and exchange of clinical records;

(h)   provides other services necessary to the health and care of patients that are generally provided by such facilities; and

(i)   is licensed or registered in accordance with local and state laws and regulations.

11.37   "Total Disability Benefits" means any benefit payable under Section 5.2.

11.38   "Totally Disabled" or "Total Disability" means a medically demonstrable anatomical or physiological abnormality caused by an Injury that –

(a)   causes the Participant to be unable to perform the normal duties for which he or she was employed;

(b)   causes the Participant to be under the regular care of an Approved Provider; and

(c)   causes the Participant to be unable to engage in light or modified duty or any other occupation for wage or profit.

11.39   "Urgent Care Claim" shall mean any claim for medical care or treatment with respect to which application of the time periods for making non-urgent Pre-Service Claim Determinations (i.e., generally, 15 days after the Claims Administrator's receipt of the claim):

(a)   could seriously jeopardize the life or health of the Participant or the ability of the Participant to regain maximum function; or

(b)   in the opinion of a physician with knowledge of the Participant's medical condition, would subject the claimant to severe pain that cannot be adequately managed without the care or treatment that is the subject of the claim.

The determination of whether a claim is an Urgent Care Claim within the meaning of subsection (a) above shall be made by the Claims Administrator applying the judgment of a prudent layperson who possesses an average knowledge of health and medicine. However, if a physician with knowledge of the Participant's medical condition determines that a claim is an Urgent Care Claim and clearly communicates such determination to the Claims Administrator, such claim shall be treated as an Urgent Care Claim for purposes of this Plan. **The characterization of a claim as being an Urgent Care Claim solely impacts the timeframes and other procedures for claims processing under ARTICLE II, and in no way changes this Plan's**

© Copyright 2007 Gilbert, McClure, Wallace & Daniels
SAIC Revised 11/8/07

approved medical provider, pre-authorization, or other medical management requirements. These requirements generally provide that (1) except in the case of Emergency Care, no amount shall be considered a Covered Medical Expense unless treatment is pre-approved by the Claims Administrator and furnished by or under the direction of an Approved Provider, and (2) all determinations relating to the physical condition of a Participant, upon which the payment of benefits is based, must be made by an Approved Provider. Urgent Care Claims may not arise to the level of involving Emergency Care. A Participant's decision to seek treatment from an urgent care clinic or hospital emergency room does not necessarily result in an Urgent Care Claim or involve Emergency Care. The determination of whether a claim involves Emergency Care shall be made within the sole administrative discretion of the Claims Administrator or Committee, with such advice and consultation from an Approved Provider as the Claims Administrator or Committee deems appropriate.

11.40 "Usual and Customary" means the expense is:

(a) usual when it is the fee regularly charged that the patient is responsible to pay in the absence of insurance or other third party reimbursement, to a health care provider or physician for the given treatment, service or supply; and

(b) customary in relation to what other physicians and health care providers in the same geographic area charge for the same and similar treatment, service or supply.

## ARTICLE XII
## GENERAL PROVISIONS

12.1 **Termination and Amendment.** The Company shall have the right and power at any time and from time to time to amend this Plan, in whole or in part, on behalf of all Employers, and at any time to terminate this Plan or any Employer's participation hereunder; provided, however, that no such amendment or termination shall reduce the amount of any benefit then due and payable to, or with respect to, a Participant under the Plan in connection with an Injury occurring prior to the date of such amendment or termination. Any such amendment or termination shall be pursuant to formal written action of a representative authorized to act on behalf of the Company. This Plan document shall also automatically cease to be effective for all purposes as of the date of the cancellation, final expiration, or non-renewal of an insurance policy issued to the Company through The Combined Group, except for purposes of the administration of any open claims occurring prior such date. Only the Company's proper adoption of another, successor benefit plan document can prevent such automatic termination of this Plan.

12.2 **Employment Noncontractual.** The establishment of this Plan shall not enlarge or otherwise affect an Employee's "at will" employment by an Employer, and an Employer may terminate the employment of any Employee at any time and/or modify the Employee's working relationship as desired, at-will for any or no reason (with or without cause), as freely and with the same effect as if this Plan had not been established.

12.3 **Plan Documents Control.** This written Plan document constitutes the entire Plan, and no oral or written representation or promise concerning the Plan, which is inconsistent with the provisions of this Plan document, shall have any effect. The provisions of this Plan document shall be the sole source of all legally enforceable rights with respect to the benefits herein provided.

12.4 **Construction.** The titles to the Articles and the headings of the Sections in this Plan are placed herein for convenience of reference only and in case of any conflict the text of this instrument, rather than such titles or headings, shall control. Whenever a noun or pronoun is used in this Plan in plural form and there be only one person or entity within the scope of the word so used, or in singular form and there be more than one person or entity within the scope of the word so used, such word or pronoun shall have a plural or singular meaning as appropriate under the circumstance.

12.5 **Separability.** If for any reason any provision of this Plan is determined to be invalid or contrary to applicable law, such invalidity shall not impair the operation of or otherwise affect the remaining provisions of this Plan.

12.6 **Applicable Law.** This Plan shall be governed and construed in accordance with the provisions of ERISA and, except where superseded by federal law, the laws of the State of Texas.

# APPENDIX A

## USE AND DISCLOSURE OF
## PROTECTED HEALTH INFORMATION

Effective April 14, 2004, the Plan shall comply with the "Standards for Privacy of Individually Identifiable Health Information" (the "HIPAA Privacy Rules"), as specified under 45 CFR Part 160 and Part 164, Subparts A and E, to the extent that the Department of Health and Human Services ("HHS") determines that these rules apply to the Medical Benefits provided under the Plan. Unless otherwise indicated below, the terms used in this Appendix shall have the same meanings as defined in the Plan.

1.1   **Employer Uses and Disclosures of PHI.** The Employer shall use and disclose PHI provided by the Plan only to the extent such use and disclosure is:

(a)   for Treatment, Payment or Health Care Operations, as permitted by and in compliance section 164.506 of the HIPAA Privacy Rules; or

(b)   as otherwise permitted or required for group health plans under section 164.502 of the HIPAA Privacy Rules.

1.2   **Certification.** The Plan shall not disclose PHI to the Employer unless the Employer provides the Plan with certification that the Employer agrees to comply with the following provisions. The Plan shall also limit the disclosure of PHI to the Employer for plan administration functions that the Employer performs only consistent with such provisions.

(a)   The Employer shall not use or further disclose PHI other than as permitted or required by the plan documents for the Plan or as required by law;

(b)   The Employer shall require any agents, including a subcontractor, to whom it provides PHI from the Plan to agree to the same restrictions and conditions that apply to the Employer with respect to PHI;

(c)   The Employer shall not use or disclose PHI from the Plan for employment-related actions and decisions or in connection with any other employee benefit plan of the Employer;

(d)   The Employer shall report to the Plan any use or disclosure of PHI provided by the Plan that is inconsistent with the purpose for which the PHI was provided, once the Employer becomes aware of such inconsistent use or disclosure;

(e)   The Employer shall provide affected individuals with access to their PHI in accordance with section 164.524 of the HIPAA Privacy Rules;

(f)   The Employer shall make PHI available for amendment by the affected individual and shall incorporate any amendments made into such PHI;

(g)   The Employer shall make available to affected individuals information required in order to provide an accounting of any disclosures made by the Plan, but only to extent that such disclosures must be accounted for under section 164.528 of the HIPAA Privacy Rules;

(h)   The Employer shall make its internal practices, books, and records relating to the use and disclosure of PHI from the Plan available to HHS for determining Plan compliance with HIPAA Privacy Rules;

(i)   If feasible, the Employer shall return or destroy all PHI received from the Plan that the Employer still maintains in any form and shall retain no copies of such PHI when no longer needed for the purpose for which disclosure was made. Notwithstanding the foregoing, if such return or destruction is not feasible, the Employer shall limit further uses and disclosures of such PHI to those purposes that make return or destruction of the PHI infeasible; and

(j)   The Employer shall ensure that adequate separation has been

©Copyright 2007 Gilmore, McClure, Wallace & Dourris
NAC Revised 11/30/07

established between the Employer and the Plan.

**1.3   Separation Between Employer and Plan.** The Plan's designated Claims Administrator, the Plan's Committee members and their respective staff members that are designated to perform Plan functions shall be the only Employees or other persons under the direct control of the Employer that shall be given access to PHI for use and disclosure.

(a)   Access to and use of PHI by the above-referenced persons shall be restricted to the Plan Administrator functions that the Employer performs for the Plan.

(b)   In the event that any of the above-referenced persons fails to comply with the requirements of the HIPAA Privacy Rules and this Appendix, an affected individual may bring a claim to resolve the noncompliance by contacting the Plan's HIPAA privacy contact person specified in the Plan's Notice of Privacy Practices.

(1)   The Plan shall respond to such claim within 30 days, subject to a 30-day extension. If the Plan disagrees with the complaint or the claim is otherwise denied in whole or in part, the Plan shall provide the affected individual with a written denial that explains the basis for the denial. The affected individual may then provide the Plan with a written statement of disagreement and/or take such further action provided in the Plan's Notice of Privacy Practices or by law.

(2)   The Employer shall ensure that this process provides appropriate sanctions for noncompliance and otherwise serves as an appropriate mechanism for noncompliance disputes.

**1.4   Exceptions to Employer Uses and Disclosures.** Notwithstanding the foregoing, the Plan may disclose the following information to the Employer:

(a)   PHI to the extent specified in an authorization that complies with section 164.508 of the HIPAA Privacy Rules;

(b)   Summary Health Information, if the Employer requests Summary Health Information for the limited purpose of either (1) obtaining premium bids for insurance coverage related to the Plan, or (2) modifying, amending or terminating the Plan; or

(c)   information on whether an affected individual is participating in the Plan.

**1.5   Definitions.** The following definitions shall apply to this Appendix:

(a)   **"Health Care Operations"** shall mean any of the following activities that relate to functions covered under the HIPAA Privacy Rules:

(1)   conducting quality assessment and improvement activities, including outcome evaluation and development of clinical guidelines, population-based activities relating to improving health or reducing health care costs, protocol development, case management and care coordination, contacting health care providers and patients about Treatment alternatives, and related functions that do not include Treatment;

(2)   reviewing the competence or qualifications of health care professionals, evaluating provider performance, health plan performance, conducting training programs related to improving health care provider skills, accreditation, certification, licensing or credentialing activities;

(3)   underwriting, premium rating and other activities related to creation, renewal or replacement of health insurance or Medical Benefits (including excess loss insurance);

(4)   conducting or arranging for medical review, legal services and auditing functions, including fraud and abuse detection and compliance programs;

(5)   business planning and development, such as conducting cost-management analyses for managing and operating the Plan;

(6)   business management and general administrative activities

©Copyright 2007 Gibson, McClure, Wallace & Dar...s
NAC Revised 11/6/07

2

of the Plan, including (A) compliance with the HIPAA Privacy Rules, (B) customer service, (C) resolution of internal grievances, or (D) the sale, transfer, merger or consolidation of all or part of a Plan with another entity that is (or will be) covered by the HIPAA Privacy Rules (including due diligence related to such activity); and

(7)    creating de-identified health information or a limited data set.

(b)    **"Payment"** means Plan activities to determine (or fulfill its responsibility for) coverage and provision of benefits under the Plan, or obtain or provide reimbursement for the provision of health care. These activities must relate to the individual receiving health care, including, but not limited to:

(1)    Eligibility or coverage determinations (including coordination of benefits) and adjudication or subrogation of Medical Benefit claims;

(2)    Risk adjusting amounts due based on enrollee health status and demographic characteristics;

(3)    Billing, claims management, collection activities, obtaining payment under a reinsurance contract and related health care data processing;

(4)    Review of health care services with respect to medical necessity, Plan coverage, appropriateness of care or justification of charges;

(5)    Utilization review activities, including precertification and preauthorization of services, concurrent and retrospective review; and

(6)    Subject to the HIPAA Privacy Rules, disclosure to consumer reporting agencies related to premium or reimbursement collection.

(c)    **"Protected Health Information"** or **"PHI"** means the individually identifiable health information (including demographics) that is transmitted

or maintained by electronic or any other form or medium and that:

(1)    is created or received by the Plan or an Employer;

(2)    relates to past, present or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present or future payment for health care for the individual; and

(3)    identifies the individual (or there is a reasonable basis to believe that the information can be used to identify the individual).

As specified under the HIPAA Privacy Rules, PHI excludes individually identifiable health information contained in education records and employment records held by an Employer.

(d)    **"Summary Health Information"** means individually identifiable health information:

(1)    that summarizes the claims history, claims expenses, or type of claims experienced by individuals for whom the Employer has provided Medical Benefits under the Plan; and

(2)    from which the certain information that identifies the individual (as described in section 164.514(b)(2)(i) of the HIPAA Privacy Rules) has been deleted, except that geographic information need only be aggregated to the level of a five digit zip code.

(e)    **"Treatment"** shall mean the provision, coordination or management of health care and related services by one or more health care providers, including coordination or management of health care by a health care provider with a third party, consultation between health care providers relating to a patient or the referral of a patient for health care from one health care provider to another.

**1.6    Security of Electronic PHI.**
Effective April 20, 2006, the Plan shall comply

Copyright 2007 Gilmer, McClure, Wallace & Daniels
NAC Revised 11-8-07

3

with this Appendix A with the "Standards for the Protection of Electronic Protected Health Information" ("HIPAA Security Rules"), as specified under 45 CFR Part 164, Subpart C.

(a) The Employer shall implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of the electronic PHI that is created, received, maintained, or transmitted by the Employer on behalf of the Plan;

(b) Subject to Section 1.4 of this Appendix, the Employer shall ensure that adequate separation exists between the Employer and the Plan through the implementation of reasonable and appropriate security measures;

(c) The Employer shall ensure that any agent, including a subcontractor, to whom it provides electronic PHI agrees to implement reasonable and appropriate security measures to protect the electronic PHI; and

(d) The Employer shall report to the Plan any security incident of which it becomes aware.

© Copyright 2007 Gibson, McClure, Wallace & Daniels
NAC Revised 1/28/07

4

FILED FOR RECORD
Cause No.: D-16-05-0545-CV
Ector County - 358th District Court
Ector County, Texas
4/10/2017 12:00:00 AM
**Clarissa Webster**
**District Clerk**
By: Natalie Guthrie, Deputy

NO. D-16-05-0545-CV

| | | |
|---|---|---|
| WILLIAM NEWBROUGH | § | IN THE DISTRICT COURT |
| | § | |
| VS. | § | 358TH JUDICIAL DISTRICT |
| | § | |
| ANCHOR RISK MANAGEMENT | § | |
| CENTRAL FREIGHT LINES, INC. AND | § | |
| SMOKER'S OUTLET, INC. | § | ECTOR COUNTY, TEXAS |

## PLAINTIFF'S SECOND AMENDED PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES. PLAINTIFF, WILLIAM NEWBROUGH, complaining of ANCHOR

RISK MANAGEMENT AND CENTRAL FREIGHT LINES, INC., DEFENDANTS, and for

cause of action would show:

I.

### *Claims for Relief*

Pursuant to Rule 47, Tex. R. Civ. P., this suit is within the jurisdictional limits of this

court, and Plaintiff seeks monetary relief between $100,000 and $200,000.

II.

### *Parties*

Plaintiff is a resident of Ector County, Texas.

Defendant, ANCHOR RISK MANAGEMENT, has answered and no further service is

necessary.

Defendant CENTRAL FREIGHT LINES, INC. has answered and no further service is

necessary.

Defendant SMOKER'S OUTLET INC., is a Texas Corporation and can be served with

1

Appendix 133

citation by serving its registered agent for service of process Carl Allen Jenkins, Jr. at 5000 East University, Suite 11, Odessa, Texas 79762 or wherever he may be found.

III.

Plaintiffs intends to conduct discovery under level II of Rule 190 of the Texas Rules of Civil Procedure.

IV.

Venue is proper in Ector County, Texas as the majority of the events surrounding and giving rise to the incident made the basis of this suit occurred in Ector County.

V.

### *Claims Against Central Freight Lines*

Plaintiff brings this suit to recover damages for personal injuries sustained by Plaintiff in an accident which occurred in Ector County, Texas, on or about June 18, 2015, which was proximately caused by the negligence of the Defendant CENTRAL FREIGHT LINES, INC.

Plaintiff, WILLIAM NEWBROUGH, while exercising due care for his own safety was in the course and scope of his employment with Defendant CENTRAL FREIGHT LINES, INC. when he was injured as a result of the negligence of Defendant CENTRAL FREIGHT LINES, INC.

Defendant CENTRAL FREIGHT LINES, INC. failed to provide a safe working environment and failed to provide safe equipment for Plaintiff's use, which proximately caused his injuries. At the time and on the occasion in question, Defendant CENTRAL FREIGHT LINES, INC.  was negligent of various acts and omissions, which negligence was the proximate cause of the occurrence in question. Defendant CENTRAL FREIGHT LINES, INC. failed to

2

provide a working environment that was safe and free from hazard and failed to provide safe equipment for the use of their employees.

As a result of the accident above described, Plaintiff suffered severe personal injuries, causing Plaintiff to incur reasonable and necessary medical expenses, physical pain and mental anguish, disfigurement, impairment, all in the past, and in reasonable probability, will continue to suffer same in the future by reason of the nature and severity of the Plaintiff's injuries, as a result of Defendant's negligence for which Plaintiff sues.

VI.

***Claims against Anchor Risk Management***

Prior to this suit, Plaintiff made claims against SMOKER'S OUTLET, INC. for his injuries arising from the above described incident.

On May 13, 2016 the Plaintiff and Defendant, by and through their respective representatives, settled claims that NEWBROUGH had against Defendant SMOKER'S OUTLET, INC. arising from the incident described above wherein he was injured on June 18, 2015.

NEWBROUGH, who had never been apprised of any subrogation interest by any party, settled the claims against SMOKER'S OUTLET, INC. and at SMOKER'S OUTLET INC.'s request, NEWBROUGH indemnified SMOKER'S OUTLET INC. for any subrogation interests which may exist. This agreement was reached on May 13, 2016.

On May 20, 2016 NEWBROUGH executed and returned to SMOKER'S OUTLET INC. a written release of claims in exchange for $35,000.

On May 24, 2016 NEWBROUGH was made aware for the first time that ANCHOR

3

RISK MANAGEMENT was asserting a subrogation interest. This date was after both the agreement was made and the release was returned.

Defendant ANCHOR RISK MANAGEMENT interfered with the settlement agreement by, after the agreement had been made, improperly asserting a subrogation interest in the settlement agreement which it has waived by its course of conduct.

NEWBROUGH further sues ANCHOR RISK MANAGEMENT pursuant to the Texas Declaratory Judgments Act for a declaration that it has no subrogation interest in the settlement agreement between NEWBROUGH and SMOKER'S OUTLET, INC. Defendant ANCHOR RISK MANAGEMENT failed or refused to assert its interest, if any, prior to any settlement. As such any interest, if any, has been waived and for laches.

NEWBROUGH further sues for reasonable and customary attorney's fees pursuant to Chapter 37, Tex. Civ. Prac. & Rem. Code.

VII.

***Claims against Smoker's Outlet, Inc.***

*Contractual claims*

Plaintiff brings this suit against SMOKER'S OUTLET, INC. to either enforce, or in the alternative, set aside the release agreement between the parties. At the time of the execution of the release Plaintiff was unaware of any alleged subrogation or reimbursement interest having been asserted by any party. Because the release was intended to settle all claims Plaintiff sues to enforce the contract, which require payment of settlement funds only to him and his counsel, or in the alternative, set aside the release agreement and proceed forward litigating his tort claims against SMOKER'S OUTLET, INC.

4

*Premises claims*

Plaintiff brings this suit against SMOKER'S OUTLET, INC. to recover for personal injuries that were suffered as a result of the negligence of the defendant in Ector County, Texas on or about June 18, 2015.

Plaintiff, while exercising due care for his own safety, was a business invitee on the premises of SMOKER'S OUTLET, INC., when he was tripped and fell on a dangerous condition on the premises, sustaining personal injuries. Defendant knew or should have known of the dangerous condition on the premises and failed to remedy same, specifically, that the hole in question was not properly covered and presented a dangerous condition.

At the time and on the occasion in question, Defendant was negligent of various acts and omissions, which negligence was the proximate cause of the occurrence in question and the injuries sustained by Plaintiff.

As a result of the incident above described the Plaintiff suffered severe personal injuries, causing Plaintiff to incur reasonable and necessary medical expenses, physical pain and mental anguish, disfigurement, impairment, loss of earnings, all in the past and in reasonable probability, will continue to suffer same in the future by reason of the nature and severity of the Plaintiff' injuries , as a result of Defendants' negligence for which Plaintiff sues.

VIII.

By reason of the above and foregoing, Plaintiff has been damaged in a sum within the minimum jurisdictional limits of this court in excess of $100,000 but less than $200,000.

IX.

Pursuant to Rule 194, Plaintiff requests Defendants to disclose, within fifty (50) days of

5

Appendix 137

service of this request, the information or material described in Rule 194.2 (a)-(l).

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests that Defendants be cited to appear and answer herein and that upon a final trial of this cause, Plaintiff recover: judgment against Defendants for Plaintiff's damages as set forth above in an amount within the minimum jurisdictional limits of this court; prejudgment interests on Plaintiff's damages as allowed by law; interest on the judgment at the legal rate; costs of court; and such other and further relief to which Plaintiff may be entitled.

Respectfully submitted,

LAW OFFICES OF MILLER & BICKLEIN
4555 E. University Ave., Suite D–5
Odessa, Texas 79762
(432) 362-4878
(432) 362-4624 (FAX)


By: _____/s/ *KEVIN B. MILLER*_____
          KEVIN B. MILLER
          Kevin@mblaw.org
          STATE BAR NO. 14094500

          MARK A. CEVALLOS
          Mark@mblaw.org
          STATE BAR NO. 24038810

          ATTORNEYS FOR PLAINTIFF


PLAINTIFFS DEMANDS TRIAL BY JURY.

6

## CERTIFICATE OF SERVICE

By my signature below I certify that the foregoing responses to interrogatories have been served pursuant to TRCP 21a on the 10th day of April, 2017 upon:

Shawn C. Morgan
Chamblee Ryan
2777 N. Stemmons Frwy, Suite 1157
Dallas, Texas 75207
(214) 905-2003
(214) 904-1213 fax
smorgan@crka.law

Attorneys for Defendant Central Freight Lines

Blake A. Bailey
Phelps Dunbar LLP
115 Grand Avenue, Suite 222
Southlake, Texas 76092-7629
(817) 305-0332
(817) 488-3214 fax
blake.bailey@phelps.com

Attorneys for Defendant Anchor Risk Management

_/s/ KEVIN B. MILLER_
KEVIN B. MILLER

7

FILED FOR RECORD
ECTOR COUNTY, TEXAS

2017 MAR 30  PM 4: 27

CAUSE NO. D-16-05-0545-CV

WILLIAM NEWBROUGH                        §        IN THE DISTRICT COURT
                                         §               DISTRICT CLERK
                                         §
VS.                                      §        358TH JUDICIAL DISTRICT
                                         §               BY DEPUTY
                                         §
ANCHOR RISK MANAGEMENT AND               §
CENTRAL FREIGHT LINES, INC.              §        ECTOR COUNTY, TEXAS

## ORDER SETTING HEARING

PLEASE TAKE NOTICE, the Court has set Defendants' Joint

Motion for Entry of Level III Scheduling Order for hearing on April 13,

2017 at 2:00 p.m. in the 358th Judicial District Court, Ector County, Texas.

SIGNED this **30** day of **March**, 2017.

_____
PRESIDING JUDGE

Order Setting Hearing                                           Page 1

CAUSE NO. D-16-05-0545-CV

| | | |
|---|---|---|
| WILLIAM NEWBROUGH | § | IN THE DISTRICT COURT |
| | § | |
| | § | |
| VS. | § | 358TH JUDICIAL DISTRICT |
| | § | |
| | § | |
| ANCHOR RISK MANAGEMENT | § | |
| AND CENTRAL FREIGHT LINES, | § | |
| INC. | § | ECTOR COUNTY, TEXAS |

## LEVEL III SCHEDULING ORDER

**TO THE HONORABLE JUDGE OF SAID COURT:**

In accordance with the Texas Rules of Civil Procedure, Defendants request entry of this scheduling order establishing deadlines to facilitate preparation of this matter for trial. Discovery in this case is controlled by Rule 190.4 (Level III) of the Texas Rules of Civil Procedure. In accordance therewith, the Court **ORDERS** as follows:

1. **June 23, 2017:** Deadline for joinder of any additional parties.

2. **August 30, 2017:** On or before this date, Plaintiff shall serve all attorneys of record with his written designation and opinions of expert witnesses expected to testify at the trial of this cause in accordance with Tex. R. Civ. P. 194 and 195. Plaintiff is required to provide written reports from retained experts.

Level III Scheduling Order – Page 1

3. **October 2, 2017:** On or before this date, Defendants shall serve all attorneys of record with their written designation and opinions of expert witnesses expected to testify at the trial of this cause in accordance with Tex. R. Civ. P. 194 and 195. Defendants are required to provide written reports from retained experts.

4. **December 12, 2017:** The parties shall mediate the case on or before this date.

5. **January 12, 2018:** All written discovery and depositions, including expert depositions, shall be completed and supplemented on or before this date.

6. **January 15, 2018:** On or before this date, Plaintiff shall file with the Court and serve all attorneys of record any other amended and/or supplemental pleadings.

7. **January 22, 2018:** On or before this date, Defendants shall file with the Court and serve all attorneys of record any other amended and/or supplemental pleadings.

8. **January 7, 2018:** Except for leave of court, motions for summary judgment and any objection or motion to exclude or limit expert testimony due to qualification of the expert or reliability of the opinions must be filed on or before this date.

9. **February 2, 2018:** On or before this date each party shall file with the Court its witness list, exhibit list, motion in limine, proposed jury charge, and designation of deposition testimony to be offered in direct examination.

10. **February _____, 2018:** The case is set for jury trial on this date.

The case will be set during the civil preference jury week for the month of February, 2018 in the 358ᵗ District Court.

W. Stacy Trotter
4/13/17

**Level III Scheduling Order – Page 2**

Unless otherwise covered by this Order, all other matters shall be governed according to the Texas Rules of Civil Procedure.  The provisions of this Order shall not be varied except upon agreement of the parties or upon subsequent Order by this Court.

SIGNED on this __13__ day of __April__ , 2017.

_____
**JUDGE PRESIDING**

**AGREED:**

*Phelps Dunbar LLP*

Blake Bailey / Brad Timms
**Counsel for Defendant**
**Anchor Risk Management**

*Chamblee, Ryan, Kershaw & Anderson, PC*

**William H. Chamblee**
**Douglas R. Lewis**
**Counsel for Defendant**
**Central Freight Lines, Inc.**

AS TO FORM!

Approved by all Counsel on 4/12/17

(w). Stay Trott

CAUSE NO. D-16-05-0545-CV

| | | |
|---|---|---|
| WILLIAM NEWBROUGH | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | 358TH JUDICIAL DISTRICT |
| | § | |
| ANCHOR RISK MANAGEMENT AND | § | |
| CENTRAL FREIGHT LINES, INC. | § | ECTOR COUNTY, TEXAS |

## ORDER SETTING HEARING DATE

IT IS ORDERED THAT the hearing on Defendant Anchor Risk Management's Rule 91a

Motion to Dismiss and Motion for Attorneys' Fees Under Civil Practice and Remedies Code

Chapter 37 is set for ~~9:00am~~ 10:00 am on June 27, 2017, at 300 N. Grant, Odessa, Ector County, Texas

79761.

SIGNED this _June 5ᵗʰ_, 2017.

_W. Stacy Trotter_

Judge Presiding

**FILED FOR RECORD**
**Cause No.: D-16-05-0545-CV**
Ector County - 358th District Court
Ector County, Texas
6/5/2017 12:17:57 PM
**Clarissa Webster**
**District Clerk**
By: Natalie Guthrie, Deputy

**CAUSE NO. D-16-05-0545-CV**

| | | |
|---|---|---|
| WILLIAM NEWBROUGH | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | 358TH JUDICIAL DISTRICT |
| | § | |
| ANCHOR RISK MANAGEMENT AND | § | |
| CENTRAL FREIGHT LINES, INC. | § | ECTOR COUNTY, TEXAS |

**NOTICE OF HEARING**

Defendant Anchor Risk Management hereby provides notice that Defendant Anchor Risk

Management's Motion to Dismiss has been scheduled for oral hearing on **Tuesday, June 27,**

**2017, at 9:30 a.m.** in the 358th Judicial District Court, Ector County, Texas.

Dated:  June 5, 2017.

Respectfully submitted,


/s/ Blake A. Bailey
BLAKE A. BAILEY
Texas State Bar No. 01514700
BRAD R. TIMMS
Texas State Bar No. 24088535
PHELPS DUNBAR LLP
115 Grand Avenue, Suite 222
Southlake, Texas 76092
(817) 488-3134
(817) 488-3214- Fax
blake.bailey@phelps.com
brad.timms@phelps.com

ATTORNEYS FOR DEFENDANT
ANCHOR RISK MANAGEMENT

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a true and correct copy of the above and foregoing document was served on all counsel of record via electronic service, pursuant to the Texas Rules of Civil Procedure, on this 5th day of June, 2017.

*/s/ Blake A. Bailey*
Blake A. Bailey



CAUSE NO. D-16-05-0545-CV

| | | |
|---|---|---|
| WILLIAM NEWBROUGH | § | IN THE DISTRICT COURT |
| | § | |
| | § | |
| VS. | § | 358TH JUDICIAL DISTRICT |
| | § | |
| ANCHOR RISK MANAGEMENT | § | |
| AND CENTRAL FREIGHT | § | |
| LINES, INC. | § | ECTOR COUNTY, TEXAS |
| | § | |

## ORDER SETTING HEARING ON CENTRAL FREIGHT LINES, INC.'S RULE 91(A) MOTION TO DISMISS

IT IS HEREBY ORDERED that Defendants' Motion to Dismiss in the above-captioned cause has been set for hearing on the 27th day of June, 2017, at 10:00 a.m., in the 358th Judicial District Court, Ector County, Texas.

_W. Stay Scott_

JUDGE PRESIDING

Signed : June 7, 2017

**FILED FOR RECORD**
**Cause No.: D-16-05-0545-CV**
Ector County - 358th District Court
Ector County, Texas
6/7/2017 4:20:27 PM
**Clarissa Webster**
**District Clerk**
By: Natalie Guthrie, Deputy

**CAUSE NO. D-16-05-0545-CV**

| | | |
|---|---|---|
| WILLIAM NEWBROUGH | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | 358TH JUDICIAL DISTRICT |
| | § | |
| ANCHOR RISK MANAGEMENT AND | § | |
| CENTRAL FREIGHT LINES, INC. | § | ECTOR COUNTY, TEXAS |

**AMENDED NOTICE OF HEARING**

Defendant Anchor Risk Management hereby provides notice that Defendant Anchor Risk

Management's Motion to Dismiss has been scheduled for oral hearing on **Tuesday, June 27,**

**2017, at 10:00 a.m.** in the 358th Judicial District Court, Ector County, Texas.

Dated:  June 7, 2017.

Respectfully submitted,


/s/ Blake A. Bailey
BLAKE A. BAILEY
Texas State Bar No. 01514700
BRAD R. TIMMS
Texas State Bar No. 24088535
PHELPS DUNBAR LLP
115 Grand Avenue, Suite 222
Southlake, Texas 76092
(817) 488-3134
(817) 488-3214- Fax
blake.bailey@phelps.com
brad.timms@phelps.com

ATTORNEYS FOR DEFENDANT
ANCHOR RISK MANAGEMENT

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing document was served on all counsel of record via electronic service, pursuant to the Texas Rules of Civil Procedure, on this 7th day of June, 2017.

*/s/ Blake A. Bailey*
Blake A. Bailey

**FILED FOR RECORD**
**Cause No.: D-16-05-0545-CV**
Ector County - 358th District Court
Ector County, Texas
6/8/2017 1:30:29 PM
**Clarissa Webster**
**District Clerk**
By: Natalie Guthrie, Deputy

## CAUSE NO. D-16-05-0545-CV

| | | |
|---|---|---|
| **WILLIAM NEWBROUGH** | § | **IN THE DISTRICT COURT** |
| | § | |
| | § | |
| **VS.** | § | **358TH JUDICIAL DISTRICT** |
| | § | |
| **ANCHOR RISK MANAGEMENT** | § | |
| **AND CENTRAL FREIGHT LINES,** | § | |
| **INC.** | § | **ECTOR COUNTY, TEXAS** |
| | § | |

## NOTICE OF HEARING ON CENTRAL FREIGHT LINES, INC.'S MOTION TO DISMISS

Defendant Central Freight Lines, Inc. hereby provides notice that Central Freight Lines, Inc.'s

Motion to Dismiss has been scheduled for oral hearing on Tuesday, June 27, 2017, at 10:00

a.m. in the 358th Judicial District Court, Ector County, Texas.

Respectfully submitted,

**CHAMBLEE RYAN, P.C.**

By:     */s/ Douglas R. Lewis*
William H. Chamblee
State Bar No.: 04086100
wchamblee@cr.law
Douglas R. Lewis
State Bar No. 12275800
dlewis@cr.law

2777 N. Stemmons Freeway, Suite 1157
Dallas, Texas 75207
(214) 905-2003
(214) 905-1213 (Facsimile)
**ATTORNEYS FOR**
**CENTRAL FREIGHT LINES, INC.**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing document was served on all counsel of record via electronic service, pursuant to the Texas Rules of Civil Procedure, on this 8th day of June, 2017.

/s/ *Douglas R. Lewis*
Douglas R. Lewis